**ORIGINAL**

1  **DREHER LAW FIRM**
2  Robert Scott Dreher (Bar No. 120527)
   Historic Louis Bank of Commerce Building
3  835 Fifth Ave., Suite 202
   San Diego, California 92101
4  Telephone: (619) 230-8828
   Facsimile: (619) 687-0136
5
   Attorneys for Plaintiffs
6



7

8              IN THE UNITED STATES DISTRICT COURT

9       FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11 | LYNN & ED FORSLUND; GABRIEL & ) | Case No.: SACV01-1085 GLT(ANx)
   | BEATRICE HERRERA; JIM HERRON; ) |

12 | TED LACY; ERIC MARTENS; ARNIE ) |
   | ADLER; ARTHUR ELLSWORTH; KEN ) | ***THIRD   AMENDED   COMPLAINT*** for

13 | SKACEL; YOLANDA SIDDIQUE; RULIFF ) | **DAMAGES AND EQUITABLE RELIEF for**
   | NEVIUS;   NITA   PAGE;   BETTY ) | **FRAUD; VIOLATIONS OF THE FEDERAL**

14 | FORREST; LINDA MCKAY; ECCO & ) | **SECURITIES   LAWS;   CONVERSION;**
   | DONALD STAMBAUGH; and CALDWELL ) | **UNFAIR, UNLAWFUL, & FRAUDULENT**

15 | INDUSTRIES, INC., ) | **BUSINESS   PRACTICES;   ELDER**
   | ) | **FINANCIAL ABUSE; BREACH OF FIDU-**

16 | Plaintiffs, ) | **CIARY DUTY; AIDING & ABETTING**
   | ) | **BREACH OF FIDUCIARY DUTY; and**

17 | vs. ) | **VIOLATIONS   OF   CALIFORNIA**
   | ) | **SECURITIES LAWS.**

18 | SCOTT J. REIN, ESQ.; REIN, EVANS ) |
   | & SESTANOVICH, LLP, law partner- ) |

19 | ship, formerly known as, and ) | Judge:  Hon. Gary L. Taylor
   | successor to, DRESSLER, REIN, ) |

20 | EVANS & SESTANOVICH, LLP, a law ) | **Plaintiffs Demand A Jury Trial.**
   | partnership; RALPH KING; GABRIEL ) |

21 | MACENROE;   DAVID   MORGANSTERN; ) |
   | VIRGIL WOMACK; DANTE ORGOLINI; ) |

22 | ROBBIE STEPHENS;   and DOES 1 ) |
   | through 100, inclusive, ) |

23 | ) |

24 | Defendants. ) |



25

26 ///

27 ///

28

1

## INTRODUCTION

1.   This is a case involving the creation and sale by Defendants of fraudulent ``international investment products,'' commonly known as a ``Prime Bank'' Ponzi scheme.   The U.S. Government has officially condemned such schemes as frauds, and spends countless hours and dollars trying to identify and prosecute such schemes in the criminal and civil courts (see, i.e., SEC v. Lauer, 52 F.3d 667, 670 (7th Cir. 1995).   The Defendants created, sold, and operated this scheme to dozens of innocent, hard-working people in Southern California, most of whom were elderly and entrusted their life-savings.

2.   KING had been a small-time con-artist when he met lawyer SCOTT REIN.   He had been sued for operating other prime bank Ponzi schemes, none of which was as sophisticated as this one.   During early to mid-1999 REIN met with KING and his cohorts to set up, and became part of, a more detailed offshore Prime Bank Ponzi Scheme which enabled them to steal a lot more money, while attempting to avoid the mistakes which had led to KING's earlier legal troubles. He helped KING establish a management and fundraising structure for the scheme. REIN instructed them on methods by which he believed they could avoid the application of U.S. securities rules and other laws. He drafted documents specifically for KING and the salespeople to give to investors, prepared them with ``talking points,'' and established offshore companies and bank accounts for the deposit of Plaintiffs' and other investors' money.   And he made sure he would get some of that money, all the while telling Plaintiffs and other investors in the offering documents that their money was safe, being

1  used only to ``secure'' a part of a ``managed investment fund''
2  operated by KING and his companies, AFCM and STAT.

3      3.   The scheme ran like this:  in exchange for commissions or
4  percentage of the money raised, the sales force, taught by KING and
5  REIN and using the sales and contract documents prepared by REIN and
6  the LAW FIRM, solicited investors for a ``high yield,'' ``secret,''
7  international investment, promising total safety of principal and
8  guaranteed returns.  They promised that Plaintiffs' money would
9  never leave the United States, but would instead be held in an
10 account which would guarantee a portion of a much larger
11 ``international trading position'' in notes or other paper.  Part of
12 the sales pitch was that a portion of the astronomical returns
13 generated by the investment would benefit a charitable technology
14 called ``Homevest'' which would provide housing for many of the
15 world's low income families.  All of this was lies.  There was no
16 high yield investment, no ``Homevest.''  There was only a bank
17 account in the Bahamas to which Defendants transferred Plaintiffs'
18 money.  From there they quickly took it and spent it.

19     4.   REIN himself kept custody of the bank statements and check
20 ledgers and bookkeeping for the scheme, and monitored on a regular
21 basis the money received from investors, and the checks KING and the
22 other defendants spent.  All the money went into, and out of, the
23 same account.  None of the money went into any legitimate
24 investment.  Plaintiffs' and other investors' money was taken by
25 REIN, the LAW FIRM, KING and his wife, son and daughter, the
26 salespeople, and others as ``management fees,'' startup costs for
27 defunct internet companies, ``commissions,'' ``legal fees,'' credit
28 card payments, meals, luxury vacations, limousine travel, fancy

---

3

offices, office plants, and ``bank fees'' which benefited the owners of the offshore bank(s) KING and REIN established, in which they owned stock.

5.    REIN and his law firm received thousands of dollars directly from Plaintiffs' and other investors' money in purported legal fees for setting up this Ponzi scheme, and also received $51,000 in ``broker commissions'' as a member of and fundraiser for the scheme.   This money came directly from Plaintiffs' funds.

6.    The Scheme has taken millions of dollars from Plaintiffs and others in so doing.   Plaintiffs ask this Court to force Defendants to return the stolen money, and for an Order that Defendants cannot operate their scheme anymore.

## JURISDICTION AND VENUE

7.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under the Securities Exchange Act of 1934 §10(b), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.   The Court has supplemental jurisdiction over the pendent state claims here pursuant to 28 U.S.C. § 1367.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, inter alia, wrongful acts and omissions, including but not limited to the fraudulent offers and sales of securities, occurred in this District.

9.    In doing the acts and omissions alleged herein, defendants, both directly and indirectly, used the means and instrumentalities of interstate commerce including but not limited

4

to the U.S. mail, e-mails, faxes and other interstate telephone and electronic communications.

<div align="center">**THE PARTIES**</div>

### *Plaintiffs*

10.  Plaintiffs LYNN & ED FORSLUND, ages 71 and 78, respectively, are residents of Irvine, California.   In April 1999 they invested $50,000 in Defendants' Prime Bank Ponzi Scheme.

11.  Plaintiff JIM HERRON, age 66, is a resident of Garden Grove, California.   In late April 1999 he invested $100,000 in Defendants' Prime Bank Ponzi Scheme.

12.  Plaintiff JUANITA PAGE, age 77, is a resident of Hayward, California.   On or about August 24, 1999, she invested $70,000 in Defendants' Prime Bank Ponzi Scheme.

13.  Plaintiff ARNIE ADLER, age 67, is a resident of Aliso Viejo, California. On or about September 24, 1999, he invested $50,000 in Defendants' Prime Bank Ponzi Scheme.

14.  Plaintiff BETTY FORREST, age 67, is a resident of Mission Viejo, California.   In November 1999, she invested $500,000 in Defendants' Prime Bank Ponzi Scheme.

15.  Plaintiff TED LACY, age 57, is a resident of Fallbrook, California.   In March 2000 he invested $50,000 in Defendants' Prime Bank Ponzi Scheme.

16.  Plaintiff LINDA MCKAY is a resident of Carlsbad, California.   In March 2000 she invested $100,000 in Defendants' Prime Bank Ponzi Scheme.

17.   Plaintiffs ECCO & DONALD STAMBAUGH, ages 57 and 75 respectively, are residents of Carlsbad, California. In April 2000 they invested $200,000 in Defendants' Prime Bank Ponzi Scheme.

18.   Plaintiff RULIFF NEVIUS, age 73, is a resident of Pinon Hills, California.   In April 2000 he invested $100,000 in Defendants' Prime Bank Ponzi Scheme.

19.   Plaintiff KEN SKACEL is a resident of Laguna Niguel, California.   During April - June 2000 he invested $100,000 in Defendants' Prime Bank Ponzi Scheme.

20.   Plaintiffs GABRIEL & BEATRICE HERRERA are residents of Pico Rivera, California.   In May 2000, they invested $100,000 in Defendants' Prime Bank Ponzi Scheme.

21.   Plaintiff ARTHUR ELLSWORTH, age 67, is a resident of Orange, California.   On or about July 19, 2000, he invested $100,000 in Defendants' Prime Bank Ponzi Scheme.

22.   Plaintiff YOLANDA SIDDIQUE is a resident of Bellflower, CA.   In July, 2000 she invested $200,000 in Defendants' Prime Bank Ponzi Scheme.

23.   Plaintiff ERIC MARTENS, age 61, is a resident of Tustin, California.   In August 2000, he invested $100,000 in Defendants' Prime Bank Ponzi Scheme.

24.   Plaintiff CALDWELL INDUSTRIES, INC. (``CALDWELL'') is a California corporation in good standing with its principal place of business in San Diego, California.   On or about December, 1997, CALDWELL invested, and lost, $100,000 in an earlier Prime Bank Ponzi Scheme operated by King.   CALDWELL sued KING in 1998 in federal court in San Diego to recover this money (Exh. 14, incorporated

herein by this reference), and KING promised to repay it, plus interest, but has thus far failed to pay it.

25.   The named Plaintiffs herein invested and entrusted to Defendants, and unknowingly to Defendants' Prime Bank Ponzi Scheme, the total sum of at least $1,820,000.  In virtually each case the money represented Plaintiffs' life savings or retirement money, and each Plaintiff entrusted that money to Defendants in the belief, formed on the basis of the written and oral representations they'd received, that this was a legitimate, safe investment.  Plaintiffs are unsure of the exact number of total investors in the scheme, but believe that the total losses to this scheme approach $7 million.

26.   Due to the nature of Defendants' scheme, and their extreme efforts to keep all its details and their actions secret, are uniquely and deliberately in possession of full and sole knowledge of the nature of their frauds.

27.   All the documents referenced herein and attached as exhibits hereto are incorporated herein as though fully set forth.

### *Defendants*

28.  Defendant RALPH KING is an individual residing in or around Los Angeles California.  He has conducted business, directly and indirectly through related entities and persons, in and around Southern California, as well as other locations both within and outside the United States, including but not limited to Nassau, Bahamas; London, England; and other places.

29.  Defendant DANTE ORGOLINI is an individual residing in Costa Mesa, California.  He has conducted business in and around Southern California, as well as other locations both within and

outside the United States, including but not limited to Nassau, Bahamas and other places.

30. Defendant ROBBIE STEPHENS is an individual residing in Napa, California. He has conducted business in and around Southern and Northern California, as well as other locations both within and outside the United States, including but not limited to Nassau, Bahamas and other places.

31. Defendant DAVID MORGANSTERN is an individual who has resided both within and outside the United States, including London, England. He has conducted business directly and indirectly through related entities and persons, both within and outside the United States in various locations including England. In the 1990's, MORGANSTERN was under investigation by the SEC in connection with a venture known as AMQUEST. On or about October 31, 2000, MORGANSTERN was charged by the FBI with securities fraud for operating prime bank and Ponzi-type schemes. See Exhibit 15, incorporated herein.

32. Defendant GABRIEL MACENROE is an individual who has resided in Gallen, Switzerland. He has conducted business directly and indirectly through related entities and persons both within and outside the United States in various locations including Switzerland. GABRIEL MCENROE has described himself on various occasions as one of about five ``international traders'' who have special and exclusive access to secret and very high-yield international trading investment opportunities. On or about October 31, 2000, GABRIEL MACENROE was arrested by the FBI for securities fraud including prime bank and Ponzi-type schemes. See Exhibit 15.

8

33.   Defendant VIRGIL WOMACK is an individual who has resided in North Carolina.    He has conducted business directly and indirectly through related entities and persons both within and outside the United States in various locations including South Carolina and Florida. On or about January 7, 2000, VIRGIL WOMACK was arrested by the FBI for securities fraud, namely prime bank and Ponzi-type schemes.   See   Exhibit   15,   incorporated   herein. MORGANSTERN,   MACENROE,   and   others   were   named   as   ``relief defendants'' in the VIRGIL WOMACK criminal case, and MORGANSTERN's brother, Fred Morganstern, is believed to be ``FM,'' a ``known but unnamed   coconspirator''   referenced   in   the   WOMACK   indictment affidavit (Exh. 15).

34.   Defendant SCOTT J. REIN, Esq. is an individual and resident of Los Angeles County.   He is a lawyer licensed to practice in the State of California.   At all relevant times herein, he is and was a partner in the Defendant law firm known as REIN, EVANS & SESTANOVICH, LLP (successor to DRESSLER, REIN, EVANS & SESTANOVICH, LLP.    In doing the actions described herein, sometimes he acted for and on behalf of, and thereby binding, his LAW FIRM, and sometimes he acted for his own account, and sometimes for both at the same time.    At all times his actions benefited the prime bank ponzi scheme.    REIN owned stock in one or more of the entities used to operate the prime bank ponzi scheme described herein, and controlled in part the actions of the scheme.

35.   Defendant REIN, EVANS & SESTANOVICH, LLP, is a law partnership and is successor to DRESSLER, REIN, EVANS & SESTANOVICH, LLP, a law partnership.   At all relevant times and in doing the

9

actions herein, this LAW FIRM Defendant was controlled by REIN, and acted through him. This law firm has a web site located at *http://www.resllp.com* available on the Internet to the general public.   In this web site, the law firm describes itself as practicing mainly in the areas of business litigation and transactional matters, and as expert in the field of securities laws.   This web site describes Defendant SCOTT REIN as expert in securities laws and transactions.   The firm's partners are REIN, Patrick J. Evans, Thomas Sestanovich, Byron Z. Moldo, and Peter A. Davidson, all of whom were at all relevant times licensed to practice law in the State of California.   At all times herein the defendant LAW FIRM, a limited liability partnership, acted and/or failed to act through one or more of its partners.

36.   Plaintiffs are unaware of the identities, roles, conduct, and/or legal capacities of other persons involved in the subject scheme, but believe there may indeed be such others who are in some way responsible for the acts, omissions and damages alleged herein. Plaintiffs will seek leave of Court to amend this complaint to allege their names and roles when ascertained.

37.   At all times mentioned herein, each and every Defendant named herein was the agent of each and every other Defendant.   In doing the things alleged herein, each and every Defendant was acting within the course and scope of this agency, and was acting with the consent, permission, authorization, and acquiescence of each of the remaining defendants.   The actions of each Defendant were ratified and approved by the other Defendants.

## FACTUAL ALLEGATIONS

### A.   Prime Bank Ponzi Schemes.

38.   Prime   bank   schemes   are   per   se   illegal.     The   U.S. Securities   and   Exchange   Commission   has   an   official   U.S.   government web   site   available   to   the   general   public   via   the   Internet.     See *http://www.sec.gov*,   incorporated   by   reference   herein;   and   see Exhibits   1 - 13   attached   hereto.     The   SEC's   web   site   contains specific   and   lengthy   descriptions   of   what   the   SEC   describes   as ``prime   bank,''   ``high-yield   investment   program''   fraud   schemes   which the   SEC   and   various   U.S.   criminal   and   civil   courts   have   determined and   found   to   be   entirely   phony,   scam   programs   that   are   illegal   *per se*.     Such   investments   ``do   not   exist''   (Exhs.   1-13;   <u>SEC v. Lauer</u>,   52 F.3d   667,   670   (7th   Cir.   1995);   <u>SEC v. Bremont</u>,   954   F.Supp.   726,   728 (S.D.N.Y.   1997)).     It   also   refers   the   visitor   to   other   governmental web   sites   containing   similar   information.

39.     These   official   web   sites   explain   that   there   are   numerous variations   of   this   type   of   fraud,   but   that   many   of   these   purported ``investment   programs''   have   elements   in   common.     The   SEC   has   stated that   there   is   a   proliferation   of   a   certain   type   of   phony   Ponzi scheme   which   the   SEC   collectively   describes   as   ``prime   bank'' schemes.     These   scams   are   variously   described   by   their   promoters   as: ``a   high-yield   investment   program,''   a   ``prime   bank''   investment,   an ``international   trading''   deal,   etc.     They   also   typically   purport   to have   a   ``charitable''   component   or   purpose.

40.     These   Prime   Bank   schemes   commonly   profess   to   offer   quick, unrealistically   high   investment   returns   and   total   safety   of   capital.

They offer some kind of participation in, or the sale of securities consisting of, international bank trading programs. In these international trading programs, large (unidentified) international banks purport to trade notes, letters of credit, guarantees, debentures, loans, and other paper. The promoters represent that the particular ``prime'' bank instrument is traded on a secret worldwide exchange by and through only a handful of ``traders'' who have access to this very exclusive inner circle of international banking.

41. Scheme promoters sometimes tout their programs as having been (secretly) approved by key U.S. and international banking organizations including the U.S. Federal Reserve Bank. However, they require strict confidentiality and secrecy, with restrictions on any and all identification or, and contact with, the ``banks'' and other principals involved.

42. Promoters of these prime bank Ponzi schemes typically offer potential investors highly-complex ``legal'' documents that purport to explain the deal and to promise and guarantee total safety and high returns. The purpose of such documents is to give an aura of legitimacy to what are entirely phony, scam programs. On much closer inspection (usually after-the-fact, by highly-trained government officials or independent counsel), these purported informational and qualifying documents and contracts are revealed to consist mostly of lies.

43. In truth, these Prime Bank international trading deals are entirely fraudulent: the purported international trading never occurs, but instead the money is converted by the promoters to

their own use and benefit. These deals exist as part of an ongoing Ponzi-type series of ventures by the promoters. That is, the principal investment monies from later investors in the same or subsequent deals, are used to temporarily to provide some quick, ``interest'' payments to earlier investors. Thus ``assured'' of the supposed legitimacy of the promoters' claims, these investors allow the promoters to keep their principal investments, and also often participate in additional deals by the same promoters.

**B.  Defendants' Prime Bank Ponzi Scheme.**

44.  Defendants operated an illegal Prime Bank Ponzi Scheme essentially identical to those described above. It involved international trading and ``placement'' of funds, secrecy, the international chamber of commerce, and extraordinarily high returns. The scheme was designed by REIN and KING, and from the beginning they knew it was a sham, because there are no such trading programs which provide such returns.

45.  To set up the scheme REIN created offshore shell companies in the Bahamas called STANDARD ATLANTIC, INC. (STAT); A.F.C.M. (Americas Fidelity Capital Management, Ltd.); and A.I.B.C. (Americas International Bank Corporation, Ltd.). AFCM and STAT were ostensibly created to ``administer'' or ``manage'' Plaintiffs' investments. They were one-and-the-same, owned and managed by the same people: KING, MORGANSTERN, WOMACK, and MACENROE, and owned in some part by REIN, too. KING's position(s) was ``fiduciary director'' and ``authorized representative'' of STAT and AFCM; MORGANSTERN was ``managing director.'' Each Plaintiff or his/her representative was to have an account at AIBC. AIBC was the

1  ``bank'' created to hold the ``trading profits'' from each

2  Plaintiff's ``investment account.'' Plaintiffs' money was to remain

3  on deposit in the United States, to ``secure'' a portion of a

4  ``fund'' whose purpose was in part to benefit Plaintiffs from its

5  trading by specialists such as MACENROE. REIN and KING established

6  all these items, guided by REIN's planning and legal expertise.

7      46. In reality, there were no separate accounts at AIBC for

8  Plaintiffs. Instead, there was one account controlled by KING,

9  MORGANSTERN, WOMACK, and MACENROE. All of Plaintiffs' money was

10  secretly deposited into this account, and bits of it were used to

11  pay bogus ``returns'' to investors, and the lion's share of the

12  money was commingled and spent for the benefit of Defendants.

13

14      47. Defendants gave to each Plaintiff or his/her

15  representative a series of complex legal documents (Exh. 16, a

16  representative copy of the offering documents describing the

17  Program, and Exh. 17, a representative copy of the ``Asset

18  Management Agreement'' by which Plaintiffs were ``admitted'' to the

19  ``program.'') which purported to describe the ``investment'' and its

20  terms. These descriptions were false. Defendants REIN and through

21  REIN's actions the LAW FIRM, drafted, revised, and created these

22  documents during early to mid-1999, and they were given to

23  Plaintiffs between that time and September 2000, at the time of each

24  Plaintiff's investment.

25      48. REIN and the LAW FIRM were paid handsomely ($50,000) in

26  July, 1999 for the drafting and creation of these documents by KING

27  from Plaintiffs' and other investors' funds. This, despite the fact

28  that Plaintiffs' funds were represented by REIN in the documents he

<div align="center">14</div>

drafted to be used only to secure an investment, not for attorneys'
fees.   REIN knew this was the case at the time because he had the
bank statements from AIBC which showed investors' money flowing into
the account and then flowing out again in the form of payments to
REIN, the LAW FIRM, and other Defendants.

49.   In the documents REIN describes a ``managed fund'' which
would ``generate profits'' to be deposited into accounts set up for
Plaintiffs in the Bahamas.   This was false straight off, because
there was no managed fund, no profits, no separate accounts.   The
documents also describe a charitable component to the investment
called ``Homevest.''   This, too, was false, because there neither
was nor is such thing as ``Homevest.''   The ``investment'' was
simply an offshore bank account controlled by KING, in a bank whose
stock was owned by KING and REIN, into which Plaintiffs' money was
deposited.   From there, the money was simply spent given away in
the form of checks and wire transfers.   Virtually every transaction
earned a ``bank fee'' for the bank and its owners.

## C.   Fundraising For the Scheme.

50.   Once the bogus sales and investment documents were
completed by REIN and the LAW FIRM and the Bahamas companies and
bank were established by REIN and the LAW FIRM, fundraising could
begin in or about June, 1999 in greater earnest.   Again REIN
created the mechanism for this.   KING recruited a ``sales force''
called ``organizers'' or ``finders,'' including STEVENS and
ORGOLINI, and Virginia Battelle, Kylie Austin, Ismael Santos, Chuck
Wargo, Bill Schallmo, Leonard Kirshner, Charles Rosemblum, and
others, who were engaged by KING using carefully-drafted legal

15

agreements (``organizer agreements'') drafted and designed by REIN during the first half of 1999 and revised later, as new ``organizers'' were recruited. These organizer agreements purported to distance the organizers or finders from KING, and to distance them from the United States and its laws, and to arrange for payments of commissions and other fees from Plaintiffs' and others' investment into the ``scheme.'' A copy of a representative sample of these agreements is attached hereto and incorporated herein as Exhibit 18. These were drafted by REIN and the LAW FIRM and were utilized by all the fundraisers.

51. Along with KING, Defendants ORGOLINI and STEVENS were in charge of selling the scheme, and with recruiting, creating, arming, and managing a sales force with the documents and trappings of the scheme, and with promises of lucrative ``commissions,'' to sell the scheme to individual ``investors,'' using documents designed by REIN (Exh. 18) to insulate KING from direct contact with investors.

52. In addition to the written documents, REIN also designed the oral representations, and the limits on those representations (``talking points'') which the organizers or sales force could use to sell the investments. The investment was sold to potential investors including Plaintiffs as a legitimate, very high-yield (e.g., 50-90% annual returns) quick-turnover, secret and confidential international trading deal open only to carefully-selected, qualified investors. KING and his sales people and organizers, including STEPHENS and ORGOLINI, stressed that they dealt with a certain few, very well-connected third-party

``traders'' (i.e. WOMACK) who had access to the highly secretive world of international trading instruments.

53.    For example, Plaintiff ARNIE ADLER was introduced to Defendants RALPH KING and DANTE ORGOLINI through an authorized selling agent, one Virginia Batelle.    There was a group meeting of numerous potential investors held at Ms. Batelle's Irvine, Ca office on August 20, 1999.  At this meeting, RALPH KING explained, based on REIN's and the LAW FIRM's instructions and guidance, the ``Program'' and what was needed to be submitted in order to be ``approved.''  He stated that the funds for this international trading program would be placed in an American bank in a ``non-depleting'' account, that the money would never leave that bank or the United States, and that it was very safe and there was no risk involved. At this meeting KING emphasized the charitable aspect of the program, i.e., HOMEVEST, which KING represented was approved by the U.S. Federal Reserve Bank.   A portion of the monthly dividend would go to HOMEVEST to build houses for underprivileged people in other parts of the world.   KING further explained that this charitable aspect was a necessary part of the program because it allowed the investors to receive substantial dividends.   Another meeting was held on September 3, 1999, at Virginia Battelle's office, with some 12-15 attendees.    Defendants RALPH KING, DANTE ORGOLINI and ROBBIE STEPHENS were present along with one or two other selling agents. The ``program'' was reviewed, followed by a question and answer period.  On September 21, 1999, another meeting was held in Virginia Batelle's office with Defendant RALPH KING and one Charles Rosenblum, who was a selling agent and may have been another

17

``senior organizer.''   At all of these meetings, it was stressed that investors' money would be held at a bank in the U.S. in a ``non-depleting'' account, would never leave the U.S., and there would be no risk at all of ever losing the original investment.

54.   REIN ensured, both in his written documents and with his instructions on the verbal sales pitches, that Plaintiffs were promised that their investment funds would remain at all times in U.S. banks only; that the money would be held in "``non-depletion,'' guaranteed bank accounts; and that Plaintiffs' investment would be totally safe, risk-free.   These statements were false, and were known by REIN to be false, because he saw firsthand that Plaintiffs' money was deposited directly into the KING-controlled account in the Bahamas where KING spent the money.   REIN received some of that money.

55.   Also stressed as a key component of the investment deal was a charitable program called ``HOMEVEST'' or ``THE BETHESDA ACCORD.''   As a material incentive to Plaintiffs for their investment in this program, Plaintiffs were promised that, beginning three months after investment, a third of the yield would be allocated to a home-building program for poor persons in third-world countries.

**D.  Fraudulent Statements in the Offering Documents.**

56.   In addition to the above, and in addition to the fact that the offering documents prepared by REIN and distributed by KING, ORGOLINI and STEVENS (which distribution was REIN's specific intent in drafting the documents), were a complete and bogus fraud, describing as they did a ``program'' which did not exist, the

18

offering documents (Exhs. 16 and 17) were false in other specific respects. Plaintiffs relied on the truth of these representations in deciding to entrust their money to Defendants. REIN and KING knew that all these statements were false at the time, because they had in their possession the bank records of AFCM and STAT, and these records showed specifically that Plaintiffs' funds were being deposited then spent on Defendants' personal affairs.

57. The ``Procedures Letter'' references a ``managed investment fund.'' This was false, because there was no managed fund, and REIN and KING knew this was false, because they had access to and had read the bank statements at the time this was drafted and sent (the dates of each correspond to the dates of Plaintiffs' investments), in the case of Exhibit 16, August 1999, showing that the fund was little more than a bank account from which the Defendants spent the money for their own benefit. The Procedures letter also references ``Homevest.'' This was false, because REIN and KING knew at all times that there was no ``Homevest.'' AFCM was simply a Bahamas entity designed by REIN to open a bank account. REIN didn't design a ``Homevest'' to go along with AFCM. AFCM had no track record and no ``Homevest technology,'' because AFCM was created by REIN shortly before Plaintiffs' began investing.

58. The first page of the ``Information Statement'' states that it has a ``specific mission: to fortify the well-being of humanity by eliminating the financially driven causes for the break up of families....'' This was false. It was not the mission of AFCM, and REIN knew this at the time. AFCM's real mission was to

3rd Amended Complaint for Damages

steal Plaintiffs' money, which is what REIN saw happening at the time he wrote this due to his access to AFCMs bank statements.

59. The ``Procedures Letter'' dated each date of Plaintiffs' investments reference a ``special purpose secured private placement investment.'' This was false. There was no such investment, and Plaintiffs' money was never secured. As REIN knew from the bank statements he read at the time, Plaintiffs' money was simply placed into the AFCM bank account at AIBC and spent. More than 10% of it was spent on REIN and the LAW FIRM.

60. The ``Procedures Letter'' also states that AFCM manages assets for discreet patrons who endorse the advanced vision of HOMEVEST WORLD SERVICES.'' It then describes HOMEVEST in very noble terms. This was all false. First, AFCM didn't manage any assets for anyone. It stole money, which REIN and KING knew, as set forth above. Second, there was no HOMEVEST. In the bank documents which REIN reviewed, at the times of Plaintiffs' investments, which showed the complete income and expenditures of AFCM and STAT, there is not a single reference to Homevest or any of the items it purports to endorse. Homevest was a fiction.

61. In the ``Summary Overview'' of the ``Program,'' REIN and KING represent falsely that AFCM will ``provide growth in capital and pay fixed rates of income'' to its investors, including Plaintiffs. Plaintiffs relied on this representation in deciding to invest. The verbal communications directed by REIN and passed on by KING, STEVENS and ORGOLINI to Plaintiffs echoed this promise. It was false. AFCM couldn't provide such, because there was no program. It was just a bank account. Defendants had no expertise

and performed no investment activities.   It was part of a Ponzi scheme.   REIN knew this because he had the bank statements, and also because as an experienced securities lawyer he knows such programs are phony.   His prior representation of KING in an identical scheme was a red flag of the bogus-ness of this scheme.

62.   REIN and KING also falsely represented in the ``Summary Overview'' that AFCM ``operates in compliance with applicable common law.''   This was false, as set forth above.   It did not.

63.   REIN's ``Summary Overview'' states that AFCM has ``developed a corrective technology called Homevest which it believes can resolve the lifetime conflict between a person's need to save and the requirement to spend.''   Again, totally false.   REIN and KING knew this at the time they made the statements to Plaintiffs, as set forth above.

64.   REIN and KING also represented to Plaintiffs that AFCM was a legitimate investment when in fact they knew or should have known it was only a ponzi scheme.   They say in the ``Summary Overview'' that ``[P]ortions of the yields from your secured investment will initially finance the development of energy efficient communities.''   This was false.   There were no yields.   The investments by Plaintiffs were not secured.   There was no development of energy-efficient communities.   The bank records read at the time by REIN and KING showed not a single expense for development of energy efficient communities.   The entire ``Summary Overview'' was false, and REIN and KING knew it, for the reasons set forth above.

65.   The ``Asset Management Agreement'' (Exh. 17) tells Plaintiffs that Defendants will ``enter the Capital into a Managed

Fund'' to be ``utilized as collateral reserves only in the Fund,''
``in order to accommodate certain special purpose secured investments'' which Defendants would ``administer it for'' plaintiffs' benefit.  These statements were false.  There was no managed fund, and Defendants didn't enter Plaintiffs' money into such.  They put it into a bank account and frittered it away for their own benefit.  As above, REIN and KING knew this at the time they made these statements to Plaintiffs.

66.   The Agreement also states that Defendants will ``comply with their fiduciary responsibilities'' in handling Plaintiffs' money.  While it is true that KING, MORGANSTERN, STEVENS, ORGOLINI, WOMACK, and MACENROE <u>had</u> fiduciary responsibilities to Plaintiffs (and that REIN and the LAW FIRM gave them substantial assistance in breaching those duties, see below), it is also true that they did not comply with those responsibilities, as is shown above.

67.   Paragraph 1.6 of the Agreement requires Defendants to ``manage control and supervise all aspects of the Fund faithfully and professionally,'' ``prepare and submit reports which accurately reflect the operating results, including monthly statements,'' and ``disburse yields'' and ``manage said yields.... in a manner that gains additional fixed income and growth in Capital,'' and ``render a full account'' upon liquidation.  These statements were false.  Defendants did, and intended to do, none of these things, and the bank records REIN had showed this at the time of Plaintiffs' investments and thereafter.  Indeed, upon ``liquidation'' in August 2000, there was no ``full account'' given to Plaintiffs.  There were no yields and no income or growth, as shown throughout.

68.   Paragraph 2.1.2 states that AFCM, controlled by Defendants KING, WOMACK, MACENROE, MORGANSTERN, would ``provide and manage various investment opportunities'' for Plaintiffs, which would provide ``yields.''   This was false.   There were no investment opportunities, and the amounts of investor money which was being spent from the AFCM account on fees and other things as set forth above was so great that there would be insufficient monies left over to yield any kind of return whatsoever.

69.   For similar reasons, Paragraph 3.1 of the Agreement and its subparagraphs are also false.   There were and could be no yields, because the money was being spent on non-investment activities by Defendants.

70.   The entire Agreement was a sham.   It was a fake, designed by REIN lend an air of legitimacy to a scam which REIN and KING knew was a Ponzi scheme.   Likewise, the ``Qualifying Documents'' Plaintiffs and their representatives were required to complete and sign.

71.   Appendix B states that ``charges'' and ``fees'' would not exceed 10% of Gross Returns, and that such ``charges'' and ``fees'' would be paid out of ``yields'' rather than Plaintiffs' invested capital except for a 1% ``bank fee.''   This was a lie.   The bank records show that from the first date of investment by Plaintiffs, all of Plaintiffs' invested capital was being withdrawn as ``fees'' and ``charges,'' well in excess of 1%.   The records also show that there were no ``yields'' yet fees and commissions were nevertheless deducted and paid.   REIN and the LAW FIRM received $51,000 in such fees despite knowing that this was prohibited by the terms of REIN's

Agreement. REIN knew this was happening because he saw the bank records at the time he wrote these documents with the intent that they be given to Plaintiffs.

### E.  Defendants' Misappropriation of Plaintiffs' Money.

72.  The money was spent on a variety of things, none of which was an investment. It was spent on legal fees to REIN and the LAW FIRM. It was spent on ``management fees'' to KING and KING's wife, daughter, and son. It was spent of offices and office improvements, plants, limousine rides, food, credit cards, commissions to the brokers and finders and other people who ``raised'' money from Plaintiffs and others. It was spent on other business ventures benefiting only KING, REIN, and the other defendants, such as starting an insurance company, a hotel, a trust company, a startup e-commerce venture, a marketing company, and an office real estate development.

73.  During January to June, 2000 (the time period during which KING and REIN falsely stated that Defendant MORGANSTERN had ``stolen'' the money) Defendants spent $2.9 million on everything but a ``managed fund'' or other investment as they had described to Plaintiffs. They didn't disclose any of these actual expenditures to Plaintiffs in any of the literature (Exhs. 16 - 17). In addition, during this period, despite Defendants' representation in the documents to the contrary, there was not a single expenditure for ``Homevest.'' REIN knew of these expenditures, and knew they were different than the use of the funds as he'd described them in the documents he designed to be given to Plaintiffs and other investors, because he had the AIBC bank statements and he received some of the

24

money at least by July 1999.  Thus he knew that the statements he made in the documents (Exhs. 16 - 17) were false at the time he made them and at the time they were given to Plaintiffs.

74.  REIN knew there was no managed fund, no ``Homevest,'' no legitimate investment, because he prepared and/or kept the bank statements, general account ledgers and records of income and expenditures for the scheme.  He saw firsthand that Plaintiffs' and investors' money was not being used as represented but was instead being spent for KING's personal benefit, and the benefit of REIN and his LAW FIRM, and others.  Thus he also knew that the monthly statements given to Plaintiffs and other investors (Exhs. 19-25) were false also, because these statements purported to show income and profits being deposited to Plaintiffs' separate accounts, yet he saw firsthand that there were no such profits, no such accounts, no such deposits.  The statements were fake.

75.  From August to December, 1999 Defendants raised $3.2 million dollars from Plaintiffs and others.  Then from January to June, 2000 they spent $2.9 million of this money on everything but a managed fund, even as they were raising more money from other Plaintiffs and investors.

76.  Defendants during January to June 2000 spent $228,000 in an attempt to start an offshore insurance company.  This was characterized as ``loans'' by REIN on the Defendants' books.  (However, ``books'' is perhaps an overly-generous term, as the Defendants appear to have kept no books other than the AIBC checking account statements.  The only other ``records'' of any of the entities and the use of Plaintiffs' money were kept in MORGANSTERN's

25

head.).  They also spent $55,000 on a hotel construction project, and $57,000 on a Brazilian construction project, and $33,000 trying to establish a Nassau Trust Company, and $65,000 to try to start an e-commerce company, and $79,000 on a Marketing company, and $30,000 on an office development in the Bahamas.  All of this money came from Plaintiffs and other investors during the 6 months prior.

77.  From this same account during the period August 1999 through December 1999 Nancy King (RALPH KING's wife) took $10,000 to $20,000 per month, while Geoffrey King and Savannah King (RALPH's kids) took $5,000 to $10,000 per month, and RALPH KING took $20,000 to $25,000 per month from this account.  KING also used this same investor money to pay ``dividends'' or returns back to various investors, a classic hallmark of a Ponzi scheme in which newer investors' money is used to pay returns to prior investors.  None of these payments was disclosed as a use of the Plaintiffs' funds, but should have been, because REIN knew the money was being spent in this fashion, contrary to what he had written in Exhibits 16 and 17.

78.  REIN and his LAW FIRM received the following payments from Plaintiffs' and other investors' funds:  $50,000 in July, 1999; $50,000 in October 1999; $10,000 in December, 1999; $20,000 in February, 2000; $20,000 in March, 2000; and two payments of $51,000 and $10,000, respectively, in May, 2000.

79.  Significantly, the May, 2000 payment of $51,000 from the account containing Plaintiffs' and other investors' funds to REIN and the LAW FIRM was not for ``legal fees'' but was a ``broker's'' fee or commission.  The documents drafted by REIN, including the ``organizers' agreements,'' specify, however, that no ``commissions''

3rd Amended Complaint for Damages

were to be paid except from ``profits earned.''   Yet this ``commission'' was paid directly from Plaintiffs funds.

80.   Then during February through May, 2000 KING spent $266,000 of Plaintiffs' and other investors' money on ``public relations,'' and $290,000 on ``legal fees.''   During August 1999 through June, 2000 KING spent $324,000 on ``brokers fees'' including $51,000 to REIN and the LAW FIRM, and $316,000 in administrator fees to KING, his family and his company, Metropolis Dune (the same entity which swindled CALDWELL).   During the first 6 months of 2000 KING spent $54,000 on hotel expenses and $9,000 in limousine rides.

81.   Finally, during September 1999 through June, 2000 KING paid $446,000 in credit card bills using Plaintiffs' and other investors' money.   None of these expenditures were disclosed, but interestingly, these are reminiscent of the same types of expenditures KING made with CALDWELL's money in the earlier Prime Bank Ponzi Scheme (Exh. 14), of which REIN was aware because he represented KING in that matter.

82.   During mid-1999, after having begun to raise money from Plaintiffs and other investors for this scheme, Defendants began spending it.   Checks from the same AIBC bank account where KING deposited Plaintiffs' money were written to Silvestri (who had already been indicted, Exh. 15), WOMACK, the LAW FIRM, KING, KING's company Metropolis Dune, and KING's family.   In October 1999, immediately after receiving $70,000 in August from Plaintiff PAGE and $50,000 in September from Plaintiff ADLER into the AIBC account, Defendants spent $70,000 on a Paradise Island Vacation.   REIN knew this at the time because he had and saw the bank statements

27

reflecting this use of investors' funds. Yet Defendants continued to distribute REIN's documents representing that the funds collected would be used only to secure an international trading investment.

83. On March 29, 2000 Defendants received $45,000 from Plaintiff LACY, and 2 days later immediately wrote themselves $45,000 in checks from the same account -- $15,000 to KING, $10,000 to Nancy King, and $20,000 to REIN and the LAW FIRM.

84. April 2000 was Defendants' biggest month in collecting investments from Plaintiffs, and it was also a big month for Defendants wallets. KING and his wife took $20,000, KING's company Metropolis Dune collected a ``management fee'' of $25,000, and REIN and the LAW FIRM collected $61,000 in commissions and fees.

85. In June, 2000 the KINGS took their $25,000 ``fees'' and they also paid a $16,000 credit card bill for ORGOLINI and a $21,000 AMEX bill. In July and August, 2000, even as they were telling Plaintiffs they had uncovered a ``problem'' but ``stopped it before the assets of the program were threatened.'' Defendants transferred $277,000 to Euro-American Holdings, another company established by REIN and used by KING and the other Defendants. This money came directly from Plaintiffs ELLSWORTH and SIDDIQUE and MARTENS, who invested a total of $400,000 during that time. The remainder of the money went to KING and his family.

86. In January of 2000 WOMACK was arrested and indicted, and investigations were begun into MORGANSTERN's activities. It turns out that the ``e-commerce'' company into which some of Plaintiffs' money was filtered was an entity called Unee, which was being run by MORGANSTERN's brother, Fred. REIN arranged for himself and the LAW

FIRM to perform ``legal services'' for Unee, which were paid for with Plaintiffs' and other investors' funds. But in addition to this so-called ``legal work,'' REIN and the law firm also arranged to represent Fred and DAVID MORGANSTERN in their legal troubles related to the SEC and FBI investigation and indictment of DAVID MORGANSTERN (Exh. 15).

87. This representation of the MORGANSTERNS in the criminal cases was also to be paid for from investors' funds in the AIBC account, but it was not identified as such. Instead REIN and KING disguised these payments as payments from AIBC to Unee for the internet e-commerce venture. REIN and KING also used Unee as a cover to pay for WOMACK's legal fees, in order to avoid the scrutiny of the Receiver which had attempted to freeze all of WOMACK's funds in order to preserve them for the investors from whom he'd stolen those funds. From February 2000 to July 2000, $90,000 was spent by KING and REIN on Unee and WOMACK. This means that, at the time Defendants KING and REIN were claiming (in writing and verbally to Plaintiffs) that MORGANSTERN had stolen Plaintiffs' money, Defendants KING and REIN were actually aware that they willingly had spent Plaintiffs' money defending these criminals. They also knew at the time they were soliciting Plaintiffs in August 2000 for a ``rollover'' investment, and telling Plaintiffs that everything was ``ok,'' that they had ``avoided'' a ``threat to the integrity of the assets of the program,'' they were actually spending Plaintiffs' money defending very the people who had allegedly threatened those assets in the first place.

**F. Hiding The True Fraudulent Nature of the Scheme.**

88.   Now that the scheme was in full swing, fundraising was important and so was coming up with an explanation of where the money was actually going.   Defendants were sending bogus ``statements'' to Plaintiffs showing that each Plaintiff was receiving a ``return'' on his investment in the form of money generated by ``trading activities'' which had been placed into each Plaintiff's investment account at AIBC.   Representative samples of each monthly statement each Plaintiff or his/her representative received, with accompanying correspondence which REIN drafted, for the period November 1999 through June are attached hereto as Exhs. 19 - 25, and incorporated herein.

89.   In addition, the form of these monthly statements, and the disclaimers which accompanied them, were designed and drafted by REIN and the LAW FIRM.   The contents of each statement were false. There were no such accounts, no such profits, no trading activities, no deposits, no such funds.   The funds were spent as set forth above.   REIN knew they were false because he timely received and read the records of corporate income and expenses, such as the bank statements from AIBC showing Plaintiffs' money going into the account and the money being spent as described above and below, and those records showed no such ``investment returns'' or deposits or accounts for the benefit of Plaintffs.   Interestingly, Defendants themselves later said that MORGANSTERN stole all Plaintiffs' money during the first part of 2000.   If this were true (it wasn't), then these ``statements'' of account sent by Defendants to Plaintiffs would be just as false, inasmuch as they purport to show investment

1  returns on money which was already stolen! (But the AIBC bank

2  statements don't show MORGANSTERN stealing the money from the other

3  Defendants; the bank statements show all the Defendants

4  systematically spending or taking the money for their own use.

5  MORGANSTERN's crime isn't that he stole from the other defendants;

6  MORGANSTERN's crime is that he and the other Defendants ran a Ponzi

7  scheme.) In short, these statements were designed as a ruse to make

8  Plaintiffs think the investment was legitimate.

9
10      90. By early to mid-2000 some of the Plaintiffs and other

11 investors began requesting their money back. The 13-month terms of

12 the investments set forth in the ``Asset Management Agreements''

13 they signed promised that their money would be returned and their

14 profits available for withdrawal in 13 months. Those investors who

15 asked first for their money received some money and purported

16 profits. However, these payments were not profits but their own and

17 other investors' money back. Typical Ponzi scheme. But soon there

18 wasn't enough money, so Defendants were forced to concoct an excuse

19 or reason why the money couldn't be repaid.

20      91. First, REIN engineered a series of bogus changes, in order

21 to generate more ``legal fees'' and to try to insulate KING from

22 liability for his excessive spending habits and cover-up the fact

23 that Defendants had taken Plaintiffs' money. In January, 2000, KING

24 sent a letter, drafted by REIN, to all Plaintiffs and investors,

25 stating that the monthly statements' format had changed. The letter

26 said, falsely, that ``In our ongoing effort to provide complete

27 disclosure to our clients, all your future statements will come from

28 STAT. STAT is the company that actually performs the growth

31

1  activity on the funds.    STAT is owned and operated by the same
2  people that owned and operated AFCM.    Nothing has changed concerning
3  your principal and/or growth account.    The managed fund accounts are
4  simply now being shown in the name of the company actually creating
5  the return,'' (Exh. 21).

6      92.    These statements were false, for several reasons.    First,
7  the letter implies that Defendants are making complete disclosure
8  of the whereabouts and uses of Plaintiffs' money.    Defendants were
9  not making any such disclosures.    Instead, the letter implies that
10 Defendants had invested Plaintiffs' money as they had promised and
11 that money was generating a return into separate accounts in the
12 names of or for the benefit of Plaintiffs.    Nothing of the sort was
13 occurring.    Instead, KING was simply spending Plaintiffs' money.
14 Defendants made no disclosures about the uses of Plaintiffs' money
15 as set forth above.    There was no managed fund, and there was no
16 ``return'' being created by any company.

17     93.    REIN knew these statements were false, because he saw the
18 AIBC bank statements which showed where the money was actually
19 going, and knew that there were no separate accounts.    He knew there
20 was only one account, in the Bahamas (not the U.S. as promised) and
21 it had Plaintiffs' money.    He and his LAW FIRM had received a good
22 portion of that money.    REIN knew there was no ``growth activity''
23 on Plaintiffs' money because it was not being invested into
24 anything.    REIN also knew that there was no return being created
25 because the financial records of the company showed no such
26 deposits.    The only deposits came from investors.    He also knew the
27 statements in the letter, and the purported investor statements that

accompanied it, were false because he knew there was no such thing as Homevest.  He knew there was no such thing as Homevest because there isn't one single reference to it in any of the ledgers or bank statements of the company.  From his knowledge of the finances of the ``investment'' REIN also knew that the numbers on the monthly statements were and could only be bogus, because they purported to show that Plaintiffs' money had been invested and was earning a return, and REIN saw that the money had not been invested and was earning no return.  How could these statements be true if, as REIN later says, MORGANSTERN had already stolen the money?  The true fact is, the Defendants stole Plaintiffs' money.

94.  Then in May, 2000 REIN prepared another letter to Plaintiffs as ``Standard Atlantic Accountholders'' (Exh. 24).  (This was a sham in itself because REIN and KING knew there were no separate accounts in the names of Plaintiffs or any other investors.)  This letter states and implies that KING, REIN, and others completed an ``exhaustive review of our business practice and policy,'' and, in an interesting bit of reverse psychology, that Plaintiffs might receive their money back and be ``kicked out'' of the investment if they didn't invest more money or sign further documents insulating the investment scheme from U.S. law.  It also falsely implies again that each Plaintiff has an investment account which has received returns generated by the ``trading'' or the investment.  All these statements were false.

95.  The statements were false because REIN and KING made no such policy review.  If they had they would have disclosed the fact that it was they who had received the lion's share of Plaintiffs'

money.   The ``policy review'' was simply a sham to entice investors to invest more money, so that Defendants could continue paying bogus ``returns'' and legal fees and management fees to themselves.   In addition, Plaintiffs' money was gone and it was impossible for KING to ``return'' the money ``as per the agreement.''   REIN knew the money was gone because he had seen the checks and ledgers of STAT and AFCM.

96.   In addition to the January, 2000 and May 2000 letters to Plaintiffs, each ``Account Statement'' also was accompanied by a form letter which was also drafted by REIN.   These ``account statements'' purport to be on AFCM or STAT letterhead, with an address in the Bahamas, however, these statements were actually mailed from California.   These letters state that a ``transfer'' of money would be made by KING to Plaintiffs' account at AIBC, ``reflecting the income'' from ``investment activities.''

97.   These form letters were false.   No such deposit of money was made for or on behalf of Plaintiffs.   There was no income, no investment activities.   Defendants all knew this not only because there is no such thing as such an investment that will generate such spectacular returns, but also because they were spending Plaintiffs' money directly, and REIN was reviewing the check registers and ledgers.

98.   In August 2000, as more money was being spent by Defendants and less was coming in, and investors were requesting refunds, Defendants became desperate for an explanation.   REIN again drafted a letter which stated that there had been a ``problem'' which ``could have'' but did not threaten Plaintiffs' funds, and

that Defendants ``discovered the problem and took remedial steps'' to protect Plaintiffs' money. This letter was a lie. In reality, there was no ``discovery of a problem.'' Defendants had spent Plaintiffs' money. It was gone. They took no remedial action.

99. Instead, Defendants invited Plaintiffs to come to the Bahamas, where a new roll-over investment would be offered to them. REIN prepared the terms and documents for the rollover investment, and attended these meetings with his associate Pat Fraioli during August 29-31, 2000. There REIN, KING, STEPHENS explained specifically to those in attendance that the STAT program was being closed due to some ``bad money'' that had been invested, and that MORGANSTERN had stolen Plaintiffs' money after KING had entrusted him with it, and that KING and REIN had recently discovered that theft. This was false, because KING had spent the money, REIN and his law firm had received some of that money, and REIN and KING knew from the checks and ledgers they had seen that MORGANSTERN didn't steal any more money than had KING. In addition, Defendants had sent Plaintiffs account statements purportedly reflecting deposits and return on investment into their specific STAT and AIBC accounts. These account statements were either false for the reasons set forth above, or false because MORGANSTERNN stole the money. We know MORGANSTERN didn't steal all the money, because a lot of it went to KING's credit cards, his family and the LAW FIRM bank account. All the money from Plaintiffs was accounted for via checks and other payments as outlined above.

100. At the Bahamas meetings REIN and KING offered those Plaintiffs and others in attendance a new investment opportunity

3rd Amended Complaint for Damages

consisting of (a) a rollover of their existing STAT investment, and (b) a new chance to invest more money in a new fund, called ``U.S. Treasury Buy-Sell Program'' (Exh. 26), the descriptive documents for which REIN wrote.   Those that elected a rollover were told by REIN and KING that their money would be returned within 30-90 days.   That never happened, even though KING and REIN have continually made such representations   through   February   of   2002,   including   the representation that KING and REIN are due to fly to Europe to recover the money and bring it back.   KING during the first part of 2002 told several plaintiffs that they would only get their money back if they dropped out of this lawsuit.

101.   KING   admitted   to   Plaintiffs   STAMBAUGH   and   their representative, at a meeting on November 21, 2001 that he was creating a new ``international trading fund'' to recover their money and that the creation of this new ``international trading fund'' called U.S. Treasury Buy-Sell Program (Exh. 26) designed to generate or ``replicate'' funds to pay back plaintiffs could only be created from the investment of <u>more</u> money by Plaintiffs or other investors. This money would then be held in a U.S. bank account to secure an investment in a larger fund overseas, etc., etc. and so the Ponzi Scheme artist continues his craft.

**G.   REIN's Knowledge of the Fraudulent Nature of the Scheme, and Activities   in   Operating,   in   Support   of,   and   in   Substantial <u>Assistance to the Other Defendants and the Scheme.</u>**

102.   In addition to the above activities, REIN also did the following in operating the scheme and helping the other Defendants operate the scheme.   In doing so the REIN and the LAW FIRM also acted to give substantial assistance to the scheme.

103.   REIN prepared the ``talking points'' for the salespeople to use, which reflected the written documents he'd prepared to sell the investments.

104.   REIN took ``finders' fees'' from Plaintiffs' funds.

105.   REIN set up separate entities where money from Plaintiffs was funneled, such as World X International.

106.   REIN used the LAW FIRM's trust account to receive and send money to and from KING and AFCM/STAT, so that the character of the funds could be masked.

107.   REIN communicated directly with investors, including Plaintiffs, telling that that their money would soon be returned, that he and KING were working on a new program which would ``replicate'' their funds, in order to dissuade legal action. This was false because there was no such way to ``replicate'' plaintiffs' money. It was another Ponzi scheme.

108.   REIN facilitated wire transfers for KING and the other Defendants, and kept a percentage as a fee.

109.   REIN negotiated commissions for the ``organizers'' and fundraisers, payable directly from Plaintiffs' investment funds (rather than ``yields''), which exceeded the 1% set forth in the Agreement which REIN himself drafted

110.   REIN negotiated, and facilitated via wire transfers and his trust account, refunds of investment monies to earlier investors (i.e. Sami Bin Mahfooz in about May 2000), paid and payable from the investment funds of newer investors (i.e., Plaintiffs). REIN knew this because he knew the funds were coming from the AFCM/STAT account where Plaintiffs' funds were deposited.

111.   Agreed to represent MORGANSTERN and WOMACK in connection with their criminal proceedings and accepted payments from Plaintiffs' invested funds to do so, while disguising these payments as payments for an entity called Unee.   The real reason he became involved in these proceedings, however, appears to be so that he could protect KING, or at least get advance warning of proceedings against KING, from being drawn into the matters.

112.   Saw that Plaintiffs' funds were being funneled into Unee, which was a project of MORGANSTERN's brother, Fred.   This project was not part of the investment activities set forth in the Offering Documents which REIN drafted.

113.   Opened bank accounts and set up corporations for KING which helped launder and dissipate Plaintiffs' money for Defendants' own uses.   Examples of such companies include Regent Provident and World X International (a Luxembourg corporation) which was opened in REIN's own name with him as sole owner.

114.   Agreed to serve as ``Trustee'' of a new ``fund'' which would help repay Plaintiffs and other investors.   This ``fund'' would supposedly be created by KING's share of the replication of another $50 million ``fund'' which MACENROE was going to gratuitously ``give'' to KING because he purportedly wanted to ``help KING repay his investors.''   This fantastic notion alone should have served to alert REIN the securities lawyer that it was just another ponzi scheme.   This was the same ``fund'' which KING talked about raising more money for, so that he could ``buy into it'' and repay the Plaintiffs.

115. The proceeds of this ``new fund'' would be used to (1) pay MORGANSTERN's SEC liability; (2) pay off earlier investors; (3) pay off Plaintiffs; (4) re-establish the bank (AIBC) to continue to provide ``yields'' to Plaintiffs who wanted to roll over their ``investments.'' REIN billed and was paid legal fees from Plaintiffs' investment funds (remember that Defendants were raising money from Plaintiffs through August, 2000, long after they knew that the money was gone and was being spent) for his legal work to create this new fund, with MACENROE's help. However, the real purpose of these machinations was to disguise the fact that this was a scheme, and to lull Plaintiffs into foregoing suit by giving them hope that their money would soon be repaid. Indeed, since September 2000 to the present REIN and KING have been telling Plaintiffs on a regular basis that ``your money will soon be here,'' and that ``we are going to Europe very soon to pick up your money.''

116. Plaintiffs several months ago formally offered to drop this lawsuit if in fact Defendants KING and REIN indeed returned from Europe as promised with Plaintiffs' funds. So far, they have not done so.

117. KING and REIN knew from mid-1999 that there were no written records of any activities by AFCM/STAT other than bank statements showing income and outgo of Plaintiffs' funds. REIN has stated that the only ``records'' are in MORGANSTERN's ``head.''

118. Was paid with plaintiffs' and investors funds for legal services involving the preparation of a bogus declaration by MORGANSTERN which purported to absolve KING from liability.

3rd Amended Complaint for Damages

119.  Knew or should have known since before 1999 of MORGANSTERN's and Silvestri's history of trouble with the SEC and non-compliance with the nation's securities laws, and knew also that MACENROE believed himself one of 4 or 5 ``traders'' in the world who had access to ``trading programs'' or ``project financing'' promising returns of 50% or more through European banks or foreign trusts. This knowledge alone should have served to alert REIN (and did alert him) to the fact that this was a bogus ponzi prime bank scheme.

120.  KING and REIN knew since 1999 that Plaintiffs' money was gone yet reported to and reassured investors through August 2000 that ``everything was OK'' and their funds were not at risk.

121.  REIN coached KING and the ``organizers'' to tell Plaintiffs that everything was OK and not to ``spill the beans'' about the truth, that Plaintiffs' money had been spent by Defendants.

122.  After the money for ``legal fees'' dried up (meaning KING and the Organizers were no longer able to solicit new funds for this scheme) in 2001 REIN threatened to disclose the truth about the scheme to the North Carolina receivership (MORGANSTERN or WOMACK's receivership case) if KING failed to pay REIN and the LAW FIRM money for services allegedly performed.

123.  The Defendants' Prime Bank Ponzi Scheme has all the hallmarks of an illegal-per-se scheme described by governmental and prosecutorial authorities.  For example, the ``introductory packet'' and the ``agreements'' (Exhs. 16 - 17), drafted by REIN for AFCM, purport to require extreme secrecy.  Defendants' literature was always labeled ``*PRIVATE AND CONFIDENTIAL.  The Fund is not*

40

available to the public.'' It stated that ``this is a summary of sophisticated information which by its' [sic] very nature is inherently incomplete.... No literature or advertising in whatsoever form can be employed regarding matters as discussed herein.'' Defendants also said that ``All communications are specific and confidential between our patrons (as legal entities) and ourselves.''

124. Defendants always made it clear that there were important ``third parties'' who could not be identified because of secrecy concerns, and that Defendants would always ``act as sole representative and authorized contact with third parties in all matters pertaining to the Fund.'' They represented that ``the fund is not available to the public.'' They proclaimed that all the documents were ``confidential in their entirety'' and that they were ``not to be circulated in any form [and is] protected under US HR 7323 (theft of trade secrets).'' Plaintiffs were told that all the details about the investments were confidential and strictly kept among wealthy foundations. Defendants made it ominously clear that all ``oral or written communication regarding this transaction shall be exclusively directed to the Administrator... **there shall be no direct or indirect, oral or written, communication with any bank officer pertaining to this transaction**.''

125. REIN also drafted a ``procedures letter'' which was given, and which was designed by REIN to be given, by KING to

41

Plaintiffs (and other investors) which purports to exclude itself from the securities laws, and which falsely states that AFCM (later STAT) ``manages assets for discreet patrons who endorse the advanced vision of HOMEVEST WORLD SERVICES.''  This was false because AFCM didn't manage any assets and had no patrons.  It simply deposited investor funds into a bank account at AIBC and spent the money. REIN knew this because he saw the documentation of the spending of the money, and because there was no such thing as ``Homevest.'' There is no record anywhere of any expenditure of a single dollar on anything entitled ``Homevest.''

126.    REIN drafted other documents which were given to Plaintiffs and other investors, and which were designed and intended by REIN to be given to Plaintiffs and other investors, which were false.  One such document was a ``summary overview'' (Exh. 16) which falsely stated that ``AFCM is a dedicated private society of high net worth individuals, foundations and corporations.''  This was false because it was not such.  It was simply an offshore corporation which took and spent the money of elderly investors such as Plaintiffs.  There were no corporations or foundations giving, or receiving, money from AFCM, a fact which REIN knew because he saw the financial records of AFCM and STAT on a timely basis.  REIN also wrote ``Our responsibility is to provide growth in capital and to pay fixed rates of income to our subscribers.''   This was false because it did nothing to provide growth in capital, had no history of such, and paid no income.  REIN knew this because he saw on a timely basis the financial records of AFCM.  AFCM had no history of

42

growth or successful investing; it was created by REIN at about the same time as the documents describing it.

127.   REIN also wrote ``AFCM has developed a corrective technology called HOMEVEST.'' This was false. There was no such thing. REIN knew this because he created AFCM and the documents describing it. He also wrote ``portions of the yields from your secured investment will initially finance the development of energy efficient communities....'' This was false. There were no yields, because the money was being spent, not invested. REIN knew this because it had no such track record, and because he saw the financial documents of the company. It was also false because Plaintiffs' investments were not secured, they were simply deposited into AFCM's Bahamas bank account. REIN knew this because he saw the AFCM bank account records showing these deposits and the subsequent expenditures of money.

128.   REIN described the investment as a ``special purpose secured private placement investment.'' In the ``asset management agreement'' (Exh. 17), which REIN drafted and which was given and designed by REIN to be given to Plaintiffs and/or their representatives, the funds are represented to be ``utilized as collateral reserves only.'' This was false. The funds were not used as collateral nor were they secured. They were simply deposited into a bank account and spent. REIN and his LAW FIRM received some of these funds as fees and commissions. No disclosure about these fees, commissions or other deductions or expenditures was ever made. REIN knew of these facts because he saw and had access to the financial records of AFCM / STAT.

43

129. It is to be noted that the Defendants, due to the nature of their fraudulent scheme and the actions they took in carrying it out, are uniquely and deliberately in possession of full and sole knowledge of the nature of their frauds and the facts concerning the scheme. They required secrecy and pretended that their business contacts and the tenets of the investment programs required secrecy, in order to hide the fact that the scheme was fraudulent, therefore Plaintiffs were not privy to and do not yet know all the details of Defendants' scheme.

## H. *KING's Earlier Prime Bank Ponzi Deal*

130. In or about December, 1997, Plaintiff CALDWELL INDUSTRIES, INC. was solicited by Defendant RALPH KING (and unrelated persons not named as defendants herein) for a $100,000 investment in what KING called a ``Five Day Trade Initiation Opportunity.''

131. This purportedly short-term, high-yield, risk-free investment was explained by Defendant KING in highly complex terms. It supposedly involved an international trading deal connected to a Swiss trading group and unidentified Japanese or Chinese institutions. Plaintiff CALDWELL's $100,000 was to be pooled with other investors' monies to enable this quick trading deal to commence.

132. Defendant KING represented and promised that this was a completely legitimate investment; further, that it was ``risk-free'' because Plaintiff's principal investment would be secured by existing collateral of KING's in U.S. banks, and Plaintiff's money would remain under KING's control at all times.

44

3rd Amended Complaint for Damages

133. KING promised that CALDWELL's principal would be returned almost immediately and that additional high-return revenues would quickly follow.

134. In February, 1998, KING reported that the ``transaction'' was delayed; that it took much longer than expected, and that CALDWELL was to ``be on the lookout for the principal to be coming back in the next few days and the return to follow.

135. Throughout 1998 and 1999, KING repeatedly promised the return of Plaintiff's money, offering continually varying explanations as to the delay, but always promising results within ``the next couple of days.''

136. One of the explanations for the loss of CALDWELL's money was that an associate of KING's purportedly stole the money and converted it to her own use. This was a lie. Bank records showed that, as he did here, KING spent the money on himself and his family members (Exh. 14).

137. In December, 1998, Plaintiff CALDWELL filed a federal lawsuit against Defendant KING (Exh. 14) and his associates for securities fraud, common law fraud and unfair business practices. Once sued KING agreed to repay the money with interest, but did not do so. REIN and the LAW FIRM represented KING in this earlier case, and they were privy to the fact that KING stole CALDWELL's money and spent it after depositing it into his own bank account, despite promising that the money would be safe and secure and would never be spent.

138. REIN used this as a learning experience for himself and KING, however. He and the LAW FIRM set up the next scheme (the

instant scheme) so that KING didn't make the mistake of transferring investor money into his own, U.S. Bank-based, bank account, the records of which could be subject to Federal Court subpoena as they were here. For the Subject Prime Bank Ponzi Scheme, REIN and the LAW FIRM advised KING to set up, and set up for him, bank accounts in the Bahamas, so that they would be beyond the reach of subpoenas, and to use more specific documentation which purported to take the transaction completely outside the reach of U.S. law and Courts.

139. In truth and in fact, REIN's and KING's scheme was a fraudulent Prime Bank Scheme, created out of whole-cloth, of the type described by the SEC at its web site. Literally none of the representations made were in fact true -- there was no international trading deal; the limited yields realized by certain early investors were the result of Ponzi-type transfers of money; there was no safety at all; the Plaintiffs' investments were entirely at risk (and lost to them); and the purported charitable program that was a key incentive to the investment by many Plaintiffs was fictional. Defendants intended to steal the money.

140. Although purportedly acting only as ``disinterested'' legal advisor, REIN actually used his role as lawyer as a ``cover'' to shield his own true and actual participation as a principal in the fraudulent scheme. He also used his ostensible role as lawyer to lend legitimacy to, and to vouch for, what was actually an ongoing pattern and practice of false, fraudulent and illegal activities by KING, MORGANSTERN, MACENROE, and their related and alter-ego entities. In doing the actions herein REIN and, by virtue of REIN's actions the LAW FIRM, acted for their own individual

pecuniary gain, and breached duties which were not unique to any client they had, but were instead their general duties under State and Federal law not to offer and sell bogus fraudulent securities to people, and not to conspire with or help others to do so.

141. Although the Defendant law firm, and specifically SCOTT REIN, held and hold themselves out as having been retained to provide certain legitimate legal services typically given by securities lawyers to investment promoters, instead SCOTT REIN gave and created the illusion of legitimacy for a scheme which he knew, or reasonably should have known, was an entirely illegal and sham scheme. By virtue of REIN's ongoing connection with other ventures by some or all of the Defendants, as well as his self-described expertise as a securities lawyer, he knew or reasonably should have known that the scheme was a prime bank ponzi scheme which was phony and illegal. He also knew, or reasonably should have known that other similar investment scams had been proscribed by the SEC; that other promoters of similar schemes had been held not only civilly liable but also criminally indicted and convicted; and that certain Defendants, including, e.g., DAVID MORGANSTERN, GABRIEL MCENROE, and VIRGIL WOMACK, had been previous and current targets of U.S. government securities violation investigations, and were also arrested by the FBI and indicted in and about 2000 for other prime-bank, Ponzi-type securities laws violations.

142. All of the representations and promises made by the Defendants were false and fraudulent and known to be so at all times by these Defendants.

143.   All of the key oral and written representations and promises made by and on behalf of THE SUBJECT PRIME BANK PONZI SCHEME DEFENDANTS were false and fraudulent.   Without limitation, they are summarized as follows:

> a.   There was no international trading program; and no trading actually took place, as promised and represented to Plaintiffs;

> b.   There was no charitable program, and no distributions to charity ever took place; and

> c.   Plaintiffs' investment monies were not used as promised; they were not kept in U.S. banks in guaranteed or safe non-depletion accounts; instead, the money was moved offshore, and otherwise converted to and for the benefit of Defendants.

144.   All of the Plaintiffs received a letter dated August 23, 2000, signed by Defendant ROBBIE STEPHENS as ``Senior Organizer'' with copies to Defendants RALPH KING and DANTE ORGOLINI.   It was a form letter except that the opening sentence was personalized to refer to a ``recent conversation'' with a principal of STAT (e.g., ROBBIE STEPHENS, DANTE ORGOLINI, and in some cases a particular selling agent selling agent).   This letter continued by announcing that ``Standard Atlantic, Inc. will be *wound up and closed by August 31, 2000*.   In order to properly wind up the company, we need you to complete the required paperwork, in the Bahamas, by the end of the month.'' (emph added)   The letter requested the investor to ``come

48

to Nassau next week, August 29-31, 2000, meet with [various principals], and *complete our affairs*. (emph. added)

145. This August 23, 2000 letter also informed the investor that: ``We would like *to discuss your options and choices for the future*, and Standard Atlantic's performance. This will include a discussion regarding our recent discovery of an unfortunate problem that arose in connection with the forward management of Standard Atlantic, Inc.'s assets. Although the problem could have threatened the integrity of the assets, we discovered the problem early enough, and took the necessary, remedial action. Finally, we have taken steps to ensure any such problem will never again threaten any investment with which we are associated.'' These statements were false. There was no performance, and there had been no remedial action. REIN knew this when he wrote these letters.

146. To date, no Plaintiff has received any return of principal or the additional high yield dividends promised by Defendants.

### FIRST CLAIM FOR RELIEF
### FRAUD AND DECEIT
**(By All Plaintiffs Except CALDWELL, Against Defendants REIN, LAW FIRM, KING, WOMACK, MORGANSTERN, MACENROE, ORGOLINI and STEPHENS)**

147. Plaintiffs repeat and incorporate by referenced Paragraphs 1 - 146 inclusive, as though set forth herein.

148. These defendants made the above representations to Plaintiffs and other investors. The representations were false as set forth above, and the Defendants knew they were false when they

made them. Plaintiffs relied on the representations to their detriment.

149. In addition, the scheme itself was a bogus fraud, an illegal Prime Bank Ponzi Scheme. The Defendants knew, or reasonably should have known, that there was no such thing as international trading programs like the one they were pitching, creating, or purportedly operating.

150. These fraudulent representations (and suppressions of the key material fact that this was an illegal and phony scam) were made by these Defendants with the purpose and intent to induce the Plaintiffs to ``invest'' or ``entrust'' their money to Defendants' scheme.

151. Had these Plaintiffs known the true facts herein, they would not have entered into any relationships with these Defendants, nor entrusted their monies into the scheme.

152. Plaintiffs justifiably relied on these Defendants. In part because these Defendants had the sole and exclusive possession of the true facts herein, and also because these Defendants deliberately shrouded this scheme in ``confidentiality'' and secrecy, purportedly for everyone's mutual benefit.

153. Plaintiffs could not, and did not, discover the true facts, including the fraud of these Defendants, and their subsequent wrongful cover-ups and concealments, until in or after the beginning of 2001.

154. Additionally, as more particularly described supra, these Defendants falsely promised to Plaintiffs that they would use and invest Plaintiffs' monies in the manner, for the purposes of, and

1   with the results stated in their oral and written contacts and
2   contracts. At all times relevant here, these Defendants had no
3   intention of fulfilling these promises.

4   155. The Defendants knew or reasonably should have known that
5   their acts and omissions would result in financial loss to
6   Plaintiffs. As a result of these Defendants' fraud and deceit,
7   Plaintiffs have suffered financial loss in an amount to be proven at
8   trial, in excess of $1.8 million.

9   156. The acts and omissions of the Defendants were willful,
10  malicious, and in conscious disregard of Plaintiffs' rights, thus
11  justifying an award of punitive and exemplary damages.

### SECOND CLAIM FOR RELIEF
### VIOLATIONS OF FEDERAL SECURITIES LAWS
**(By all Plaintiffs except CALDWELL against Defendants**
**REIN, KING, MACENROE, MORGANSTERN,**
**WOMACK, ORGOLINI, and STEPHENS)**

157. Plaintiffs repeat and incorporate by reference Paragraphs
1 - 156 inclusive, as though fully set forth herein.

158. This claim is brought for violations by the Defendants of
Section 10(b) of the Federal Securities Exchange Act of 1934 and
Rule 10b-5 promulgated thereunder.

159. As more particularly described _supra_, during 1999 and
2000 these Defendants created, promoted, operated and solicited
investment by Plaintiffs in false and fraudulent Prime Bank Ponzi
Scheme and device and artifice to defraud. Additionally, thereafter
beginning in the summer of 2000, these Defendants made additional
solicitations of Plaintiffs in a changed/revised program and/or in

51

new programs or ventures, which were also phony and bogus, and part of these Defendants' ongoing Ponzi-type practices.

160.  All of these solicitations were for ``securities'' within the meaning of the federal securities laws.

161.  By their acts as alleged herein, these Defendants directly and indirectly have engaged and participated, and continue to engage and participate, in a wrongful course of business, by the use of means or instrumentalities of interstate commerce, or of the mails with scienter:  (1) employed devices, schemes or artifices (namely a prime bank ponzi scheme) to defraud; (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, not misleading; and (3) engaged in transactions, practices or courses of business (namely a prime bank ponzi scheme) which operated as a fraud or deceit upon the purchaser, in violation of Sections 10(b) and 10(b)(5) of the Exchange Act.

162.  Had Plaintiffs known of the true facts and the materially adverse information not disclosed by these Defendants, they would not have purchased any securities with, by, from, or at the instance of, these Defendants.

163.  As a legal cause of Defendants' fraudulent acts and misrepresentations Plaintiffs have been damaged in an amount exceeding $1.8 million.

<div align="center">

**THIRD CLAIM FOR RELIEF**
**CONVERSION**
**(By all Plaintiffs Except CALDWELL,**
**Against Defendants KING, ORGOLINI, WOMACK,**
**MORGANSTERN, MACENROE, and STEPHENS)**

</div>

<div align="center">52</div>

164.  Plaintiffs repeat and incorporate by reference Paragraphs 1 - 163, inclusive, as though set forth herein.

165.  Before investing in Defendants' scheme, each of these Plaintiffs was the owner of the respective amount of money which each Plaintiff invested in Defendants' scheme and entrusted to the care of Defendants.  This money was specific and Defendants represented that they would hold it only as security or collateral for an investment.

166.  As set forth above, Defendants took this money from each of these Plaintiffs and converted it to and for their own use and benefit.

167.  Beginning in late 2000 thereafter to the present time, as per their contracts with Defendants, each named Plaintiff has demanded the immediate return of the invested amount and the promised high yields.  Defendants have promised but failed and refused to return Plaintiffs' money to them.

168.  As a result of the conversion of Plaintiffs' money by the Defendants, Plaintiffs have been damaged in an amount to be proved at trial.

169.  These Defendants' actions were willful, malicious and in conscious disregard of Plaintiffs' rights, thus justifying an award of punitive and exemplary damages.

### FOURTH CLAIM FOR RELIEF
### UNFAIR BUSINESS PRACTICES
**(By All Plaintiffs Against Defendants KING, REIN, STEPHENS, ORGOLINI, MORGANSTERN, WOMACH, and MACENROE)**

170.  Plaintiffs repeat and incorporate by reference Paragraphs 1 - 169, inclusive, as though set forth herein.

171. Plaintiffs bring this claim pursuant to California Business & Professions Code Sections 17200 - 17500 et seq. on behalf of themselves individually, and also in a representative capacity on behalf of the general public of the State of California, under the authority of these statutes.

172. The conduct of these Defendants constituted unfair, unlawful and/or fraudulent business practices as described in, defined in, and proscribed by these statutes.

173. Defendants Rein, King, Stephens, Orgolini, Morganstern, Womack, and McEnroe deceived and misled the public by their acts as set forth herein, including, among other things: creating a management and fundraising structure for the prime bank ponzi scheme alleged herein, knowing that the scheme they created would be communicated and sold to potential investors by way of a sales force fed by high commissions from the funds invested by the victims of the scheme; organizing and equipping a sales force to go out into the public and seek out potential investors through financial planners and other contacts; instructing the other Defendants on the methods by which they believed they could avoid the application of U.S. securities rules and laws; drafting fraudulent documents that they designed to be and knew would be provided to potential investors, to induce those potential investors to invest money into the prime bank ponzi scheme that they knew was a fraud; promising that each investor would have an account in an offshore bank to hold ``trading profits,'' while knowing full well that there were no such accounts or profits; describing a managed fund which would generate profits, knowing full well that there were no managed funds and

there would never be any profits (at least to the investors); creating and distributing to the public a ``Procedures Letter,'' which contained information known by these Defendants to be false; creating and distributing to the public a ``Summary Overview,'' which contained false information designed to induce members of the public to invest in the ponzi scheme; creating and distributing the ``Asset Management Agreement,'' which contained information known by these Defendants to be false; sending bogus statements and disclaimers to Plaintiffs, falsely stating that each Plaintiff was receiving a ``return'' on their investment; soliciting ``investors'' by promising that the investment was ``high yield'' with total safety of their principal and by guaranteeing returns on the investment, all the while knowing that these statements were false; promising that Plaintiffs' money would never leave the United States, while knowing that these statements were false; promising investors that a portion of their investment would benefit a charitable technology called ``Homevest,'' which would provide housing for many of the world's low income families, knowing that these promises were false; describing to potential investors that the investment was legitimate, very high-yield, open only to carefully selected and qualified investors, knowing that these statements were false.  Plaintiffs are members of the public and were misled into entrusting their money to defendants' scheme; other members of the public have been misled and will be misled if this scheme is not remedied and future such schemes by defendants not quashed.

55

174.   Pursuant to Sections 17200 - 17500 et seq., Plaintiffs seek from these Defendants, and each of them, restitution and disgorgement of all earnings, profits, compensation and benefit obtained as a result of these Defendants' actions.

175.   In addition, pursuant to Section 17203 Plaintiffs seek an Order enjoining these Defendants, and each of them, as well as their agents, employees, representatives, and all persons acting in concert or participating with them, from continuing to engage in these illegal international banking or prime bank investment transactions and from continuing to engage in wrongful conduct which constitutes violations of section 17200 et seq. in the sale of more such investments.   Plaintiffs and members of the public will be irreparably harmed if such an order is not granted.

### FIFTH CLAIM FOR RELIEF
**ELDER ABUSE (Cal. W & I Code §15600 et seq)**
**(By all Plaintiffs except CALDWELL, HERRERA, LACEY, SKACEL, & MCKAY, against Defendants KING, MORGANSTERN, WOMACK, MACENROE, STEPHENS, and ORGOLINI)**

176.  Plaintiffs  repeat  and  incorporate  by  reference Paragraphs 1 - 175, inclusive, as though set forth herein.

177.   This claim is brought by those Plaintiffs who were residents of the State of California who were ages 65 and over at the time they were solicited for investment by Defendants, or were otherwise financially-dependent adults:  FORSLUND;  HERRON;  LACEY; MARTENS; ADLER; NEVIUS; PAGE; FORREST; STAMBAUGH; and ELLSWORTH.

178.   This claim is brought pursuant to California Welfare & Institutions Code sections 15600 et seq.

179. Plaintiffs at all relevant times were over 65 years of age, and/or were, at all relevant times herein, elders within the purview and definition of sec. 15610.27, and/or were or are dependent adults within the meaning of sec. 15610.23.

180. By doing the actions set forth herein these Defendants were and are these Plaintiffs' fiduciaries, having been entrusted by these Plaintiffs with the handling and safe investment and care of Plaintiffs' money, and at all relevant times Defendants placed themselves in and stand in a position of trust and confidence to these Plaintiffs, pursuant to and within the purview of Welfare and Institutions Code §15610.30.

181. These Defendants took, secreted, and/or appropriated Plaintiffs' money or property for Defendants' use and purposes which were not in the due and lawful execution of Defendants' fiduciary duties or relationship of trust to Plaintiffs. By committing the actions and making the statements and omissions set forth herein, these Defendants committed fiduciary abuse and abandonment pursuant to and within the purview and meaning of §15610.30 and §15610.05.

182. These Defendants knew, or reasonably should have known, that Plaintiffs trusted defendants to accept their money only for investment into a legitimate investment opportunity.

183. Plaintiffs trusted these Defendants to accurately disclose the true nature of the deal, and/or to present a legitimate investment deal instead of a scam. These Defendants understood or reasonably should have understood that these specific Plaintiffs were elderly and/or dependent.

3rd Amended Complaint for Damages

184.   These Defendants assumed and stood in a position of trust to these elderly Plaintiffs at all times herein mentioned.   These Defendants' actions were a part of a deliberate, willful, knowing and intentionally fraudulent scheme and represent an unfair taking of money or property not in the due and lawful execution of the trust of Plaintiffs.

185.   The actions of these Defendants towards these elderly Plaintiffs constitute fiduciary abuse as defined by sec. 15610.30.

186.   As a legal result of these Defendants' conduct herein alleged, Plaintiffs were damaged including without limitation economic injury related to the loss of their retirement savings, lost interest, and other general and special damages, in an amount according to proof at time of trial.

187.   The actions taken by these Defendants set forth above were in all respects malicious, willful and oppressive, and manifested either disregard or contempt for the rights of Plaintiffs.   These Defendants were fully cognizant of the position of trust in which these Defendants stood.   Plaintiffs are thereby entitled to an award of punitive and exemplary damages as well as attorneys' fees pursuant to Welfare & Institutions Code sec. 15657, in an amount according to proof at time of trial.

188.   As the subject transactions were with Plaintiffs who are senior citizens and/or dependent, Plaintiffs are entitled to treble damages and penalties pursuant to Civil Code §3345 because:  (1) these Defendants knew or should have known that their conduct was directed to one or more senior citizens; or (2) these Defendants' conduct caused one or more senior citizens to suffer loss or damage.

**SIXTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY**
**(By all Plaintiffs Except CALDWELL Against KING, MORGANSTERN, MACENROE, WOMACK, STEPHENS, and ORGOLINI)**

189.  Plaintiffs repeat and incorporate by reference Paragraphs 1 - 188, inclusive, as though set forth herein.

190.  These defendants designed, created and operated an investment ``vehicle'' for which they solicited investments of money, and for which the solicited Plaintiffs' trust.  These defendants, as operators of this scheme, became Plaintiffs' fiduciaries by accepting Plaintiffs' money and trust into their scheme on the terms set forth in the documents REIN drafted.  Thus they undertook and assumed a fiduciary duty to place Plaintiffs' interests ahead of their own in the handling of Plaintiffs' money and ``investment.''  Indeed, KING himself was named ``fiduciary director'' in the documents created by REIN, thus leading Plaintiffs to believe that these Defendants were, and were acting as, Plaintiffs' fiduciaries in the handling of Plaintiffs' money, and therefore are estopped from denying that they were in a fiduciary capacity and relationship with respect to Plaintiffs.

191.  By their actions and the contracts and agreements between Plaintiffs and Defendants, Defendants were and placed themselves into and assumed a fiduciary relationship with respect to Plaintiffs and Plaintiffs' money entrusted to them.

192.  In seeking to, and succeeding in, taking these Plaintiffs' money, and purporting to invest that money for these Plaintiffs' benefit, these Defendants owed these Plaintiffs the duty

to deal them in the highest degree of good faith, integrity and fair dealing.

193. By the acts and omissions described in detail, <u>supra</u>, herein alleged, these Defendants breached their fiduciary duties to these Plaintiffs, to the detriment of these Plaintiffs.

194. As a direct and legal result of these Defendants' acts and omissions, Plaintiffs were damaged in an amount to be proved at trial.

195. These Defendants' actions were willful, malicious and in conscious disregard of these Plaintiffs' rights, thus justifying an award of punitive and exemplary damages.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(By all Plaintiffs except CALDWELL Against**
**Defendants REIN and the LAW FIRM)**

</div>

196. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 - 195, inclusive, as though set forth herein.

197. Defendants KING, ORGOLINI, WOMACK, MACENROE, MORGANSTERN, and STEVENS undertook and owed fiduciary duties to plaintiffs with respect to the handling of plaintiffs' investment monies entrusted to them. Defendants REIN and the LAW FIRM knew of and were aware of these fiduciary duties and knew that they were owed to Plaintiffs, and in fact recognized them and attempted to avoid compliance with them. Further, Defendants REIN and the LAW FIRM were aware of KING's breaches of fiduciary duty and his desire to breach that duty via the operation of a prime bank ponzi scheme.

3rd Amended Complaint for Damages

198.  By their actions as set forth herein, including but not limited to the LAW FIRM's failure to supervise the activities of REIN and his use of LAW FIRM resources and personnel, these defendants gave substantial assistance to KING's breaches of fiduciary duty, and substantially assisted KING in stealing Plaintiffs' money and in breaching his duties of trust and loyalty in the handling of Plaintiffs' invested and entrusted funds, and gave substantial assistance to the operation of the subject fraudulent prime bank ponzi scheme.  The actions described herein constitute substantial assistance in KING's breaches of fiduciary duties to Plaintiffs.

199.  As a direct and legal result of the acts and omissions of these defendants, Plaintiffs have suffered damages to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA SECURITIES LAWS
(By all Plaintiffs Except CALDWELL For:
1. Violations of Corp. Code §§25403 and 25504 AIDING AND ABETTING
Against REIN and the LAW FIRM; and
2. Violations of Corp. Code §§25400 and 25401 SECURITIES
FRAUD Against KING, MORGANSTERN, WOMACK, MACENROE, STEPHENS,
and ORGOLINI)

200.  Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 - 199, inclusive, as though set forth herein.

201.  By their actions alleged herein Defendants KING, MORGANSTERN, WOMACK, MACENROE, STEPHENS, and ORGOLINI are alleged to have violated California Corporations Code Sections 25400(d) and 25401 (misrepresentations in connection with the sale of a security) by creating, planning, marketing, promoting, and offering for sale the bogus prime bank Ponzi scheme described above.  These

Defendants, by their actions, offered and/or sold securities securities by making, for the purpose of inducing payments of money to them by Plaintiffs, statements which were, at the time Defendants made them, false and/or misleading with respect to material facts. These Defendants also failed to state material facts necessary to make their statements not misleading, in light of the circumstances under which they were made. These Defendants knew or had reason to know that their statements were false and misleading, and in violation of California Corporations Code Sections 25400 et seq. These Defendants, by their actions, offered to sell and sold securities to Plaintiffs within the purview of Corporations Code Section 25017 by means of communications which included untrue statements of material fact, and they omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, and in doing so violated Sections 24501 and/or 25503.

202. By their actions alleged herein Defendants REIN and the LAW FIRM are alleged to have violated California Corporations Code Sections 25403(a) and 25403(b) by aiding and abetting and offering and providing substantial assistance in and to the securities fraud prime bank Ponzi scheme operated by REIN and/or KING, MORGANSTERN, WOMACK, MACENROE, STEPHENS and ORGOLINI. By their actions described above, including but not limited to the LAW FIRM's failure to supervise Defendant REIN and his use of law firm resources and personnel, defendants REIN and the LAW FIRM have knowingly provided substantial assistance to the other defendants in their violation of the California securities laws.

203.  As a legal and actual result of Defendants' actions, Plaintiffs have been damaged in an amount to be determined at trial, and are entitled to one or more of the remedies and measures of damage set forth in Corporations Code sections 25500 - 25502.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment as follows:

Judgment in their favor against each Defendant for damages in an amount as proven, including return of their lost investments and lost opportunity cost thereof; pre-judgment interest; costs of suit; and attorneys fees as allowed by law;

Extraordinary, equitable and injunctive relief, including restitution, disgorgement, an order freezing the assets of scheme, attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' activities or other assets to assure that Plaintiffs have an effective remedy, and an order barring these defendants from continuing to operate their illegal international banking schemes;

And such other and further relief as may be just and proper.

**DREHER LAW FIRM**

Dated:  September 13, 2002        By: _____
Robert Scott Dreher
Attorneys for Plaintiffs

### JURY TRIAL DEMAND

Plaintiffs respectfully demand a jury trial on all issues so triable.

**DREHER LAW FIRM**

Dated:  September 13, 2002        By: _____
Robert Scott Dreher
Attorneys for Plaintiffs

M:\JD\CASES\132\Pleadings\3AC.doc

3rd Amended Complaint for Damages

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

**Forslund, et al. v. Rein, et al.** *Case No.* **SACV01-1085GLT(ANx)**

### PROOF OF SERVICE

I, Yassarette Alcala, the undersigned, declare: I am over the age of eighteen years and not a party to the case. I am employed in the County of San Diego, California, where the service occurs; and my business address is 835 Fifth Avenue, Suite 202, San Diego, California 92101.

On **September 16, 2002**, I served the foregoing document(s) described as *THIRD AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF FOR FRAUD; VIOLATIONS OF THE FEDERAL SECURITIES LAWS; CONVERSION; UNFAIR, UNLAWFUL, & FRAUDULENT BUSINESS PRACTICES; ELDER FINANCIAL ABUSE; BREACH OF FIDUCIARY DUTY; AIDING & ABETTING BREACH OF FIDUCIARY DUTY; AND VIOLATIONS OF CALIFORNIA SECURITIES LAWS,* as follows:

| | |
|---|---|
| Ralph King<br>6712 Portshead Road<br>Malibu, CA 90265<br>T: (310) 589-8393<br>F: (310) 589-8093<br>*Defendant In Propria* | Dante Orgolini<br>1555 Mesa Verdi Dr. East, #38B<br>Costa Mesa, CA 92626-000<br>T: (714) 546-0253<br>F: (714) 546-0253<br>*Defendant in Propria Persona* |
| Michael C. Robinson<br>Daniel C. Faustino<br>ROBINSON, DI LANDO & WHITAKER<br>800 Wilshire Blvd., Suite 1100<br>Los Angeles, CA 90017<br>T: (213) 229-0100<br>F: (213) 229-0114<br>*Attorneys for Defendants Scott Rein, Rein, Evans & Sestanovich, L.L.P., Patrick Evans, Thomas Sestanovich, Byron Moldo and Peter Davidson* | David E. Kronemyer<br>1925 Century Park E., Ste. 1600<br>Los Angeles, CA 90067<br>T: (310) 551-3100<br>F: (310) 551-0238<br>*Attorneys for Defendants Scott Rein, Rein, Evans & Sestanovich, L.L.P., Patrick Evans, Thomas Sestanovich, Byron Moldo and Peter Davidson* |

[X]     BY MAIL. I am readily familiar with the Dreher Law Firm's practice of collection and processing of correspondence for mailing with the United States Postal Service, and that the correspondence shall be deposited with the United States Postal Service this same day in the ordinary course of business.

[ ]     BY FAX. In addition to service by mail as set forth above, a copy of said document(s) were also delivered by facsimile transmission.

[ ]     BY FEDERAL EXPRESS MAIL. I caused said document(s) to be deposited in a box or other facility regularly maintained by the Federal Express service carrier providing overnight delivery.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and was executed **September 16, 2002**, at San Diego, California.

Yassarette Alcala

Home | Fast Answers | Site Map | Search:

**U.S. Securities and Exchange Commission**

About the SEC

Filings (EDGAR)

Regulatory Actions

Staff Interps

Investor Info

News & Statements

Litigation

Information for...

**Divisions**

Corporation Finance
Enforcement
Investment Mgmt.
Market Regulation

# How Prime Bank Frauds Work

Prime bank programs often claim investors' funds will be used to purchase and trade "prime bank" financial instruments on clandestine overseas markets in order to generate huge returns in which the investor will share. However, neither these instruments, nor the markets on which they allegedly trade, exist. To give the scheme an air of legitimacy, the promoters distribute documents that appear complex, sophisticated and official. The sellers frequently tell potential investors that they have special access to programs that otherwise would be reserved for top financiers on Wall Street, or in London, Geneva or other world financial centers. Investors are also told that profits of 100% or more are possible with little risk.

Individuals and entities are targeted, including municipalities, charitable associations and other nonprofit organizations. The promoters of these schemes have demonstrated remarkable audacity, advertising in national newspapers, such as *USA Today* and the *Wall Street Journal*. Some promoters of these schemes avoid using the term "Prime Bank note," and tell prospective investors that their programs do not involve prime bank instruments in an effort to demonstrate that their programs are not fraudulent. Regardless of the terminology, the basic pitch – that the program involves trading in international financial instruments – remains the same, and investors should continue to be vigilant against such fraud.

## Signs of Banking-Related Investment Fraud

Below are warning signs of prime bank or other fraudulent bank-related investment schemes.

### Excessive Guaranteed Returns

These fraudulent investment pitches typically offer or guarantee spectacular returns of 20 to 200 percent monthly, absolutely risk free. Promises of unrealistic returns at no risk are hallmarks of prime bank fraud.

### Fictitious Financial Instrument

Despite having credible-sounding names, the supposed "financial instruments" at the heart of any prime bank scheme simply do not exist. Exercise caution if you've been asked to invest in a debt obligation of the top 100 world banks, Medium Term Bank Notes or Debentures, Standby Letters of Credit, Bank Guarantees, an offshore trading program, a roll program, bank-issued debentures, a high yield investment program, or some variation on these descriptions. Promoters frequently claim that the

*Exh. 1*

offere ...inancial instrument is issued, traded, guaranteed, or endorsed by the World Bank, International Monetary Fund (IMF), Federal Reserve, Department of Treasury, International Chamber of Commerce (ICC), or an international central bank.

**Extreme Secrecy**

Promoters claim that transactions must be kept strictly confidential by all parties, making client references unavailable. They may characterize the transactions as the best-kept secret in the banking industry, and assert that, if asked, bank and regulatory officials would deny knowledge of such instruments. Investors may be asked to sign nondisclosure agreements.

**Exclusive Opportunity**

Promoters frequently claim that investment opportunities of this type are by invitation only, available to only a handful of special customers, and historically reserved for the wealthy elite.

**Claims of Inordinate Complexity**

Investment pitches frequently are vague about who is involved in the transaction or where the money is going. Promoters may try to explain away this lack of specificity by stating that the financial instruments are too technical or complex for nonexperts to understand.

You should be especially watchful for prime-bank related schemes promoted over the Internet. Despite numerous SEC actions charging prime bank promoters with multiple violations of the federal securities laws, prime bank offerings continue to proliferate in cyberspace.

If you have any information regarding the offer or sale of "prime bank" or similar financial instruments, or programs employing these instruments, please provide that information to the SEC's Division of Enforcement immediately by using the Enforcement Complaint Center. You also may want to visit other helpful websites to learn more about prime bank-related fraud.

| Prime Bank Home | Contacts |
|---|---|
| SEC Actions | Links |

*http://www.sec.gov/divisions/enforce/primebank/howtheywork.shtml*

Contact | Employment | Links | FOIA | Privacy Policy          Modified: 01/30/2002



Home | Fast Answers | Site Map | Search:

## U.S. Securities and Exchange Commission

About the SEC

Filings (EDGAR)

Regulatory Actions

Staff Interps

Investor Info

News & Statements

Litigation

Information for...

**Divisions**

Corporation Finance
Enforcement
Investment Mgmt.
Market Regulation

## Contacts

### Contacting Federal or International Agencies

Promoters of "prime bank" frauds often use the names of legitimate government agencies or international organizations as part of their modes operandi. You should contact the agencies listed below if you suspect someone is making a false statement involving one of the respective agencies:

- United States Securities and Exchange Commision
- Federal Reserve System
- International Monetary Fund
- International Chamber of Commerce
- World Bank

| How Prime Bank Frauds Work | Links |
| --- | --- |
| SEC Actions | Prime Bank Home |

*http://www.sec.gov/divisions/enforce/primebank/pbcont.shtml*

Contact | Employment | Links | FOIA | Privacy Policy          Modified: 01/30/2002

*EXh. 2*

**U.S. Securities and Exchange Commission**

# Warning to All Investors About Bogus "Prime Bank" and Other Banking-Related Investment Schemes

About the SEC

Filings (EDGAR)

Regulatory Actions

Staff Interps

Investor Info

News & Statements

Litigation

Information for...

**Divisions**

Corporation Finance

Enforcement

Investment Mgmt.

Market Regulation

Lured by the promise of astronomical profits and the chance to be part of an exclusive, international investing program, investors are once again falling prey to bogus "prime bank" scams. These fraudulent schemes involve the purported issuance, trading, or use of so-called "prime" bank, "prime" European bank or "prime" world bank financial instruments, or other "high yield investment programs" ("HYIP"s). The fraud artists who promote these schemes often use the word "prime" – or a synonymous phrase, such as "top fifty world banks" – to cloak their programs with an air of legitimacy. They seek to mislead investors by suggesting that well regarded and financially sound institutions participate in these bogus programs. But prime bank and other related schemes have no connection whatsoever to the world's leading financial institutions or to banks with the word "prime" in their names. The Securities and Exchange Commission and <u>other federal</u> and <u>state agencies</u> are continuing to warn investors about these scams.

| How Prime Bank Frauds Work | Contacts |
|---|---|
| SEC Actions | Links |

*http://www.sec.gov/divisions/enforce/primebank.shtml*

Contact |: Employment | Links | FOIA | Privacy Policy          Modified: 01/30/2002

*Exh.3*

Home | Fast Answers | Site Map | Search:

## U.S. Securities and Exchange Commission

# Announcements of Selected SEC Enforcement Actions Related to Prime Bank Fraud

About the SEC

Filings (EDGAR)

Regulatory Actions

Staff Interps

Investor Info

News & Statements

Litigation

Information for...

**Divisions**

Corporation Finance
Enforcement
Investment Mgmt.
Market Regulation

How Prime Bank Frauds Work

Contacts

Links

Prime Bank Home

| Release No. | Date | Action |
|---|---|---|
| **2002 Releases – Internet Actions** | | |
| LR-17517 | May 14, 2002 | Lewis J. McConnell, Jr., Ned L. Huggins, and Gregory T. Wood |
| LR-17516 | May 14, 2002 | Louis M. Lazorwitz, J. Charles Reives, Tri-Star Investment Group, L.L.C. a/k/a Tri-Star Investment Group, Defendants, and Lazor, Ltd., Relief Defendant |
| LR-17506 | May 7, 2002 | Sebastian Corriere, et al. |
| LR-17480 | Apr. 22, 2002 | Advance Local Development Corp., et al. |
| LR-17474 | Apr. 17, 2002 | Frederick J. Gilliland, Defendant, and MM ACMC Banque de Commerce, Inc., Relief Defendant |
| LR-17468 | Apr. 11, 2002 | Edward J. Paradis, Jr. and Walter R. Snyder, Jr. |
| LR-17461 | Apr. 5, 2002 | Dennis Herula, et al. |
| LR-17459 | Apr. 5, 2002 | U.S. Reservation Bank & Trust, Higher Investment Technologies, Inc., Global-Link Capital Markets, L.L.C., Edward J. Driving Hawk, Sr., Leo Driving Hawk, Sr., John M. Adams, Edmund J. Smedley, Kenneth S. Harrison, William J. Herisko, Thomas T. Emerton, Defendants, and Oyate Development, Inc., Oyate Enterprises, L.L.P., Oyate Trust, River Walk Development, L.L.C., Ringthunder Racing Stables, Inc., HPHC, Inc., James R. Driving Hawk, Orpha Jane Johnston, Relief Defendants |
| LR-17454 | Apr. 2, 2002 | Terry L. Dowdel, et al. |
| 34-45498 | Mar. 4, 2002 | Ellsworth Wayne McLaws and Alan Clagg |
| LR-17440 | Mar. 27, 2002 | Charles Timson |
| LR-17438 | Mar. 26, 2002 | Resource Development International, LLC, David Edwards, James Edwards, Jade Asset Management, Ltd., Sound Financial Services, Inc., Intercostal Group, LLC, Intercoastal Group II, LLC, Kevin Lynds, |

Exh. 4
5/19/2002

| | | Gerald J. ___ __k, Blackwolf Holdings, LLC and William Whelan, Defendants and Pacific International Limited Partnership, International Education Research Corporation, Galaxy Asset Management, Inc., and David Cluff, Individually and d/b/a Rivera Trust 410, Relief Defendants |
|---|---|---|
| LR-17411 | Mar. 14, 2002 | Harral Dunbar, Jr., individually and d/b/a Ghost International |
| LR-17403 | Mar. 7, 2002 | Joseph Lloyd Norris, Mark Gray Coleman, Magellan Communications Group, LLC, and Northern Lights Financial, LLC |
| LR-17386 | Feb. 27, 2002 | CDH & Affiliates, Inc. and C. David Hallman |
| LR-17362 | Feb. 14, 2002 | Clif Goldstein, formerly known as Clifford Dixon Noe, Paul Howe Noe, also known as Paul Noe Randall, Carolyn M. Kaplan, Noel Alelov, Russell B. Gerstein, Nuell W. Paschal, Great American Trust Company, Inc., and Great American Trust Corporation, Inc. |
| 33-8061 | Jan. 24, 2002 | Brian A. Schmidt, John Aristotle Dilworth, II, and Euro-Atlantic Securities, Inc. Rel. no.: 34-45330 |
| LR-17322 | Jan. 16, 2002 | Lewis J. McConnell, Jr., Ned L. Huggins, and Gregory T. Wood |
| LR-17318 | Jan. 16, 2002 | Philip J. Yoder |
| LR-17317 | Jan. 15, 2002 | Louis M. Lazorwitz, J. Charles Reives, Tri-Star Investment Group, L.L.C. a/k/a Tri-Star Investment Group, Defendants, and Lazor, Ltd. Relief Defendant |

### 2001 Releases – Internet Actions

| LR-17289 | Dec. 21, 2001 | Earl A. Abbott, Richard L. Stalvey, Glenn Perdue, Robert E. Gerwin, Kenneth C. Nunn and Thomas J. O'Keeffe |
|---|---|---|
| LR-17281 | Dec. 19, 2001 | Lytle E. Fogelsong, Thomas Gregory Cook, James H. Malbaff, and Malbaff & Cook |
| LR-17258 | Dec. 6, 2001 | Richard Collins, et al. |
| LR-17256 | Dec. 5, 2001 | John C. Willy, Jr. |
| LR-17244 | Nov. 21, 2001 | W. David Blunk, Jr., Aubrey John Elam, Jr. and Stanley C. Eaves |
| LR-17242 | Nov. 19, 2001 | Terry L. Dowdell, et al. |
| LR-17233 | Nov.15, 2001 | Highland Financial Corporation, et al. |
| LR-17208 | Oct. 25, 2001 | James R. Harrold, Franklin Management and Consulting, LLC, Accipter, LLC, Franklin Asset Management and Consulting, LLC, Franklin Management and Consulting, Inc., and Concord Development Group, LLC. |
| LR-17198 | Oct. 19, 2001 | Earl A. Abbott, Richard L. Stalvey, Glenn Purdue, Kenneth C. Nunn and Thomas J. O'Keeffe |

| LR-17197 | Oct. 18, 2001 | Rodolfo Lobrido, Elias I. Kodsi and Alain D. Kodsi |
| LR-17196 | Oct. 17, 2001 | Millionaire.com and Robert L. White |
| LR-17187 | Oct. 15, 2001 | Mark Steven Snader, d/b/a E-Highyields.com and The High Yield Club |
| LR-17186 | Oct. 15, 2001 | Concord Capital Enterprise, dba Concord Capital Inc., Scott Yoshizumi, Ann Ta, and Dionisia Pappas |
| LR-17181 | Oct. 11, 2001 | Frank L. Peitz, Daniel B. Benson, Peter A. Loutos, Sr., Robert D. Paladino, Randall W. Law, and Monica M. Iles |
| 33-8017 | Sept. 28, 2001 | Enrico Cortesano |
| LR-17121 | Sept. 7, 2001 | Tri-West Investment Club, Alyn Richard Waage, and Haarlem Universal Corporation |
| 34-44671 | Aug. 9, 2001 | John E. Brinker, Jr. and Gary J. Bentz |
| 34-44577 | Jul. 19, 2001 | Ellsworth Wayne McLaws and Alan Clagg |
| LR-17057 | Jun. 29, 2001 | Garry W. Stroud, individually and d/b/a Diamond Global Holding Trust, Euro Credit and Exchange Bank Ltd., and Angelic International |
| LR-17031 | Jun. 7, 2001 | Ian Renert, et al. |
| LR-16990 | May 7, 2001 | Phillip H. Ezell, individually and doing business as 21st Century Funding |
| LR-16977 | Apr. 26, 2001 | Elfindepan, S.A., Southern Financial Group, Tracy Calvin Dunlap, Jr., Barry Lowe, James L. McCall, Strategic Asset Funds, S.A., Edmund Menden, Michael Menden and Michael Zieglmeier, defendants, and C.R.C.C. LLC and Patrick Wilson, relief defendants |
| LR-16942 | Mar. 23, 2001 | Nancy J. Cheal |
| LR-16902 | Feb. 16, 2001 | Advance Local Development Corp., et. al. |
| LR-16892 | Feb. 8, 2001 | Elfindepan, S.A., Southern Financial Group, Tracy CalvinDunlap, Jr., Barry Lowe, James L. McCall, Strategic Asset Funds, S.A. EdmundMenden, Michael Menden and Michael Zieglmeier, defendants, and C.R.C.C. LLCand Patrick Wilson, relief defendants |

**Other 2001 Releases**

| LR-17164 | Sept. 28, 2001 | Gilbert Merrell Wynne, et al. |
| 33-8012 | Sept. 26, 2001 | John F. Smart |
| LR-17152 | Sept. 26, 2001 | John E. Brinker, Jr., Gary J. Bentz, et al. |
| LR-17142 | Sept. 20, 2001 | Alamin, Inc., Financial Resources, George L. Vaughn and Curt Arvidson |
| LR-17137 | Sept. 19, 2001 | Zappa International Corporation, Scott L. Simpson, Scott B. Walker, Equity Management Services, Eagle Vision Holdings Inc., Wayne Nattrass, and Westminster Trading Trust |

| | | |
|---|---|---|
| LR-1 6 | Sept. 18, 2001 | Kenton Ca , Ltd., et al. |
| LR-17135 | Sept. 18, 2001 | Daniel E. Schneider, et al., Defendants and Gordon A. Dunlop, et al., Relief Defendants |
| LR-17132 | Sept. 18, 2001 | James R. Harrold, Franklin Management and Consulting, LLC, Accipter, LLC, Franklin Asset Management and Consulting, LLC, Franklin Management and Consulting, Inc., and Concord Development Group, LLC. |
| LR-17119 | Sept. 6, 2001 | Donald Barry Tamres |
| LR-17109 | Aug. 28, 2001 | Lewis Allen Rivlin, Edwin Earl Huling III, and Alfred Huascar Velarde, as defendants; and Z-Finance, S.A., Anthony P. Zioudas, Hedley Finance Ltd., Christian Dante,and Chrysanthos Chrysostomou, as relief defendants |
| 34-44671 | Aug. 9, 2001 | John E. Brinker, Jr. and Gary J. Bentz |
| LR-17085 | Aug. 2, 2001 | 2001 TLC Investments & Trade Co., TLC America, Inc. dba Brea Development Company, TLC Brokerage, Inc. dba TLC Marketing, TLC Development Inc., TLC Real Properties RLLP-1, Cloud & Associates consulting, Inc., Ernest F. Cossey, Gary W. Williams, and Thomas G. Cloud |
| LR-17073 | Jul. 19, 2001 | Kenton Capital, Ltd., et al. |
| 34-44577 | Jul. 19, 2001 | Ellsworth Wayne McLaws and Alan Clagg |
| LR-17055 | Jun. 29, 2001 | Terry V. Koontz |
| LR-17017 | May 24, 2001 | Pacific Air Transport, Inc. and Robert B. Hirsh |
| LR-17012 | May 22, 2001 | Funding Resources Group, et al. |
| LR-17007 | May 16, 2001 | Paul Shingledecker |
| LR-16979 | Apr. 30, 2001 | The Gateway Association, The Gateway Association (Illinois), Richard J. Collins, Bill Wilson, Jerome Coppage, David A. Morgenstern, William J. Windsor, Linda A. Fehl, Malcolm Silverman, Janet Collins and Christine J. Todd |
| ~~LR-16969~~ | ~~Apr. 18, 2001~~ | ~~Eric E. Resteiner, et al.~~ |
| LR-16963 | Apr. 16, 2001 | Eric E. Resteiner |
| LR-16950 | Apr. 3, 2001 | Steven E. Thorn, Craig A. Morgan, Karen A. Estrada, Global Investors Group, LLC, First Financial Ventures, LLC, Second Financial Ventures, LLC, Third Financial Ventures, LLC, Fund Global, LLC and Global Equity Group, LLC |
| 34-44132 | Mar. 29, 2001 | Michael P. Keating and Keating Advisory Group |
| LR-16940 | Mar. 22, 2001 | Earl A. Abbott, Richard L. Stalvey, Glenn Purdue, Robert E. Gerwin, Kenneth C. Nunn and Thomas J. O'Keeffe |
| LR-16934 | Mar. 16, 2001 | Lewis Allen Rivlin, Edwin Earl Huling III, and Alfred Huascar Velarde, as Defendants; and Z-Finance, S.A., Anthony P. Zioudas, Hedley Finance Ltd., Christian |

Dante, and Chrysanthos Chrysostomou, as Relief Defendants

| | | |
|---|---|---|
| LR-16927 | Mar. 8, 2001 | Terry V. Koontz, et al. |
| LR-16915 | Feb. 28, 2001 | John E. Brinker, Jr., Gary J. Bentz, Castlerock Consulting, LLC, Guardian First Limited, Inc. (a Nevada corporation), Guardian First Limited, Inc. (a Grenada corporation), Wellington Bank and Trust, Ltd., Wellington Capital Holdings Ltd., Inc., Wellington Capital Holdings, Ltd., Wellington International Investments, Inc., Wellington First International Investments, Inc. and all subsequently numbered Wellington International Investments, Inc. entities, Alpha Advantage II, Inc., Eleven Eighty-Five, LP, and Steadfast Ministries, Inc. |
| LR-16897 | Feb. 14, 2001 | Edward J. Paradis, Jr. and Walter R. Snyder, Jr. |
| LR-16896 | Feb. 13, 2001 | TAC International Limited, Douglas R. Walker, Craig Southwood, Larry B. Richardson and Jan Harry "Jack" Wilded |
| LR-16883 | Jan. 31, 2001 | Stewart, et al. |
| LR-16849 | Jan. 2, 2001 | Benjamin Franklin Cook, et al. |

## 2000 Releases – Internet Actions

| | | |
|---|---|---|
| LR-16833 | Dec. 19, 2000 | Phillip H. Ezell, individually and doing business as 21st Century Funding |
| LR-16789 | Nov. 6, 2000 | TLC Investments & Trade Co., TLC America, Inc. dba Brea Development Company, TLC Brokerage, Inc., dba TLC Marketing, TLC Development, Inc., TLC Real Properties RLLP-1, Cloud & Associates Consulting, Inc., Ernest F. Cossey, Gary W. Williams, and Thomas G. Cloud |
| LR-16754 | Oct. 5, 2000 | TLC Investments &Trade Co., TLC America, Inc. dba Brea Development Company, TLC Brokerage, Inc., dba TLC Marketing, TLC Development, Inc., TLC Real Properties RLLP-1, Cloud &Associates Consulting, Inc., Ernest F. Cossey, Gary W. Williams, and Thomas G. Cloud |
| LR-16649 | Aug. 10, 2000 | Elfindepan, S.A. Southern Financial Group, Tracy Calvin Dunlap, Jr. and Barry Lowe |
| LR-16440 | Feb. 17, 2000 | Nancy J. Cheal, individually and d/b/a Relief Enterprise, et al. |
| LR-16424 | Feb. 3, 2000 | Nancy J. Cheal |

## Other 2000 Releases

| | | |
|---|---|---|
| LR-16821 | Dec. 11, 2000 | Perennial Fund I LP, et. al. |

| LR-16799 | Nov. 24, 2000 | Concord Capital Enterprise, DBA Concord Capital Inc. and Concord Capital Enterprises, Scott Yoshizumi, Ann Ta, and Dionisia Pappas |
| --- | --- | --- |
| LR-16797 | Nov. 8, 2000 | Roy E. Matlock and Alan Root |
| LR-16796 | Nov. 8, 2000 | Steven C. Roberts |
| LR-16769 | Oct. 16, 2000 | Anthony J. Marino, Gregory C. Johnson, Richard Ames Higgins, Mousa International, AJM Global, and Consortio Intranacional |
| LR-16736 | Sep. 28, 2000 | Terry V. Koontz, et al. |
| LR-16727 | Sep. 27, 2000 | Terry V. Koontz, et al. |
| 34-43034 | Jul. 20, 2000 | Gerald Lee Pate |
| LR-16538 | May 4, 2000 | Benjamin Franklin Cook et al |
| LR-16496 | Mar. 31, 2000 | Highland Financial Corporation, et al. |
| LR-16488 | Mar. 27, 2000 | Alliance Leasing Corporation and Prime Atlantic, Inc. |
| LR-16428 | Feb. 7, 2000 | TAC International Limited, Douglas R. Walker, Craig Southwood, Larry B. Richardson and Jan Harry "Jack" Wilde |
| 34-42391 | Feb. 7, 2000 | Roy E. Matlock |
| LR-16408 | Jan. 14, 2000 | John Lauer, et al. |

## 1999 Releases – Internet Actions

| LR-16140 | May 11, 1999 | Theodore O. Pollard |
| --- | --- | --- |
| LR-16139 | May 11, 1999 | HDG Investment Corporation and Paul J. Edwards |
| LR-16138 | May 11, 1999 | Abacus International Holding Corp. and Arthur Agustin |
| LR-16134 | May 11, 1999 | Richard J. Briden |
| LR-16132 | May 5, 1999 | Theodore O. Pollard and World Investment Network, Ltd. |
| 33-7679 | May 11, 1999 | In the Matter of David Francis |
| 33-7677 | May 11, 1999 | In the Matter of Derrick Johnson |
| 34-41388 | May 11, 1999 | In the Matter of Lila Keith |
| 33-7680 | May 11, 1999 | In the Matter of Robert Stahl, Elizabeth Boyd and Bobby Rodgers |

## Other 1999 Releases

| LR-16274 | Sep. 8, 1999 | Highland Financial Corporation, Kay L. Cahill, individually and d/b/a Interdyne Ltd., Michael B. Chalmers, John C. Matthews, individually and d/b/a Sunland States Insurance Agency, Roger Myatt and Robert Alberding |
| --- | --- | --- |
| LR-16245 | Aug. 5, 1999 | Alamin, Inc., Financial Resources, George |

L. Vaughn u Curt Arvidson

| | | |
|---|---|---|
| LR-16219 | Jul. 23, 1999 | Funding Resoures Group, et al |
| LR-16210 | Jul. 13, 1999 | Kenneth Senffner |
| LR-16207 | Jul. 12, 1999 | Stewart, et al. |
| LR-16201 | Jun. 30, 1999 | Edward J. Paradis, Jr. and Walter R. Snyder |
| LR-16195 | Jun. 25, 1999 | Clarence Wayne Cook, Brian E. Causey, Haven Quest and Cayman South International, Inc. |
| LR-16184 | Jun. 10, 1999 | Daniel T. Todt, et al., (*unavailable online*) (See also LR-15960, Oct. 28, 1998) |
| LR-16179 | Jun. 8, 1999 | Lewis Allen Rivlin, Edwin Earl Huling III, and Alfred Huascar Velarde, As Defendants; and Z-Finance, S.A., Anthony P. Zioudas, Hedley Finance Ltd., Christian Dante, and Chrysanthos Chrysostomou, As Relief Defendants |
| LR-16168 | May 28, 1999 | Glen Eugene Miller, Rich Barlow, LD&B Management, Inc., Acquire Venture Fund Group, Lori Miller, Reflex Body & Fitness, LLC, and Canyon Rim, LLC |
| LR-16153 | May 19, 1999 | Marshall Nell Craig Ronald, Rudolf Alexander Victor Linschoten A/K/A Rudolf Van Lin *or* Dr. Rudolf Van Lin, and Frieda G. Freitas |
| LR-16147 | May 14, 1999 | Anthony J. Marino et al. |
| LR-11620 | Apr. 22, 1999 | Lennox Investment Group, Ltd., Active International, Inc., Randall W. Law, James F. Wardell, Monica M. Iles, Frank L. Peitz, and Daniel B. Benson |
| LR-16112 | Apr. 14, 1999 | Benjamin Franklin Cook, individually and DBA Dennel Finance Limited, Gerald Lee Pate, Ellsworth, Wayne McLaws and Alan Clagg, et al. |
| LR-16109 | Apr. 8, 1999 | |
| LR-16100 | Mar. 31, 1999 | Jeffrey Norton, Donald Reynolds, Edward Menster and John Tartaglia |
| LR-16034 | Jan. 21, 1999 | Donald Wallace, et al. |
| LR-16020 | Jan. 12, 1999 | Barnard Sackett, John H. Schriek and Enviroland, Ltd. |

## 1998 Releases

| | | |
|---|---|---|
| LR-15986 | Nov. 24, 1998 | Vincent Setteducate |
| LR-15984 | Nov. 20, 1998 | Zappa International Corporation, Scott L. Simpson, Scott B. Walker, Equity Management Services, Eagle Vision Holdings Inc., Wayne Nattrass, and Westminster Trading Trust; |
| LR-15976 | Nov. 13, 1998 | Austria Trust Company, Ltd., Glen Moyer and Bobby Lee Rodgers, Defendants, and City (U.K.) Ltd., Relief Defendant |

| LR-1___5 | Oct. 26, 1998 | Kenton C___i, Ltd., et al. |
|---|---|---|
| LR-15941 | Oct. 20, 1998 | Richard Warren & Associates, Inc., et. al. |
| LR-15883 | Sep. 16, 1998 | Teddy Wayne Solomon and Lisa Debra Stevens |
| LR-15878 | Sep. 10, 1998 | Fernando Cruz (see also LR-15557) |
| LR-15866 | Sep. 2, 1998 | Kellin Investment Corp. and Orlando R. Landa (see also Order barring Defendant Orlando R. Landa from securities industry, Sept. 22, 1998) |
| LR-15828 | Jul. 31, 1998 | Calvin Douglas Brace, et al. (See also Order barring Defendant Brace from association with any investment adviser, Aug. 26, 1999) |
| LR-15813 | Jul. 16, 1998 | Michael D. Richmond, Individually, Michael D. Richmond D/B/A Liberty Network, Royal Meridian International Bank, Meridian Monetary Services, Inc., William Duke, Meridian Management Services, LLC., K. Bruce Nuckols, Anthony Garry, Thomas Connolly, and as Relief Defendants, Zone Productions, Inc., Terry Koontz and Marianne Clark and Linda Mitchell as Trustees for Purr Trust; (See also LR-16104, Apr. 2, 1999) |
| LR-15790 | Jun. 25, 1998 | Kathy S. Kingsmore, (unavailable online) (See also LR-5078, Sept. 26, 1996) |
| LR-15612 | Jan. 8, 1998 | The Trust Group, Ltd., et al. |

**1997 Releases**

| LR-15604 | Dec. 23, 1997 | Gene Block, Individually and d/b/a Block Consulting Services, Renate Haag, Individually and d/b/a Haag + Partner, and Robert T. Riley, Individually and d/b/a The Roberts Group |
|---|---|---|
| LR-15579 | Dec. 4, 1997 | Joseph A. Bremont, Jimmy B. Sanchez, Comcar International, Ltd., Commercial Capital Resources, Inc., Loomis Ltd., Michael R. Spector, and R.P.S. Financial Group, Inc. |
| LR-15560 | Nov. 14, 1997 | Charles Brumfield, Joseph Brumfield, Robert Allen, William Mylett, Joseph Penna, and Joseph Kenton Capital, Ltd |
| LR-15469 | Sep. 3, 1997 | Ellis L. Deyon, Bradley T. Gullett (individually, and D.B.A. "Gullet and Associates"), William Hanke, Dove Investment Group, Inc. Sherwood H. Craig |
| LR-15355 | Apr. 29, 1997 | Gene Block and Robert T. Riley |
| LR-15340 | Apr. 18, 1997 | Jeffrey E. Carter |
| LR-15299 | Mar. 18, 1997 | Terry Plack |
| LR-15222 | Jan. 21, 1997 | Ellis Deyon |

**199\. Releases**

| | | |
|---|---|---|
| LR-15197 | Dec. 19, 1996 | Oscar William Olson, Jr. |
| LR-15163 | Nov. 21, 1996 | Joseph A. Bremont, Comcar International, Ltd., Commercial Capital Resources, Inc., and Jimmy B. Sanchez |
| LR-15140 | Oct. 29, 1996 | John F. D'Acquisto, D'Acquisto Financial Group, Inc., Doubleday Trust and Thomas F. Goodman |
| LR-15136 | Oct. 25, 1996 | Joseph Polichemi, Lyle Neal, Oscar William Olson, Jr., and Charles Padilla |
| LR-15135 | Oct. 24, 1996 | Harry Watson, Tracy French and Deltaur Partners |
| LR-15028 | Sep. 3, 1996 | Jeffrey S. Norton |
| LR-14999 | Aug. 5, 1996 | Joseph Silvestri, Charles Smith and Atlantic Pacific Guarantee Corporation |
| LR-14998 | Aug. 1, 1996 | Joseph Polichemi, Lyle Neal, Oscar William Olson, and Charles Padilla |
| LR-14833 | Mar. 5, 1996 | Harold Gantz |
| LR-14828 | Feb. 27, 1996 | Renate Haag |
| LR-14804 | Jan. 30, 1996 | Renate Haag |

**1995 Releases**

| | | |
|---|---|---|
| LR-14736 | Nov. 27, 1995 | Oscar William Olson, Jr. |
| LR-14711 | Nov. 2, 1995 | Renate Haag |
| LR-14705 | Oct. 31, 1995 | John D. Lauer and Clifton Lauer |
| LR-14701 | Oct. 26, 1995 | John Lauer |
| LR-14681 | Oct. 5, 1995 | D'Acquisto Financial Group, Inc., Doubleday Trust, John F. D'Acquisto and Thomas F. Goodman |

*http://www.sec.gov/divisions/enforce/primebank/pbaction.shtml*

Contact | Employment | Links | FOIA | Privacy Policy          Modified: 05/17/2002

U.S. Securities and Exchange Commission

# SECURITIES AND EXCHANGE COMMISSION

## LITIGATION RELEASE NO. 16979 / April 30, 2001

**SECURITIES AND EXCHANGE COMMISSION V. THE GATEWAY ASSOCIATION, THE GATEWAY ASSOCIATION (ILLINOIS), RICHARD J. COLLINS, BILL WILSON, JEROME COPPAGE, DAVID A. MORGENSTERN, WILLIAM J. WINDSOR, LINDA A. FEHL, MALCOLM SILVERMAN, JANET COLLINS AND CHRISTINE J. TODD (United States District Court for the Northern District of Illinois, 01C 3085)**

The Commission announced today the filing of a civil fraud action in the United States District Court for the Northern District of Illinois against two corporations and three individuals for the fraudulent sale of over $10 million in non-existent prime bank securities. According to the complaint, The Gateway Association Inc., and Illinois corporation, and The Gateway Association (Illinois) Inc., a Florida corporation, (collectively Gateway); Richard J. Collins (Collins), of Naperville, Illinois; Bill Wilson (Wilson), of Elmhurst, Illinois; and Jerome Coppage (Coppage), of Schererville, Indiana sold over $10 million in non-existent prime bank securities. The Commission alleges that the defendants violated the securities registration and antifraud provisions of the federal securities laws in connection with their offer and sale of these alleged prime bank instruments. At least six relief defendants received investor funds from Gateway. David A. Morgenstern (Morgenstern), of Ft. Lauderdale, Florida, is alleged to have received approximately $1.7 million of these funds; William J. Windsor (Windsor), of Kissimmee, Florida, is alleged to have received approximately $325,000 of these funds; Linda A. Fehl (Fehl), of Alphraretta, Georgia, is alleged to have received approximately $1.7 million of these funds; Malcolm Silverman (Silverman), of Arlington Heights, Illinois, is alleged to have received approximately $120,000 of these funds; Janet Collins, Collins' wife, and a resident of Naperville, Illinois, is alleged to have received approximately $325,000 of these funds; and Christine J. Todd, Collins' daughter, and a resident of Plainfield, Illinois, is alleged to have received approximately $200,000 of these funds.

The Commission's complaint alleges that from approximately November 1997 through March 1999, Gateway, Collins, Wilson and Coppage solicited primarily Hispanic investors to invest in a fictitious prime bank trading program. Specifically, Gateway, Collins, Wilson and Coppage made misrepresentations and omitted to state material facts to investors relating to, among other things: the rates of return on the Gateway trading program; the existence of prime bank securities; the risks of the trading program; the location of investors' deposits; and the use of the proceeds. At meetings held across the country, the defendants described the Gateway investment as a guaranteed, risk-free, high yield trading program in which a $100,000 initial investment would yield $1.25 million in ten months. Promotional materials provided to investors by Gateway representatives

*Exh.5*

explained to investors that their funds would be pooled to invest in an overseas bank debenture trading program involving medium-term bank debentures issued by the "top one hundred world banks." Approximately 400 investors invested more than $10 million in the Gateway program. In fact, this type of investment program does not exist and the investors' funds were simply used to fund various individual and corporate accounts, to purchase cars, and to pay for various other personal expenses.

The Commission's complaint alleges that in connection with this scheme, the defendants engaged in transactions, acts, practices and courses of business which constitute violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 (Securities Act), Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b-5 promulgated thereunder.

The Commission seeks a permanent injunction prohibiting the defendants from violating the securities registration and antifraud provisions of the Securities Act and the Exchange Act. In addition, the Commission seeks disgorgement of ill-gotten gains from Defendants Gateway, Collins, Wilson and Coppage and from Relief Defendants Morgenstern, Windsor, Fehl, Silverman, Janet Collins and Christine Todd, and the imposition of civil monetary penalties against all the primary defendants pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.
*http://www.sec.gov/litigation/litreleases/lr16979.htm*

---

Home | Previous Page                    Modified: 05/01/2001

Home | Fast Answers | Site Map | Search:

## U.S. Securities and Exchange Commission

## Links

### Helpful Websites

About the SEC

Filings (EDGAR)

Regulatory Actions

Staff Interps

Investor Info

News & Statements

Litigation

Information for...

**Divisions**

Corporation Finance

Enforcement

Investment Mgmt.

Market Regulation

Testimony concerning the FED's actions addressing illegal Prime Bank Schemes

The FED's Investment Scheme Advisory Alert

An alert statement issued by the OCC concerning Prime Bank Fraud

FBI's Fraud Alert concerning Prime Bank Notes

A Concise Summary of Prime Bank Instrument Scams, courtesy of the Kentucky Department of Financial Institutions

Description of Prime Bank Scams, from the Connecticut Department of Banking, Securities and Business Investments Division.

Description of Prime Bank Scams, from PricewaterhouseCoopers

The SEC's warning that "Limited Edition" United States Treasury do not exist

The NASDR's alert concerning Prime Bank Fraud.

| How Prime Bank Frauds Work | Contacts |
|---|---|
| SEC Actions | Prime Bank Home |

*http://www.sec.gov/divisions/enforce/primebank/pblinks.shtml*

Contact | Employment | Links | FOIA | Privacy Policy          Modified: 01/30/2002

*Exh. 6*

http://www.sec.gov/divisions/enforce/primebank/pblinks.shtml          5/19/2002

# The Federal Reserve Board

# Testimony of Herbert A. Biern
**Deputy Associate Director, Division of Banking Supervision and Regulation**
*"Prime bank" schemes*
**Before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate**
**July 17, 1996**

I am pleased to appear before the Committee on Banking, Housing, and Urban Affairs to discuss actions that the Federal Reserve has taken over the past several years to address the problem of "prime bank" financial instruments and related illegal financial schemes. The Federal Reserve has taken an active role in alerting the banking industry and the public about the illicit activities of individuals trying to peddle nonexistent financial instruments here in the United States and abroad, and we have worked closely with the law enforcement community to assist their efforts to investigate and prosecute these wrongdoers.

**"Prime Bank" Schemes and Advisories**
In late 1993, Federal Reserve staff was alerted by domestic and foreign banking organizations that their names were being used for apparently unlawful purposes in connection with the attempted sale of questionable financial instruments. We were also contacted by individuals who had been approached to purchase questionable, highly complex investment-type instruments.

The transactions that were brought to our attention involved notes, guarantees, letters of credit, debentures, or other seemingly legitimate types of financial instruments being issued by an unidentified "prime bank," or by a domestic or foreign banking organization that was said to be keeping the issuance of the instruments secret. The various proposals that involved "prime bank"-related financial instruments had similar characteristics:

(1) the investor could realize extremely high rates of return on an instrument described as risk-free;

(2) the investor was buying a part of a large tranche of securities or financial instruments that was almost fully subscribed by other investors or was part of a "roll program" that automatically put the investor into an investor group of some sort;

(3) the financial instrument that was being purchased was traded on a worldwide secret exchange;

(4) the documentation related to a "prime bank" investment was extremely complex and difficult to comprehend;

(5) a secure escrow account maintained at a "prime bank" or by an attorney would be used to hold the investors' funds and payments into this account would be made by some sort of "key tested telex" message;

http://www.federalreserve.gov/boarddocs/testimony/1996/19960717.htm

*Exh. 7*
5/19/2002

(6) the financial instruments being issued were in formats purportedly approved by the International Chamber of Commerce or fully sanctioned by the Federal Reserve, the World Bank, or some other known international organization.

Some "prime bank" schemes appeared to be targeted to individuals and companies who needed loans. These potential borrowers were advised that their loans would be funded by a "prime bank" provided they paid a large, up-front fee to secure the funding. Board staff believed that the proposed payment of unrealistic rates of return was indicative of a fraudulent scheme and contacted several banks to make sure that legitimate banking organizations were not referring to themselves as "prime banks" or using financial instruments that in any manner referred to "prime banks." Once assured that there was no legitimate use of the term "prime bank" or lawful use of a "prime bank" instrument, we drafted an interagency advisory on "prime bank" schemes and began to work through the Department of Justice's Interagency Bank Fraud Working Group in order to issue the pronouncement. Coordination efforts to address the problem were also initiated with some of the other 12 agencies participating in the Working Group, including the Securities and Exchange Commission, as well as with international law enforcement authorities, including Britain's Scotland Yard and Department of Trade and Industry.

On October 21, 1993, the Federal Reserve and the other federal banking agencies issued the first interagency advisory entitled "Warning Concerning Prime Bank Notes, Guarantees, and Letters of Credit and Similar Financial Instruments." The advisory, which is attached to my prepared statement, informed banking organizations and the public that the Federal Reserve and the other regulators know of no legitimate use of any "prime bank"-related financial instrument. The advisory also asked the public to contact agency representatives if approached to invest in a "prime bank" instrument or pay an advance fee to secure a loan funded by a "prime bank" note, letter of credit, or other type of questionable financial instrument. The banking agencies committed to refer cases of potential illegal conduct associated with supposed "prime bank" documents to a senior official in the Washington, D.C., office of the SEC and to the local offices of the FBI because almost all "prime bank" schemes appeared to involve fraud, including securities fraud.

The advisory prompted numerous calls and letters about "prime bank" matters. Between late 1993 and mid-1995, hundreds of inquiries were received from individuals who had been solicited to purchase "prime bank" financial instruments, from investment advisors considering potential investments on behalf of clients, and from banking organizations that had received faxed solicitations. Calls and letters came from as far as South Africa, Germany, Australia, France, and Singapore. The correspondents were highly suspicious of the proposed schemes and many indicated they wanted to check with the government "to be sure" that their suspicions were justified. During this period, Board staff assisted federal prosecutors in New Jersey, Oklahoma, Virginia and in other districts to investigate and eventually convict individuals for "prime bank"-associated federal criminal law violations.

Calls and letters to the Federal Reserve regarding "prime bank" scams began to slow in late 1995 and early 1996 but, unfortunately, began again in recent months. The new inquiries have focused on the role of the Federal Reserve itself, with callers asking whether the Federal Reserve registers agents in certain European countries, licenses traders on secret "prime bank" exchanges, clears the transfers of "prime bank" securities, or oversees investment plans comprised of "prime bank" instruments.

The Federal Reserve responded with a new advisory, released on June 1, 1996, to dispel any misconceptions that the Federal Reserve plays a role in "prime bank"-related investments. The recent advisory is also included with my statement.

## The Effect of "Prime Bank" Schemes

The Federal Reserve is not aware that banking organizations supervised by the Board or any other federal banking agency have engaged, or otherwise knowingly participated in, any illegal "prime bank"-related conduct. We know of no domestic bank that has suffered losses from "investments" in "prime bank" financial instruments or from any other enterprise involving such instruments. Most "prime bank" scams entail multi-million dollar investments, and as such we are not aware of losses to individual, as opposed to institutional, investors. Some well- known organizations, however, have suffered large losses because of their investments in phony "prime bank" financial instruments.

In criminal matters involving "prime bank" schemes, U.S. Attorney's Offices have prosecuted and won cases under existing criminal statutes, and the SEC has been able to freeze accounts of wrongdoers and obtain other injunctive relief.

## Legislation

The Committee has asked the Federal Reserve to comment on the need for additional legislation addressing misconduct by fraudsters selling these instruments. The Board generally defers to the law enforcement community and to the securities regulators regarding legislative proposals such as S. 1009, the "Financial Instruments Anti-Fraud Act of 1995" proposed by Senator D'Amato. It is our view, however, that continuing successful prosecution of these cases is crucial in sending a message to potential "prime bank" fraudsters. Thus, new statutory authority enhancing law enforcement's ability to prosecute wrongdoers may prove useful.

I am happy to address any questions you may have about the Federal Reserve's efforts to address the problems associated with these illegal financial schemes.

▲ Return to top

**Federal Reserve Bank of New York**

| HOME | CONTACTS | SEARCH | SITEMAP |



+ About the Fed
+ Banking Information
+ Community Development
+ Economic Education
+ Economic Research & Data
+ Financial Services
+ News & Events
+ Publications
+ Statistics

QUICK PICKS

Circular No. **10858**
June 19, 1996

# INVESTMENT SCHEME ADVISORY ALERT

### Illegal "Prime Bank" Financial Instruments and Scams

*To All State Member Banks, and Others Concerned, in the Second Federal Reserve District:*

The following statement was issued by the Board of Governors of the Federal Reserve System:

> The Federal Reserve Board has issued an Investment Scheme Advisory alert cautioning the public about the continued proliferation of illegal "prime bank" financial instruments and scams.
>
> This Investment Scheme Advisory updates an October 1993 interagency alert concerning fraudulent "prime bank" financial instruments and investment programs that supposedly invest in them.
>
> The Advisory also states that, contrary to statements in some of the written materials used by individuals involved with the fraudulent schemes, the Federal Reserve does not, among other things, authorize, sanction or oversee any investment programs or plans involving "prime bank" products. The Federal Reserve also does NOT license traders in "prime bank" instruments or have agents abroad to sell or redeem such financial instruments.

Printed on the following pages is the Board's current Investment Scheme Advisory, together with a copy of the October 21, 1993 Advisory. Please contact the appropriate federal agency in the event you become aware of illegal "prime bank" scams or similar transactions.

Questions regarding this matter may be directed to Timothy D. Mahoney, Enforcement Officer or your respective portfolio manager in Bank Supervision.

WILLIAM J. McDONOUGH,
*President.*

## BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

June 11, 1996

*EXh. 8*

## INVESTMENT SCHEME ADVISORY

On October 21, 1993, the Federal Reserve Board and other federal banking agencies issued an Interagency Advisory concerning "prime bank" financial instruments, a copy of which is attached. The 1993 advisory warned that there were illegal schemes claiming to involve financial instruments issued by a "prime bank" and claiming unrealistic rates of return or other benefits. Since the issuance of the advisory, law enforcement and regulatory authorities in the United States and abroad have prosecuted numerous individuals for their participation in "prime bank" scams, and millions of dollars in illegal proceeds have been seized.

In one federal case involving a program that supposedly invested in "prime bank" financial instruments, a U.S. Court of Appeals stated unequivocally that "Prime Bank Instruments do not exist". (Securities and Exchange Commission v. John D. Lauer, 52 F.3d 667,669 (7th Cir. 1995)).

Despite the notoriety given to illegal "prime bank" scams and the efforts of law enforcement authorities over the past several years, fraudulent investment schemes supposedly involving "prime bank" financial instruments and other investment opportunities involving extremely unusual rates of return, which are sometimes referred to as "roll programs", are still proliferating. Unlike the schemes the Federal Reserve encountered in 1993, many of the recent frauds state that the Federal Reserve sanctions the investment program, oversees trading in secret "prime bank" markets, licenses or registers traders of "prime bank" financial instruments, has agents in offices around the world to handle investments and redemptions of "prime bank" instruments, or is in some other manner involved with an investment opportunity.

This advisory reiterates that the Federal Reserve is not aware of any legitimate use of any type of "prime bank" financial instrument. Also, the Federal Reserve does not participate in any manner in any "prime bank"-related investment program. The Federal Reserve does not license or register traders, does not have agents who process or oversee investments, and does not sanction, authorize, license, or otherwise administer any type of investment program or plan for the public in the United States or abroad.

> Board of Governors of the Federal Reserve System
> Federal Deposit Insurance Corporation
> National Credit Union Administration
> Office of the Comptroller of the Currency
> Office of Thrift Supervision

> October 21, 1993

## *Interagency Advisory*

### WARNING CONCERNING "PRIME BANK"
### NOTES, GUARANTEES, AND LETTERS OF CREDIT

**AND SIMILAR FINANCIAL INSTRUMENTS**

The enforcement staffs of the federal financial institutions supervisory agencies, who work with federal law enforcement officials responsible for investigating and prosecuting bank fraud-related matters, have noted an increase in the use, or attempted use, of questionable financial instruments in connection with complex, and possibly illegal, schemes. Many of these schemes have been aimed at defrauding borrowers and investors in the United States and abroad, as well as domestic and foreign banks. The questionable instruments are often denominated as "Prime Bank Notes", "Prime Bank Guarantees", or "Prime Bank letters of Credit". They are also called by such other names as "Prime European Bank Letters of Credit", "Prime World Bank Debentures", or "Prime Insurance Guarantees".[1]

Over the past several years, federal and state law enforcement authorities have prosecuted, or are presently in the process of investigating, wrongdoers who have defrauded individuals and entities by promising, for example, to arrange loans that would be funded in some manner by "Prime Bank-types of financial instruments, or would, in some other way, involve such instruments and advance loan fee payments. Many of the illegal or dubious schemes that have been brought to the attention of various regulatory agencies by law enforcement officials, foreign banks, the World Bank, and central banking authorities appear to involve overly complex loan funding mechanisms necessitating the use of "Prime Bank"-type documents. Other suspicious schemes involve "investments" in "Prime Bank"-type financial instruments and promises of unrealistic returns on multi-million dollar investments. In many recent situations, the agencies have been advised that individuals have been improperly using the names of large, well-known domestic and foreign banks, the World Bank, and central banks in connection with their "Prime Bank" schemes. When contacted by potential borrowers, investors or regulators, the institutions had no knowledge about the unauthorized use of their names or the issuance of anything akin to "Prime Bank"-type financial instruments.

Because the staffs of the federal bank, thrift and credit union regulatory agencies are not aware of any legitimate use of any financial instrument called a "Prime Bank" note, guarantee, letter of credit, debenture, or similar type of financial instrument, you should be alert to the potential dangers associated with any transaction involving these types of instruments.[2] Likewise, you should be attentive to the attempted use of any traditional type of financial instrument--such as a standby, performance or commercial letter of credit--that is somehow referred to in an unconventional manner, such as a letter of credit referencing forms allegedly produced or approved by the International Chamber of Commerce. Examples of these include bogus schemes involving the supposed issuance of an "ICC 3034" or an "ICC 3039" letter of credit by a domestic or foreign bank.

The staffs of the regulatory agencies, in cooperation with the Department of Justice, the Federal Bureau of Investigation, the U.S. Secret Service, and the Securities and Exchange Commission, want to alert you to this situation and request that, in the event you become aware of any transaction involving any

of the aforementioned types of financial instruments, you advise one of the following federal regulatory agency officials:

Board of Governors of the Federal Reserve System
Deputy Associate Director
Enforcement and Special Investigations Sections
Division of Banking Supervision and Regulation
Mail Stop 175
Washington, D.C. 20551
(202)452-2620
(202)736-5641 (fax)

National Credit Union Administration
Office of the General Counsel
1775 Duke Street
Alexandria, Virginia 22314
(703)518-6540
(703)518-6569 (fax)

Federal Deposit Insurance Corporation
Chief
Special Activities Section
Division of Supervision
550 17th Street, N.W.
Washington, D.C. 20429
(202)898-6750
(202)898-3627 (fax)

Office of the Comptroller of the Currency
Law Department
Enforcement and Compliance Director
250 E Street, S.W.
Washington, D.C. 20219
(202)874-4800
(202)874-5301 (fax)

Office of Thrift Supervision
Deputy Director for Regional Operations
1700 G Street, N.W.
Washington, D.C. 20552
(202)906-6853
(202)898-0230 (fax)

Also, if you suspect that a criminal offense is being committed, it is required that you promptly make a criminal referral to the appropriate federal law enforcement agencies in accordance with applicable criminal referral regulations.

1. These and similar financial instruments were the subject of prior regulatory agency alerts issued by the Office of the Comptroller of the Currency. These

inc... ..d the Office of the Comptroller of the ...rrency's Banking Circular BC-141, Supplement 2, dated July 14, 1982, several subsequent supplements to BC- 141, and BC-243, dated February 7, 1990.

2. There are currently six insured depository institutions with the word "Prime" in their names in the United States. Two of them are commercial banks that operate in Florida, one is a commercial bank in Connecticut, another is a commercial bank in Indiana, and two of them are thrift associations operating in Wisconsin and Pennsylvania, respectively. There is also one bank holding company in Illinois with the word "Prime" in its name. This alert is not associated with any deposit or other type of legitimate debt obligation or financial instrument issued by any of these financial institutions.

*Last modified: 04/03/2002 11:04:26*

**33 Liberty Street   New York, NY 10045 (212) 720-6130**      ACCESSIBILITY      TERMS OF USE

Alert 2001-2
OCC Alert
Type: Unauthorized Banking
Subject: British Bank of Commerce
Date: February 21, 2001

TO: Chief Executive Officers of All National
Banks; All State Banking Authorities;
Chairman, Board of Governors of the Federal
Reserve System; Chairman, Federal
Deposit Insurance Corporation; Conference of
State Bank Supervisors; Deputy
Comptrollers (Districts); Assistant Deputy
Comptrollers; District Counsel and Examining
Personnel

RE: British Bank of Commerce
    a.k.a. British Bank of Trade & Commerce
    499 Park Avenue, Ste 621
    New York, NY 10022

Information has been received that the subject entity
may be operating a banking business in the United
States without authorization.  The Office of the
Comptroller of the Currency has not granted a national
bank charter to this entity and the state of New York
has not granted permission for it to operate a banking
business.

Any information which you may have concerning this
matter should be brought to the
attention of:

Mail  Office of the Comptroller of the Currency
      Enforcement & Compliance Division
      250 E Street, SW, Washington, DC    20219
      Fax       (202) 874-5301
      Internet  http://www.occ.treas.gov
      E-mail    alertresponses@occ.treas.gov

      and

Mail      New York State Banking Department
          Criminal Investigations Bureau
          2 Rector Street
          New York, NY 10006
Fax       (212) 618-6588


      Brian C. McCormally
      Director
      Enforcement & Compliance Division

Exh. 9
5/19/2002

# FBI – New York
# Fraud Alert

Advance Fee Schemes
Health Insurance Frauds
Impersonation Frauds
Internet Frauds
Letter Of Credit Frauds
Nigerian Letter, or "419" Frauds
Prime Bank Note Frauds
"Ponzi" Schemes
Pyramid Schemes
New York Office Home Page

The following is a fraud alert from the New York Office of the Federal Bureau of Investigation concerning Advance Fee Schemes:

## What is an Advance Fee Scheme?

An Advance Fee Scheme occurs when the victim pays money to someone in anticipation of receiving something of greater value, such as a loan, contract, investment or gift, and then receives little or nothing in return.

The variety of advance fee schemes is limited only by the imagination of the con artists who offer them. They may involve the sale of products or services, the offering of investments, lottery winnings, "found money," or a myriad of other "opportunities." Clever con artists will offer to find financing arrangements for their clients who pay a "finder's fee" in advance. They require their clients to sign contracts in which they agree to pay the fee when they are introduced to the financing source. Victims often learn that they are ineligible for financing only after they have paid the "finder" according to the contract. Such agreements may be legal unless it can be shown that the "finder" never had the intention or the ability to provide financing for the victims.

Some Tips To Help You Avoid These Frauds:

1. If the offer of an "opportunity" appears too good to be true, it probably is.

2. Know who you are dealing with. If you have not heard of a person or company that you intend to do business with, learn more about them. Depending on the amount of money that you intend to spend, you may want to visit the business location, check with the Better Business Bureau or consult with your bank, an attorney or the police.

3. Follow common business practice. For example, legitimate business is rarely conducted in cash on a street corner.

4. Make sure you fully understand any business agreement that you enter into. If the terms are complex, have them reviewed by a competent attorney.

*EXh. 10*

http://newyork.fbi.gov/fraudalert.htm                    5/19/2002

State of Connecticut · Department of Banking
Securities and Business Investments Division

The Informed Investor

# "Prime Bank" Scams

 A basic adage says when something looks too good to be true, it probably is. This is particularly true with secretive investments touted for their connection with "prime banks" or "wealthy investors," with little other verifiable information being provided.

**"Prime Bank" Scams:**

With strong recent stock market gains, many individuals are eager to take advantage of investing opportunities. Not surprisingly, an investment in "prime bank" financial instruments in which you can earn spectacular returns of 20 to 200 percent monthly on your money "risk free" can seem very attractive.

Unfortunately such investments – supposedly debt obligations guaranteed by the world's "top 100 banks" or "prime" banks – cost investors tens of millions of lost dollars every year, according to state securities regulators.

That's because **"prime bank notes" do not exist**. They are fictitious and fraudulent instruments – not backed or endorsed by any legitimate financial institution. Similar scams go by names such as: prime bank guarantees, prime world bank debentures, standby letters of credit, bills of exchange, bank secured trading programs or loan roll programs.

While the specifics may vary, these various scams have similar themes. Con artists typically claim only big corporations, foreign banks or ultra-wealthy investors know about these investments. In Idaho, regulators say con artists tried to lure investors by suggesting that a "Saudi oil sheik" and "the Onassis family" were poised to invest in a prime bank trading program. "They're pitched as secret trading programs that the Rothschilds and Rockefellers set up years ago, which are only offered to the elite," Utah's Securities Commissioner said.

Confidentiality is also stressed. According to an Idaho official, "This market is purportedly so secret that investors are told not to independently investigate the offering or risk being permanently expelled from [future participation] in these markets." Investors may be told that involved institutions or regulatory agencies will deny the existence of such investments, in an attempt by the promoters to deflect investors' concerns. Some con artists may even ask investors to sign non-disclosure agreements, since the huge profits in this "secret market" would disappear if too many people became aware of its existence.

Con artists also often tell investors that these instruments are too technical or complex

Exh. 11

5/19/2002

for non-experts to understand. Legitimate terminology from genuine bonds or certificates of deposit may be sprinkled liberally throughout fictitious documents to lend them an air of authenticity, and the documents themselves may look very official through the wonders of desktop publishing.

Investment pitches are typically short on specifics about who is involved or where the money is going. Alternatively, perpetrators may claim invested money will finance beneficial projects such as roads and health care facilities. In fact, the stolen money often goes to mundane purposes. Utah regulators alleged a Florida man spent $50,000 raised in a prime bank scheme on a sport utility vehicle and mortgage payments.

**Warning Signs of a Scam:**

- **Excessive "guaranteed" returns.** A simple rule of investing is the higher the possible profit, the higher the risk. If anyone claims that a high yield investment has no risk or that your return from it will be guaranteed, don't believe them.

- **International or inside angle.** Institutions such as the Federal Reserve, the World Bank or European government central banks do *not* endorse investments. Similarly, don't accept an investment's legitimacy by unsupported claims that Wall Street financiers or wealthy individuals have made similar investments.

- **Lack of information.** While "prime bank scams" are typically cloaked in anonymity and confidentiality, disclosure is a fundamental means of investor protection. You should be able to fully research and discuss a prospective investment, and a lack of specific or verifiable information should be a strong "red flag" warning of potential trouble.

- **Technical complexity.** "Prime bank scams" are often characterized as being extremely complex and too technical for average investors to comprehend. In general, it's good advice to avoid investments you don't fully understand. Otherwise, seek advice from a reputable, trusted professional and consider getting a second opinion.

**How We Can Help:**

The Securities Division, as well as the federal Securities and Exchange Commission, regulates how securities are sold in Connecticut. If you have questions about investments, please contact us. We can't tell you how to invest your money. We can, however, tell you if the person selling the investment is properly registered.

Contact the Division for answers to these questions:

▶ *Is the seller registered/licensed to sell securities in Connecticut?*

▶ *Has written information that you received about the investment been filed in Connecticut?*

▶ *Does the investment comply with Connecticut's securities laws?*

**For More Information:**

- **Securities and Exchange Commission**
- **International Monetary Fund**
- **PriceWaterhouseCoopers**
- **World Bank**


**Securities Division | Department of Banking Home Page**

PRICEWATERHOUSECOOPERS

United Kingdom

Select From... ▼ ▶

Search Home

Careers
Insights & Solutions
    Executive Perspectives
    Issues
    Of Specific Interest
    Survey Reports
    Publications
About Us
Cricket Ratings

Home > Insights & Solutions > Issues

# Uncovering secret market fraud

NO HONEST, competent banker would believe in a *secret market* for banks where profits of two per cent a week can be earned without any risk to capital. Nevertheless, there are numerous intermediaries who say they have been introduced to bankers who say they trade in such a market.
*By Richard Coleman*

- [Myth - banks trade in discounted instruments](#)
- [Myth - banks trade in a secret market](#)
- [Myth - banks run "roll programmes"](#)
- [How has this fraud survived for so long?](#)
- [Myth - money invested is not at risk](#)
- [Fraudsters laugh all the way to the bank](#)
- [What can bankers do to stop this fraud](#)

## Myth - banks trade in discounted instruments

Banks issue *instruments* at substantial discounts to other banks. The *instrument* is called a *prime bank guarantee* , a *standby letter of credit* , a *blocked funds certificate* or something similar. They all offer some kind of promise that a bank will pay a sum of money at a future date - an instrument for which there is no recognized market.

Attention tends to focus on the *instrument* rather than the substantial discount. *Standby letters of credit* do, of course, exist but by their nature they cannot logically be traded separately from the obligation they guarantee; *blocked funds* also exist and it is easier to imagine a market for them similar to the market in third world debt.

Typically the issuing bank is said to be one of the top 25 world banks (a *prime* bank) and instruments from a selection (or *menu* ) of issuing banks may be offered. The discount is said to be much more than the amount required to allow for interest. The issuing bank will be said to be receiving, typically, 86 per cent of face value for an *instrument* with a 7.5 per cent coupon maturing in a year and a day.

Such generosity is, of course, unthinkable. Why would any banker wish to incur such losses? Some appear to believe the *instrument* has been carefully. designed to have a maturity date of one year and a day - and so, according to the fraudster, it does not have to be included on the bank's balance sheet. The logical extension of this proposition is that the banks issuing such instruments are preparing false accounts and may be hopelessly insolvent.

The *secret market* is said to be well known to the banking regulators throughout the world who condone it as a necessary way of managing the money supply. It is also claimed that banks use the money received to fund credit card business at interest rates of 30 per cent or so, leaving plenty of margin to pay for the extra discount on the *instrument*. This presupposes that other sources of borrowing at cheaper rates have been exhausted.

*EXh. 12*

**. . . . . n - banks trade in secret market**
Banks are said to trade among themselves in a secret market in instruments and will, reluctantly and on conditions of the utmost secrecy, permit privileged investors to participate provided they have the resources and introductions to do so. Banks are said to deny that the secret market exists or that they participate in it.

Against this it is said that banks would be expected to deny the existence of the market because if too many people know about it the huge profits would disappear. However hard investors may try, they will be unable to locate the secret market as it is said to have no physical location - it is an inter-bank market.

At an early stage in the trading process the instrument, which is for a large sum, is said to be divided up into smaller, more saleable denominations. This process is said to be carried out by a cutting house, by someone descended as a master cutter. The smaller denomination instruments are said to be fresh cut and after they have been around for a while they become seasoned. The reader should, of course, take this with a large pinch of salt.

Trades in the secret market always seem to be at a profit and never at a loss. The profit on each trade is typically described as being two per cent (even though elementary arithmetic says that if you buy at 86 and sell at 88 your profit is more than that).

After a number of banks have traded the instrument it is sold on to an institutional investor, at a discount which corresponds to the interest rate, who holds until maturity.

Myth - banks run "roll programmes"
Banks run roll programmes where an investor deposits say $5 million at a bank which is said to be managing a regular series of purchases and sales of instruments for a group of investors. This enables much larger sums to be invested and is said to be a market for big players. Investors with a mere $10 million may find this is their only way to enter the market.

Investors will be given plausible reasons why the money has to be sent to an overseas bank. The more likely reason is that it reduces the fraudsters' risk of being prosecuted. When investors ask for the return of their money they may be told that the programme is in the middle of a roll or that they cannot withdraw from the programme until there is another investor willing to join. In reality the money is probably long gone.

**How has this fraud survived for so long?**
It was the subject of warnings by the British Bankers Association as long ago as 1992 and banks have long had standard procedures to deal with funny money or ghost money. Bankers who recognize that their customers are thinking of making this type of investment tend to discourage their clients but not in terms sufficiently strong enough to persuade customers that they are likely to incur substantial losses.

Fraudsters will tell customers that they can well understand the warnings the banker has given; they are a natural consequence of the bad press given to the market. But they say they have access to another bank that actively trades in the market and will therefore confirm that the market is genuine.

**Myth - money invested is not at risk**
Investors may be told that their capital can be held by a fiduciary banker and will not actually be invested in an instrument or in a roll programme but will remain on deposit, can be withdrawn at short notice and will not be at any risk at any time. Nevertheless, the roll programme manager will be able, extraordinarily, to trade in the market

to earn substantial profits for investors.

It beggars belief that anyone would fall for this story. If managers can trade on credit they do not need, it would be extraordinarily generous if they shared the (illusory) profit with investors.

### Fraudsters laugh all the way to the bank

The fraudsters who design the pseudo-legal documents typically found in these schemes seem to have a well developed sense of humour. Usually the gullible would-be investor is required to state that his funds are "good clean funds of a n on-criminal origin".   A recent variation provided that the agreement would be dissolved "should any party be found guilty of any unlawful acts; and/or be found guilty, under a United States, Canadian, Switzerland, United Kingdom, any nation, or Interpol indictment for international bank fraud".

### What can bankers do to stop this fraud?

On 29 march 1994 The Bank of England sent a letter to all authorized institutions asking that any such schemes should be brought to the attention of its Special Investigations Unit, notwithstanding any action the institution might take to disclose to the relevant law enforcement authorities.

Publicity may be helping. Perhaps some would-be investors are being deterred by reading articles such as this. However fraudsters continue to find victims willing to sacrifice large sums of money. Bankers approached by customers seeking to open bank accounts through which *trading* will be conducted politely decline to open the account and suggest to customers that they should not get involved. However they are frequently not sufficiently open with customers to dissuade them.

Fraudsters are likely to tell their intended victims that such a response demonstrates the market exists but cannot be accessed through that particular bank on that particular day. Bankers should leave customers in no doubt that they are about to be a victim of fraud and lose a great sum of money.

### About the author

**Richard Coleman** is a forensic accounting principal in PricewaterhouseCoopers. He is a founder member of the National Fraud and Investigations Group and specialises in investigating banking and investment frauds.

In recent years he has investigated numerous frauds involving instruments in *prime bank guarantees* and similar fictitious *instruments* .

### Please note our usual copyright and disclaimer notice

print page 🖳

© 2002 PricewaterhouseCoopers . PricewaterhouseCoopers refers to the individual member firms of the worldwide PricewaterhouseCoopers organisation. All rights reserved.

Privacy Statement | Legal Disclaimer | Email Webmaster

5. Be wary of businesses th●●perate out of post office boxes or mai●●ps and do not have a street address, or of dealing with persons who do not have a direct telephone line, who are never "in" when you call, but always return your call later.

6. Be wary of business deals that require you to sign non disclosure or non circumvention agreements that are designed to prevent you from independently verifying the bona-fides of the people with whom you intend to do business. Con artists often use non circumvention agreements to threaten their victims with civil suit if they report their losses to law enforcement.

The following is a fraud alert from the New York Office of the Federal Bureau of Investigation concerning Health Insurance Frauds:

## Common Health Insurance Frauds:

Medical Equipment Fraud: Equipment manufacturers offer "free" products to individuals. Insurers are then charged for products that were not needed and/or may not have been delivered.

"Rolling Lab" Schemes: Unnecessary and sometimes fake tests are given to individuals at health clubs, retirement homes or shopping malls and billed to insurance companies or Medicare.

Services Not Performed: Customers or providers bill insurers for services never rendered by changing bills or submitting fake ones.

Medicare Fraud: Medicare fraud can take the form of any of the Health Insurance Frauds described above. Senior citizens are frequent targets of Medicare schemes, especially by medical equipment manufacturers who offer seniors free medical products in exchange for their Medicare numbers. Because a physician has to sign a form certifying that equipment or testing is needed before Medicare pays for it, con artists fake signatures or bribe corrupt doctors to sign the forms. Once a signature is in place, the manufacturers bill Medicare for merchandise or service that wasn't needed or in some cases wasn't ordered.

## Some Tips To Help You Avoid These Frauds:

1. Never sign blank insurance claim forms.

2. Never give blanket authorization to a medical provider to bill for services rendered.

3. Ask your medical providers what they will charge and what you will be expected to pay out-of-pocket.

4. Carefully review your insurer's explanation of benefits statement. Call your insurer and provider if you have questions.

5. Do not do business with door-to-door or telephone salespeople who tell you that services of medical equipment are free.

6. Give your insurance/Medicare identification only to those who have provided you with medical services.

7. Keep accurate records of all health care appointments.

http://newyork.fbi.gov/fraudalert.htm                                    5/19/2002

8. Know if your physician ordered equipment for you.

The following is a fraud alert from the New York Office of the Federal Bureau of Investigation concerning Impersonation Frauds:

## What Is Impersonation Fraud?

Impersonation Fraud occurs when someone assumes your identity to perform a fraud or other criminal act.

Criminals can get the information they need to assume your identity from a variety of sources, such as the theft of your wallet, your trash, or from credit or bank information. They may even approach you directly in person, by telephone or on the Internet and ask you for the information.

The sources of information about you are so numerous that you cannot prevent the theft of your identity. But you can minimize your risk of loss by following a few simple hints:

Some Tips To Help You Avoid These Frauds:

1. Never throw away ATM receipts, credit statements, credit cards or bank statements in a usable form.

2. Never give your credit card number over the telephone unless you make the call.

3. Reconcile your bank account monthly and notify your bank of discrepancies immediately.

4. Keep a list of telephone numbers to call to report the loss or theft of your wallet, credit cards, etc.

5. Report unauthorized financial transactions to your bank, credit card company and the police as soon as you detect them.

6. Review a copy of your credit report at least once each year. Notify the credit bureau in writing of any questionable entries and follow through until they are explained or removed.

7. If your identity has been assumed, ask the credit bureau to print a statement to that effect in your credit report.

8. If you know of anyone who receives mail from credit card companies or banks in the names of others, report it to local or federal law enforcement authorities.

The following is a fraud alert from the New York Office of the Federal Bureau of Investigation concerning Trojan Horse viruses on the Internet:

## What is a Trojan Horse Virus?

A Trojan Horse virus is a program or malicious code contained within a seemingly legitimate program. There has been an alarming increase in the number of Trojan Horse viruses being transmitted via Internet e-mail.

A Trojan Horse Virus has been found recently which captures key-strokes of unknowing computer

users. Once this interior program is deployed it will record key-strokes of the individual that it is deployed against, and then e-mail the captured data back to the individual who deployed it. This Trojan Horse key-stroke capture program is installed and operates on a computer without the user's knowledge. The program can be activated when a user receives it as an attachment to e-mail and clicks on the attachment. Users who receive the Trojan Horse program may have no indication that it has infected their computers. Once deployed and active, this program can capture the user's private communications and is impervious to encryption.

Some Tips To Help You Avoid These Frauds:

1. To avoid being infected by a key-stroke capture virus, refrain from opening e-mail attachments from unknown senders.

2. If you are concerned that your computer may have been compromised by a key-stroke capture virus, contact your Internet provider for assistance.

The following is a fraud alert from the New York Office of the Federal Bureau of Investigation concerning Letter Of Credit Frauds:

### What is a Letter of Credit Fraud?

Legitimate letters of credit are issued by banks to ensure payment for goods shipped in connection with international trade. Payment on a letter of credit generally requires that the paying bank receive documentation certifying that the goods that were ordered have been shipped and are en route to their intended destination.

Legitimate Letters of Credit are never sold or offered as investments.

Letter of Credit frauds are often attempted against banks by providing false documentation to show that goods were shipped, when in fact no goods, or inferior goods were shipped.

Other Letter of Credit Frauds occur when con artists offer a "letter of credit" or "bank guarantee" as an investment wherein the investor is promised huge interest rates on the order of 100 to 300 percent annually. Such investment "opportunities" simply do not exist. (See Prime Bank Notes for additional information.)

Some Tips To Help You Avoid These Frauds:

1. If an "opportunity" appears too good to be true, it probably is.

2. Do not invest in anything unless you understand the deal. Con artists rely on complex transactions and faulty logic to "explain" fraudulent investment schemes.

3. Do not invest or attempt to "purchase" a "Letter of Credit." Such investments simply do not exist.

4. Be wary of any investment that offers the promise of extremely high yields.

5. Independently verify the terms of any investment that you intend to make, including the parties involved and the nature of the investment.

The following is a fraud ale. om the New York Office of the Fede Bureau of Investigation concerning Nigerian Letter, or "419" Frauds:

## What is a Nigerian Letter or "419" Fraud?

Nigerian letter frauds combine the threat of impersonation fraud with a variation of an advance fee scheme in which a letter, mailed from Nigeria, offers the recipient the "opportunity" to share in a percentage of millions of dollars that the author, a self-proclaimed government official, is trying to transfer illegally out of Nigeria. The recipient is encouraged to send information to the author, such as blank letterhead stationary, bank name and account numbers and other identifying information using a facsimile number provided in the letter. Some of these letters have also been received via E-mail through the Internet. The scheme relies on convincing a willing victim, who has demonstrated a "propensity for larceny" by responding to the invitation, to send money to the author of the letter in Nigeria in several installments of increasing amounts for a variety of reasons. Payment of taxes, bribes to government officials, and legal fees are often described in great detail with the promise that all expenses will be reimbursed as soon as the funds are spirited out of Nigeria. In actuality, the millions of dollars do not exist and the victim eventually ends up with nothing but loss. Once the victim stops sending money, the perpetrators have been known to use the personal information and checks that they received to impersonate the victim, draining bank accounts and credit card balances until the victim's assets are taken in their entirety.

While such an invitation impresses most law-abiding citizens as a laughable hoax, millions of dollars in losses are caused by these schemes annually. Some victims have been lured to Nigeria, where they have been imprisoned against their will in addition to losing large sums of money. The Nigerian government is not sympathetic to victims of these schemes, since the victim actually conspires to remove funds from Nigeria in a manner that is contrary to Nigerian law. The schemes themselves violate section 419 of the Nigerian criminal code, hence the label "419 fraud."

Some Tips To Help You Avoid These Frauds:

1. If you receive a letter from Nigeria asking you to send personal or banking information, do not reply in any manner. Send the letter to the U.S. Secret Service or the FBI.

2. If you know someone who is corresponding in one of these schemes, encourage that person to contact the FBI or the U.S. Secret Service as soon as possible.

The following is a fraud alert from the New York Office of the Federal Bureau of Investigation concerning Prime Bank Note Frauds:

## What is a Prime Bank Note?

International fraud artists have invented an investment scheme that offers extremely high yields in a relatively short period of time. In this scheme, they purport to have access to "bank guarantees" which they can buy at a discount and sell at a premium. By reselling the "bank guarantees" several times, they claim to be able to produce exceptional returns on investment. For example, if $10 million worth of "bank guarantees" can be sold at a two percent profit on ten separate occasions, or "traunches," the seller would receive a 20 percent profit. Such a scheme is often referred to as a "roll program." To make their schemes more enticing, con artists often refer to the "guarantees" as being issued by the world's "Prime Banks," hence the term "Prime Bank Guarantees." Other official sounding terms are also used, such as "Prime Bank Notes" and "Prime Bank Debentures." Legal documents associated with such schemes

often require the victim to e. ● into non disclosure and non circumv ● ion agreements, offer returns on investment in "a year and a day" and claim to use forms required by the International Chamber of Commerce (ICC). In fact, the ICC has issued a warning to all potential investors that no such investments exist.

The purpose of these frauds is generally to encourage the victim to send money to a foreign bank, where it is eventually transferred to an off-shore account that is in the control of the con artist. From there, the victim's money is used for the perpetrator's personal expenses or is laundered in an effort to make it disappear.

While foreign banks use instruments called "bank guarantees" in the same manner that U.S. banks use letters of credit to insure payment for goods in international trade, such bank guarantees are never traded or sold on any kind of market.

Some Tips To Help You Avoid These Frauds:

1. Think before you invest in anything. Be wary of an investment in any scheme, referred to as a "roll program," that offers unusually high yields by buying and selling anything issued by "Prime Banks."

2. As with any investment, perform due diligence. Independently verify the identity of the people involved, the veracity of the deal, and the existence of the security in which you plan to invest.

3. Be wary of business deals that require non disclosure or non circumvention agreements that are designed to prevent you from independently verifying information about the investment.

The following is a fraud alert from the New York Office of the Federal Bureau of Investigation concerning "Ponzi" Schemes:

## What is a "Ponzi" Scheme?

A Ponzi scheme is essentially an investment fraud wherein the operator promises high financial returns or dividends that are not available through traditional investments. Instead of investing victims' funds, the operator pays "dividends" to initial investors using the principle amounts "invested" by subsequent investors. The scheme generally falls apart when the operator flees with all of the proceeds, or when a sufficient number of new investors cannot be found to allow the continued payment of "dividends."

This type of scheme is named after Charles Ponzi, of Boston, Massachusetts, who operated an extremely attractive investment scheme in which he guaranteed investors a 50 percent return on their investment in postal coupons. Although he was able to pay his initial investors, the scheme dissolved when he was unable to pay investors who entered the scheme later on.

Some Tips To Help You Avoid These Frauds:

1. As with all investments, exercise due diligence in selecting investments and the people with whom you invest.

2. Make sure you fully understand the investment before you invest your money.

The following is a fraud alert from the New York Office of the Federal Bureau of Investigation concerning Pyramid Schemes:

http://newyork.fbi.gov/fraudalert.htm                                                                5/19/2002

## What is a Pyramid Scheme?

Pyramid schemes, also referred to as franchise fraud, or chain referral schemes, are marketing and investment frauds in which an individual is offered a distributorship or franchise to market a particular product. The real profit is earned, not by the sale of the product, but by the sale of new distributorships. Emphasis on selling franchises rather than the product eventually leads to a point where the supply of potential investors is exhausted and the pyramid collapses. At the heart of each pyramid scheme there is typically a representation that new participants can recoup their original investments by inducing two or more prospects to make the same investment. Promoters fail to tell prospective participants that this is mathematically impossible for everyone to do, since some participants drop out, while others recoup their original investments and then drop out. The country of Albania recently experienced the collapse of pyramid investment schemes that promised extremely high yields on investments. Public outcry resulting from widespread losses by common citizens led to internal strife and the attempted overthrow of the government.

Some Tips To Help You Avoid These Frauds:

1. Be wary of "opportunities" to invest your money in franchises or investments that require you to bring in subsequent investors to increase your profit or recoup your initial investment.

2. Independently verify the legitimacy of any franchise or investment before you invest.

**U.S. Securities and Exchange Commission**

## So-Called "Limited Edition" United States Treasury Securities

*June 20, 1997*

The Securities and Exchange Commission (SEC) is warning investors and financial institutions to beware of a new investment scheme involving so-called "Limited Edition" United States Treasury securities. The U.S. Department of Treasury has advised the SEC that these securities do **not** exist.

No matter what anyone tells you, there's no such thing as a "Limited Edition" Treasury. **It's a scam.**

Overseas con artists are trying to defraud banks, broker-dealers and other financial institutions by offering to sell and structure transactions in these bogus securities. As part of the scheme, the con artists are seeking banks to act as go-betweens for sales of these fictitious securities.

The sales pitch for the scam misrepresents the way legitimate U.S. Treasuries may be issued, bought or sold. It also describes the "Limited Edition" Treasury securities as:

- having a term of 10 years,
- yielding an annual interest rate of 6%,
- requiring a minimum purchase amount of $100 million,
- having an initial price of 57% of face value,
- having an unspecified offering amount (available for sale until "exhausted"), and
- being issued in physical (paper) form.

If you have information on the offer or sale of "Limited Edition" Treasury securities, contact the SEC Division of Enforcement, 450 Fifth Street, N.W., Mail Stop 2-3, Washington, DC 20549, or via e-mail to enforcement@sec.gov.

Alerts regarding these fictitious securities have also been issued by

- the Office of the Comptroller of the Currency (OCC Alert 97-9),

- the Federal Deposit Insurance Corporation (FIL-42-97), and

- the New York Stock Exchange (Information Memo No. 97-22).

*http://www.sec.gov/divisions/enforce/alerts/ltdtreas.htm*

*Exh. 13*

JEFFREY & DREHER, L.L.P.
Robert Scott Dreher (CSB No. 120527)
Matthew R. Miller (CSB No. 194647)
225 Broadway, 19th Floor
San Diego, California 92101
Telephone (619) 230-8828

Attorneys for Plaintiff

FILED

99 MAY 25 PM 1:59

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                    DEPUTY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALDWELL INDUSTRIES, INC., ) | Case No. 98-2300 TW(LAB) |
| ) | |
| Plaintiff, ) | **AMENDED COMPLAINT FOR DAMAGES** |
| ) | **AND EQUITABLE RELIEF FOR FRAUD;** |
| vs. ) | **VIOLATIONS OF THE FEDERAL** |
| ) | **SECURITIES LAWS; and UNFAIR** |
| RALPH KING; METROPOLIS DUNE, ) | **BUSINESS PRACTICES** |
| L.L.C.; ELLEN FASSLER; and ) | |
| DOES 1 through 50, inclusive, ) | |
| ) | |
| Defendants. ) | |
| ) | Plaintiff Requests A |
| _____ ) | Jury Trial. |

### INTRODUCTION

1.    This is a securities fraud case.  The Defendants operated a bogus "Prime Bank Scheme" in order to steal Plaintiff's money. They labeled their scam a "Five Day Trade Initiation Opportunity", and packaged it as an investment opportunity for Plaintiff to participate in a "trade contract", which was purportedly worth five billion dollars, orchestrated by a Swiss trading group, and purportedly involving Swiss and other Prime banks and a Chinese or Japanese "institution."  Defendants presented themselves as a big player in international banking, and described an intricate and

*Exh. 14*

1  highly complex system of trades, "purchasing collateral",

2  "positions", and off-shore accounts, which according to Defendants

3  produced large commissions. Defendants presented Plaintiff with

4  bank accounts, passports, and promissory notes in an effort to

5  create legitimacy. Plaintiff entrusted $100,000 to Defendants in

6  reliance on their promises.

7      2.   Unfortunately, the investment described by Defendants did

8  not exist. There were no banks, no Swiss trading group, no "trade

9  contract", no return of investment, and no profit. The grand and

10 complicated system smoothly described by Defendants was phony.

11 Since its investment in December of 1997, Plaintiff repeatedly has

12 been assured that its money will be delivered. Plaintiff now asks

13 the Court's help in gaining the return of its money and an

14 injunction preventing Defendants from continuing their fraudulent

15 scheme.

16              **JURISDICTION AND VENUE**

17     3.   The Court has jurisdiction over this action pursuant to

18 28 USC § 1331, as the action arises under the Securities Exchange

19 Act of 1934 sections 10(b), as amended, 15 U.S.C. §§ 78j(b) and

20 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-

21 5. The Court has supplemental jurisdiction over the state claims

22 in this action pursuant to 28 U.S.C. §1367.

23     4.   Venue is proper in this District because a substantial

24 part of the acts and transactions complained of, including the

25 fraudulent offer and sale of securities, occurred in this District.

26     5.   In connection with the acts and course of conduct alleged

27 in this Complaint, the defendants, directly and indirectly, used

28 the means and instrumentalities of interstate commerce, including

                          -2-                    98-2300TW(LAB)

1 the mails and interstate telephone communications.

2 <center>**THE PARTIES**</center>

3     6.   Plaintiff CALDWELL INDUSTRIES, INC. is a California

4 corporation in good standing with its principal place of business

5 in San Diego, CA.  It entrusted a total of $100,000.00 with

6 Defendants and their fraudulent Prime Bank Scheme.

7     7.   Defendant RALPH KING is an individual residing in

8 Westlake Village or Ontario, California, who is doing business in

9 San Diego, California.  KING at all relevant times was the managing

10 director of METROPOLIS DUNE, L.L.C.  Defendant ELLEN FASSLER is a

11 resident of Hermosa Beach, California who is doing business in San

12 Diego County, California.  At all relevant times FASSLER was

13 president of METROPOLIS DUNE, L.L.C.

14     8.   Defendant METROPOLIS DUNE, L.L.C. was a Nevada Limited

15 Liability Company, dissolved in August 1998, which was at all

16 relevant times operating in San Diego County, California and other

17 places.  It is believed to be currently in operation in some other

18 form, guise or fashion.

19     9.   At all relevant times herein all the corporate Defendants

20 and entities named herein were and are the alter egos of the

21 individual Defendants and each other and were and are inadequately

22 capitalized and had and have no genuine or separate existence, but

23 were and are used and are existing for the sole purpose of

24 permitting the Defendants to transact a portion or portions of

25 their business under separate and fraudulent guises.

26     10. At all relevant times herein the individual Defendants

27 completely controlled, dominated, managed, and operated the

28 corporate entities together and commingled and intermingled their

<center>-3-</center>

<div align="right">98-2300TW(LAB)</div>

1   assets together to suit the convenience of said Defendants.   The

2   corporate defendant was deliberately under-capitalized and had no

3   separate existence apart from its principals and their scheme, such

4   that the individuality or separateness of the corporate Defendants

5   from the individual Defendants did not exist but was instead a ruse

6   to attempt to avoid liability for their actions and capacities

7   alleged herein.

8       11.  The acts of each individual Defendant and the above

9   entities were and are the acts of all Defendants.

10      12.  Failure to disregard the fiction of the corporate

11  structures and pierce the corporate veil would promote injustice

12  and, based thereon, the Defendants are jointly and severally

13  liable.

14      13.  Plaintiff is unaware of the true names, roles, conduct,

15  and/or legal capacities of those defendants sued herein as DOES 1

16  through 50, and therefore sues those Defendants by these fictitious

17  names.  Plaintiff will seek leave of Court to amend this complaint

18  to allege their true names and capacities when ascertained.

19  Plaintiff is informed and believes and thereon alleges that each

20  DOE Defendant is in some way responsible for the acts, omissions,

21  and damages alleged herein.  These fictitious defendants include

22  banks, lawyers, accountants, and others who committed, assisted,

23  and/or aided and abetted the acts and breaches of duty described

24  herein.

25      14.  At all times mentioned herein, each and every defendant

26  and entity named herein was the agent of each and every other

27  defendant and entity.  In doing the things alleged herein, each and

28  every defendant was acting within the course and scope of this

-4-                                 98-2300TW(LAB)

1  agency, and was acting with the consent, permission, authorization,

2  and acquiescence of each of the remaining defendants.  All actions

3  of each defendant alleged herein were ratified and approved by the

4  other defendants and/or their officers or managing agents.

5  <center>**PRIME BANK SCHEMES**</center>

6      15.  Defendants operated and participated in operating an

7  investment scam known as a Prime Bank Scheme.  While having several

8  variations, Prime Bank Schemes commonly profess to offer

9  unrealistically high investment returns and safety of capital by

10  offering participation in, or the sale of securities consisting of,

11  international bank trading programs, in which various large

12  international banks purport to trade notes, letters of credit,

13  guarantees, debentures, loans, and other paper.  In reality, there

14  are no such programs.  The "banks" either do not exist or, if they

15  do exist, they know nothing about the promoters of the schemes or

16  the "programs."  They are marketed in very complicated terms by

17  smooth-talking professional salespeople who enshroud their

18  explanations with requirements of secrecy.

19      16.  Prime Bank Schemes are characterized by promises of high

20  rates of risk-free returns.  They represent that the "prime"

21  instrument is traded on a secret worldwide exchange and that the

22  investor would be obtaining a part of a large tranche of securities

23  which are almost fully subscribed.  They usually involve, or are

24  described as involving, exceedingly complex documentation (which,

25  in the eyes of an unsophisticated investor, can make a questionable

26  investment worthwhile), and are sometimes touted as having been

27  approved by well-known U.S. and international organizations such as

28  the Federal Reserve or World Bank.  They are often said to be

<center>-5-</center>

<center>98-2300TW(LAB)</center>

1  secret in nature, with restrictions on direct contact with the
2  "banks" or other principals involved. Common targets of such
3  schemes include both institutional investors and individuals, who
4  may be induced to participate in possible "Ponzi" schemes involving
5  the pooling of investors' funds to purchase "prime" bank
6  instruments.

7      17. The SEC and various state regulators have recently noted
8  an increase in the proliferation of such schemes. In March, 1998,
9  David Tatman, chief of enforcement for the Oregon Division of
10 Securities, was quoted as saying that "prime bank" fraud has made
11 a heady revival in recent months. "In the (American) West it is a
12 significant problem," he noted. "It disappeared for a few years
13 and now it has morphed into something different."

14      18. For example, the Idaho Securities Bureau has recently
15 brought charges against a company for allegedly participating in a
16 prime bank scheme, and the issue drew a lot of attention at a
17 routine meeting of regional regulators in Portland, Oregon last
18 February. "We are seeing a proliferation of screwball products,"
19 said Mike Burton, director of securities of the Arizona Corporation
20 Commission, referring to prime bank notes and other worthless
21 securities, as quoted in the March 2, 1998 issue of the
22 Institutional Investor, Inc.'s *Compliance Reporter*. And late last
23 Fall, the SEC sued three Southern Californians for allegedly
24 raising $3.7 million in a fraud scheme involving fictional trading
25 of securities purportedly issued by major international banks.

26                    **FACTUAL ALLEGATIONS**

27      19. In December 1997, Caldwell's investment advisor and
28 agent, Grace Pastore, was approached by Defendant KING with a

                          -6-                98-2300TW(LAB)

1   proposed investment.  At all relevant times herein, KING knew that

2   Pastore was acting on behalf of a principal, and it was this

3   principal whose money KING was soliciting and for which KING was

4   making the representations set forth herein.  At all relevant times

5   herein KING knew that he was offering the investment not to Pastore

6   personally but to a principal whom she represented.  KING knew that

7   Pastore was an agent and made all his representations to her in

8   that capacity.  KING made all the statements herein with the intent

9   and design that the representations would be passed on by Pastore

10  to her principal, and with the intent and design that Pastore's

11  principal would believe the representations to be true and would

12  rely on them in entrusting money to KING.  Accordingly, the

13  representations made by KING to Caldwell's agent were in fact made

14  to CALDWELL.

15      20.  KING described the investment as an opportunity to

16  participate in a "trade contract" worth five billion dollars.  KING

17  described this investment as a "Five Day Trade Initiation

18  Opportunity."  In reality Defendants were pushing a Prime Bank

19  Scheme.

20      21.  As with other Prime Bank Schemes, Defendants described

21  the investment in highly complex and complicated terms to increase

22  their own credibility and that of the scam.  KING explained that he

23  had an opportunity to initiate a trade contract for a trading group

24  operating in Switzerland.  According to KING, this "trading group"

25  arranged a "small" five billion dollar contract for an

26  "institution" in Japan or China that was not allowed to "purchase

27  the collateral in the first position."  KING further explained

28  that, because the traders were unable to purchase the collateral

-7-                        98-2300TW(LAB)

1  and "flip" it themselves, they and he were approaching Plaintiff as

2  an investor, and others, to "act as the first position buyer" on

3  the first trade of one hundred million dollars to initiate the

4  contract and start the flow of paper, by opening a trading account.

5      22.  KING represented that this was an opportunity for

6  Plaintiff to invest $100,000 which would result in significant

7  short-term returns.  He represented that the $100,000 from

8  Plaintiffs would be pooled with another $400,000 (totalling

9  $500,000) to open the "trading account" in a Swiss bank.  Once

10 open, KING explained, the account could then receive the several

11 million dollars from a Chinese or Japanese group which would then

12 be used to purchase a discounted international bank instrument

13 which, upon resale or maturity, would generate millions of dollars

14 in profits in a relatively short period of time.  KING explained

15 that the Japanese or Chinese group was barred by the laws of its

16 own country from opening such accounts directly and that therefore

17 this initial money was required.  KING further represented that,

18 upon receipt into the account of the money from the Japanese or

19 Chinese group, the original $500,000, which included Plaintiff's

20 $100,000, would immediately be returned, and Plaintiff's group

21 would remain as "first position buyer" whose name was on the

22 account and thus entitled to receive profits.

23     23.  Defendant KING represented that this $500,000 was

24 "secured" by the sum of $4,000,000 which KING had in 2 bank

25 accounts in Arizona.  KING also agreed to, and did, personally

26 guarantee the return of Plaintiff's $100,000.  In this fashion KING

27 represented that there was no risk to Plaintiff's principal.  Based

28 on and in reliance upon the truth of KING's representations,

-8-                    98-2300TW(LAB)

1  Plaintiff invested $100,000 with KING on or about December 16,

2  1997, wiring the money to KING's account as he directed.

3      24.  This scheme was a sham.  While bank records show that a

4  $500,000 transfer occurred at KING's direction on December 16,

5  1997, this transfer was to a bank in Chicago, not Switzerland.

6  And, this $500,000 was actually part of the very $4,000,000 which

7  KING represented was separate from, and securing, the $500,000.

8  The $4,000,000 was money from other investors and did not belong to

9  KING, nor was the $4,000,000 actually used or intended to be used

10  to secure Plaintiff's investment, contrary to Defendants'

11  representations.

12      25.  Here's how KING did this:  During October 1997 KING

13  received $4,000,000 from various other people into a bank account

14  at an Arizona bank in Metropolis Dune's name.  KING copied the bank

15  records showing that the account contained these funds, and

16  provided them to Plaintiff's agent for distribution to Plaintiff

17  with assurances that this separate money would "secure" Plaintiff's

18  investment.

19      26.  After doing this, KING transferred this $4,000,000 to a

20  second Arizona bank account which he opened at the same bank at

21  about that same time.  From this second account he transferred

22  $500,000 to Chicago.  He was thus able to show Plaintiff that he

23  had indeed transferred $500,000 from another account as he said he

24  had done.  Although this $500,000 supposedly contained Plaintiff's

25  money, in reality it was merely money from other investors.  KING

26  later transferred the remaining $3.5 million to Chicago, as well.

27  In Chicago, a woman named Kathryn Pearson, with whom KING was

28  rumored to be having or had had an undisclosed personal

-9-

98-2300TW (LAB)

1   relationship, received and apparently stole the $4,000,000 and

2   converted it to her own uses.  The money was never invested in

3   anything.

4       27.  On or about December 16, 1997 KING received Plaintiff's

5   $100,000, which was transferred to KING's own personal account in

6   a North Carolina bank.  Although he represented it was part of the

7   $500,000 which was supposedly transferred to Switzerland, in

8   reality KING kept, and spent, this money.  KING, quite literally,

9   spent Plaintiff's $100,000 "at the shopping mall."  He immediately

10  gave $6,000 to his children, bought various and sundry items at

11  surf shops, electronics stores, and other such outlets.    For

12  example, on December 21, 1997, KING spent $600 at a Donna Karan

13  store in California.  And, on December 22, 1997, KING spent another

14  $900 at two surf shops, also in California.  An additional $1100

15  was spent at Snow Summit, a ski resort in California, between

16  December 30, 1997 and January 7, 1998.  In one month, after

17  receiving Plaintiff's investment capital, KING spent $83,690.18 of

18  it on items such as them.  KING did not disclose that he would be

19  spending Plaintiff's $100,000 at the shopping mall, nor did he ever

20  disclose that all the money, including the purported "security" for

21  Plaintiff's investment, was being sent to a personal friend in

22  Chicago rather than Switzerland

23      28.  For  Plaintiff's  "participation"  of  $100,000.00,

24  Defendants promised a return of Plaintiff's capital and "profits."

25  Defendants further promised that Plaintiff's investment was risk-

26  free and <u>fully secured</u> by the $4,000,000 in funds in Defendants'

27  account in an <u>Arizona bank</u>.

28      29.  Defendants induced Plaintiff, through its agent, into

98-2300TW(LAB)

1  investing $100,000 into their scheme by making the above

2  representations, and the following representations, both oral and

3  written, upon which Plaintiff and its agent relied in doing so:

    (a)   Defendants represented that the "investment" was legitimate;

    (b)   Defendants represented that the investment would generate a high profit or return on investment within a short period of time. Defendants stated that the "process" would be accomplished, and the capital back into Defendants' account in North Carolina, on Friday December 19th.

    (c)   Defendants represented that the investment was risk-free. KING represented that Plaintiff's funds would be under the control of KING "at all times and are secured by the Metropolis Dune LLC Account at Bank One." Additionally, Defendants promised to "accept full responsibility for your [plaintiff's] funds throughout this process." And, finally, KING promised to "personally guarantee" the return of Plaintiff's funds.

    (d)   Defendants represented that the investment opportunity involved: (1) a trading group operating in Switzerland, (2) Swiss and other European banks, and (3) an "institution" in Japan or China.

    (e)   Defendants represented that Plaintiff's investment of $100,000.00 would yield a profit plus return of principal.

30.  Plaintiff never received the return of its investment capital, nor any profits, as promised. Instead, Defendants began

-11-

98-2300TW(LAB)

1  offering explanations for the delay. Now the money is gone.

2      31. In February 1998 Defendants reported that the

3  "transaction" was delayed. KING said, "It obviously took much

4  longer than anticipated to get things underway, and I guess it

5  [sic] always better late than never." Defendants informed Caldwell

6  "to be on the lookout for the principal to be coming back in the

7  next few days and the return to follow."

8      32. Throughout 1998 and 1999, Defendants have repeatedly

9  promised the return of Plaintiff's money, offering various

10  explanations as to the delay, but always promising within the "next

11  couple of days." Now, over one year later, Plaintiff still has not

12  received any of the $100,000.00 it invested.

**FIRST CLAIM FOR RELIEF**
**(Fraud)**

13

14

15      33. Plaintiff repeats and incorporates by reference

paragraphs 1-32, inclusive, as though set forth herein.

16

17      34. The representations set forth above were material and

were false. Defendants made them knowing they were false, or with

18

reckless disregard to whether they were true or false, or without

19

any reasonable basis in fact. They were false because, in truth:

20

21      (a) The "investment program" was not a legitimate investment.

It was a ruse and a scam to steal Plaintiff's money.

22

Defendants' "Five Day Trade Initiation Opportunity" was

23

a typical Prime Bank Scheme as described above. It was

24

fictitious. The "banks" involved either did not exist or

25

did not know anything about Defendants' "initiation

26

opportunity." There were no securities, notes, letters

27

of credit, guarantees, debentures, loans, or any other

28

-12-                    98-2300TW (LAB)

1  paper being traded.  It was simply a ruse to steal

2  Plaintiff's money;

3  (b-c) The "investment opportunity" offered no real chance or

4  opportunity for Plaintiff to receive the return of, or

5  make a reasonable or fair return on, its investment

6  money.  It was not risk-free, because Defendants designed

7  the "opportunity" solely to take Plaintiff's money for

8  their own use;

9  (d)  Swiss "trading groups" and banks were not involved.  The

10  one bank mentioned by name (Union Bank of Switzerland) is

11  believed to have no knowledge of the transactions

12  described by Defendant, Plaintiff's money, or any such

13  securities.  It is also believed that the large Japanese

14  or Chinese "institution" mentioned by Defendants also had

15  no knowledge of Defendants' program or scheme.  The other

16  banks mentioned by Defendants, located in North Carolina

17  and Arizona, were used simply to establish a false sense

18  of legitimacy with Plaintiff or other "investors;" and

19  (e)  The "investment" would never generate any return at all,

20  nor would it "pay off," because it was a fake.

21  35.  In addition to the above false statements, Defendants

22  made the following express and implied, and false, representations

23  and non-disclosures of material fact:

24  a.  Defendants represented that they had performed due

25  diligence into the "opportunity", and that the

26  investments were sound and legitimate investment

27  opportunities, and that the Defendants were

28  reputable operators thereof.  *(This was false*

-13-                    98-2300TW(LAB)

1     *because, if they believed it was legitimate, none*

2     *of the Defendants performed any due diligence upon*

3     *the investments.  Had they done so they would have*

4     *discovered that the investment "opportunity" was a*

5     *sham.)*

6     b.    Defendants have covered up and have refused to

7           disclose the true nature of the investment

8           "opportunity" as a sham and scam, and to disclose

9           the true nature and extent of their financial

10          interests in the investments.

11     c.    Defendants falsely represented that they possessed

12           and would apply special knowledge, expertise and

13           experience in a manner likely to result in

14           financial benefit to plaintiff.  They had none.

15     d.    Defendants failed to disclose that they were going

16           to convert Plaintiff's money to their own uses.

17     e.    Defendants failed to disclose that the investment

18           opportunity they solicited from Plaintiff was

19           likely to result in a loss of all of Plaintiff's

20          money, and was simply part of a high pressure

21          solicitation effort to steal Plaintiff's money.

22     f.    Defendants represented that Plaintiff's investment

23           was secured and personally guaranteed.  *(This was*

24           *false because the investment was not secured,*

25           *inasmuch as Defendants spent the $4,000,000 which*

26           *was represented to be securing the money, and*

27           *Defendants have repudiated their so-called*

28           *"personal guarantee" by failing to honor it.)*

98-2300TW(LAB)

36.  Defendants' fraudulent representations were made for the purpose and with the intent to induce Plaintiff to "invest" $100,000.00 with Defendants.

37.  Had Plaintiff known the true facts herein, it would not have entrusted its money with, or at the behest of, Defendants. Plaintiff could not, and did not, discover the true facts, including Defendants' frauds, concealment, and cover-ups until November, 1998 because Defendants misrepresented and concealed the true facts, and continue to do so to this day.

38.  Defendants knew or should have known that their misrepresentations and breaches of duty would result in financial loss to Plaintiff. As a result of Defendants' fraud, Plaintiff has suffered financial loss in an amount to be proven at trial, in excess of $100,000.00.

39.  Defendants' actions were willful, malicious and in conscious disregard of Plaintiff's rights, thus justifying an award of punitive and exemplary damages.

<div align="center">

**SECOND CLAIM FOR RELIEF**
(Violations of §10(b) of The Securities Exchange Act
And Rule 10b-5 Thereunder)

</div>

40.  Plaintiff repeats and incorporates by reference paragraphs 1-39, inclusive, as though set forth herein.

41.  This claim is brought against Defendants by Plaintiff for violations of §10(b) of the Federal Securities Exchange Act and Rule 10b-5 promulgated thereunder.

42.  By their acts as alleged herein, Defendants directly and indirectly have engaged and participated in a wrongful course of business, by the use of means or instrumentalities of interstate commerce, or of the mails with scienter:  (1) employed devices,

1    schemes or artifices to defraud; (2) obtained money or property by
2    means of untrue statements of material fact or omissions to state
3    material facts necessary in order to make the statements made, not
4    misleading; and (3) engaged in transactions, practices or courses
5    of business which operated as a fraud or deceit upon the purchaser,
6    in violation of Sections 10(b) and 10(b)(5) of the Exchange Act.

7        43.  Had Plaintiff known of the true facts and the materially
8    adverse information not disclosed by the Defendants, it would not
9    have purchased any securities with, by, from, or at the instance
10   of, Defendants.

11       44.  As a legal cause of Defendants' fraudulent acts and
12   misrepresentations Plaintiff has been damaged in an amount
13   exceeding $100,000.00.

14                      **THIRD CLAIM FOR RELIEF**
                       **(Unfair Business Practices)**
15                     **(Against All Defendants)**

16       45.  Plaintiff  repeats  and  incorporates  by  reference
17   paragraphs 1 through 44, inclusive, as though fully set forth at
18   length herein.

19       46.  The acts, statements, and representations of Defendants,
20   and each of them, as set forth herein, constituted unlawful,
21   unfair, and fraudulent business practices and unfair, deceptive,
22   untrue and misleading advertising, pursuant to and in violation of
23   California Business and Professions Code sections 17200 et seq. and
24   17500, et seq.

25       47.  The acts, statements, and representations of Defendants,
26   and each of them, as set forth herein, were performed in the course
27   of Defendants' advertising activities, in that they were designed
28   and utilized by Defendants to, and did, advertise Defendants' own

                              -16-                    98-2300TW(LAB)

1  business and bring Defendants' goods, services, and/or

2  property(ies) to Plaintiff's, and others', attention and cause and

3  induce Plaintiff, and others, to entrust their money with

4  Defendants, and to purchase and utilize Defendants' goods,

5  services, and/or property(ies).  In doing the actions and things

6  set forth herein the Defendants violated Business and Professions

7  Code sections 17200 et seq. and 17500, et seq.  Plaintiff relied

8  upon Defendants' acts, statements and representations to its

9  detriment.

10     48.  As a direct and legal result of the aforementioned acts,

11 statements, representations, and unfair business practices,

12 Plaintiff has lost money and has been damaged in amounts to be

13 proven at trial.

<div align="center">

**JURY TRIAL REQUESTED**

</div>

15     Plaintiff hereby requests a jury trial on all issues so

16 triable.

<div align="center">

**PRAYER FOR RELIEF**

</div>

18     WHEREFORE, Plaintiff requests judgment as follows:

19     Judgment against each Defendant and in favor of the Plaintiff

20 for damages in an amount to be determined, including return of its

21 lost investment of $100,000 and lost opportunity cost therefor;

22     Pre-judgment and post-judgment interest, as well as the costs

23 of this suit, including reasonable attorneys' and experts' fees and

24 other disbursements; and

25     Extraordinary, equitable and/or injunctive relief as permitted

26 by law, equity and the federal statutory provisions sued hereunder,

27 pursuant to Rules 64 and 65 and any appropriate state law remedies,

28 including freezing Defendants' assets, attaching, impounding,

<div align="center">-17-</div>

98-2300TW(LAB)

1  imposing a constructive trust on or otherwise restricting the

2  proceeds of Defendants' trading activities or their other assets

3  to assure that Plaintiff has an effective remedy; and such other

4  and further relief as may be just and proper.

5                              JEFFREY & DREHER, L.L.P.

6
   Dated: May 25, 1999           By: _____
7                                    ROBERT SCOTT DREHER
                                     Attorneys for Plaintiffs
8  F:\JD\CASES\73\PLD\AMCOMP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              -18-                    98-2300TW(LAB)

CASE NO. 98 CV 2300 TW(LAB)

### CERTIFICATE OF SERVICE

I, Terri Rodrigues, declare I am over the age of eighteen years and not a party to the case. I am employed in the County of San Diego, California, where the service occurs; and my business address is 225 Broadway, 19th Floor, San Diego, California 92101.

On May 25, 1999, I served the foregoing document(s) described as: **AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF FOR FRAUD; VIOLATIONS OF THE FEDERAL SECURITIES LAWS; and UNFAIR BUSINESS PRACTICES,** to be served upon:

Scott J. Rein
Henry G. Weinstein
DRESSLER REIN EVANS & SESTANOVICH, LLP
1800 Century Park East
Tenth Floor
Los Angeles, CA 90067
(310) 551-3100
(310) 551-0238 FAX

__ BY PERSONAL SERVICE: I personally served said document(s) to the addressee by hand-delivery.

_X_ MAIL: by placing a true copy thereof in an envelope with first class postage thereon fully prepaid, addressed as set forth below. I am familiar with Jeffrey & Dreher's practice for collection and processing correspondence for mailing with the United States Postal Service and all correspondence will be deposited with the United States Postal Service in San Diego, California, the same day during the ordinary course of business.

__ FEDERAL EXPRESS: by placing a true copy thereof enclosed in a sealed Federal Express envelope with postage fully prepaid at a Federal Express office located in San Diego, California, addressed as set forth above, for delivery on the next business day.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 25, 1999 at San Diego, California.

Terri Rodrigues

RÓ 91 (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### ANDERSON DIVISION

**FILED**

OCT 3 1 2000

LARRY W. PROPES, CLERK
U. S. DISTRICT COURT

UNITED STATES OF AMERICA

**CRIMINAL COMPLAINT**

vs.

Criminal Number 8:00-0697

GABRIEL MacENROE
DAVID MORGENSTERN
JOSEPH SILVESTRI

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

On or about February 2000 through October 30, 2000, in Anderson County, in the District of South Carolina, the defendant(s) did, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, conspire to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, in violation of Title 18 , United States Code, Section 371.

I further state that I am a Special Agent, Federal Bureau of Investigation, and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:   ■ Yes    □ No

_____
Paul A. Jacobs, Special Agent, FBI

Sworn to and subscribed in my presence on October 31, 2000, at Greenville, South Carolina.

William M. Catoe
United States Magistrate Judge

_____
Signature of Judicial Officer

Exh. 15

UNITED STATES DISTRICT OF SOUTH CAROLINA

GREENVILLE, SOUTH CAROLINA

### AFFIDAVIT

I, Paul A. Jacobs, a Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state:

I have been a Special Agent for 17 years. I am currently assigned to the Columbia Division of the FBI, Greenville, South Carolina Resident Agency. My duties and responsibilities involve the investigation of violation of certain federal statutes, including violations concerning Mail Fraud, Fraud by Wire, Money Laundering and Conspiracy. During my employment with the FBI, I have been assigned cases and have assisted other Special Agents with investigations involving these violations. I have directed and participated in numerous investigations, interviews, arrests, and search warrants involving these violations and related activities. The following facts are within my personal knowledge and/or have been related to me by other agents of the FBI.

### SUMMARY OF THE VIOLATIONS

This affidavit is submitted in support of complaints and arrest warrants for Gabriel MacEnroe, David Morgenstern and Joseph Silvestri. Your affiant has reason to believe that Gabriel MacEnroe, residing in St. Gallen, Switzerland (herein referred to as MacEnroe), David Morgenstern, residing in London, England (herein referred to as Morgenstern), Joseph Silvestri, residing in Florida, (herein referred to as Silvestri) and other

1

known but unnamed coconspirators (herein referred to individually as FM and H) have conspired to defraud a Cooperating Witness residing in Columbus, Ohio (herein referred to as CW) and an Undercover Special Agent of the FBI (herein referred to as UCSA) in violation of Title 18, United States Code, Section 371 (Conspiracy) and Section 1343 (Fraud by Wire).

Prior to his arrest on January 7, 2000, Virgil Womack (herein referred to as Womack) of Seneca, South Carolina managed a business based in Seneca which marketed fraudulent "guaranteed" investment opportunities to individual investors. The fraudulent guaranteed investments were marketed by Womack under the name "Chemical Trust" and other fictitious names through Womack's network of salesmen nationwide (one of whom was CW), and were "guaranteed" by a bogus corporation known as "U.S. Guarantee." Womack's fraud scheme resulted in approximately 1300 investors investing approximately 61 million dollars in the investment scheme. The Grand Jury for the District of South Carolina returned an indictment against Womack and others with respect to the scheme on charges of conspiracy, mail and wire fraud and money laundering in the matter of United States v. Virgil Womack, et al, in the District of South Carolina, Anderson Division, and Womack is currently awaiting trial.

From February 2000 through October 2000, CW personally met with MacEnroe, Morgenstern, Silvestri and the other coconspirators and received numerous interstate telephone calls and interstate facsimile transmissions from them in furtherance

2

of their conspiracy. Specifically, the conspirators efforts focused upon their attempts to convince CW to invest approximately 60 million dollars (represented by CW to be under his control) in their new investment program. Additionally, the conspirators undertook efforts to satisfy CW that, as a condition of his investing such funds, they would accomplish the return of millions of dollars worth of unrecovered funds invested in the Womack program back to the Court Appointed Receiver in the <u>Womack</u> case.

Based upon the telephonic conversations and meetings that took place between the CW, UCSA and the conspirators, and facsimile transmissions sent to and received by the conspirators, there is reason to believe that such meetings, conversations and transmissions were in furtherance of a conspiracy to defraud CW and the UCSA of approximately $60 million represented to be under CW's control.

## PROBABLE CAUSE

1.  The investigation relating to the conspiracy to defraud CW evolved from an initial contact in February 2000, a month after Womack's arrest, by Silvestri and from subsequent contacts with H and Morgenstern.

2.  During the initial contact with Silvestri, Silvestri told CW that Silvestri had $600,000 placed with Morgenstern earning five percent interest per month. Silvestri told CW that

3

the government considered money in the Bahamas to be illegal if it had been transferred there from the United States. Silvestri stated to CW that he could prove that the Chemical Trust money earned ten percent interest per month and that Morgenstern had all of the money invested by investors in the Womack program. Further, Silvestri stated that H had expertise in "block trading programs" and had done a lot of this type of trading in the past. Eventually, CW was told that Silvestri, Morgenstern and H wanted someone to replace Womack in a new trading investment program.

3. CW subsequently met with H and discussed the trading of treasury notes and commissions on their sale. H further stated to CW that H knew where the Chemical Trust money was located and that it was earning ten percent interest.

4. In approximately March 2000, Morgenstern telephonically contacted CW at CW's residence, and stated that Morgenstern would and could prove where $27 million of Chemical Trust funds were located. Morgenstern told CW that the government's position in the Womack case was "bogus," and that "they" had done nothing criminal.

5. Thereafter, CW was requested by Morgenstern to travel to London, England (where Morgenstern reportedly lived) and to meet with him there to discuss CW's investment of funds.

6. In early April 2000, CW traveled to Florida and met with H. There, H continued to discuss trading programs and how "they" (H and others) went about buying 20-30 million dollars worth of treasury notes.

4

7.    In June 2000, CW was telephoned by Silvestri and FM concerning the possibility of CW being the conduit for the return of Chemical Trust funds.

8.    In July 2000, CW was told by FM that CW would need to personally meet with Morgenstern in order to more fully discuss the possibility of returning Chemical Trust funds to the Receiver, and to discuss details of investment opportunity with Morgenstern.  Further, FM told CW that Morgenstern would not come to the United States to meet CW and to discuss business there.

9.    During the month of August 2000 and early September 2000, numerous interstate telephone conversations took place between FM, Silvestri (both of whom resided in Florida) and CW in which FM and Silvestri described to CW how the millions of unrecovered investor funds could be returned to the Receiver via CW.  FM told CW by telephone that Morgenstern and other individuals would have to work out the details with CW for the return of the funds.  FM also discussed with CW the potential investment of additional funds raised by CW through CW's investment business, and stated that Morgenstern and others would actually place the funds in new investment opportunities.  CW told FM that he had millions of dollars to invest in such a program, and FM requested that CW send a facsimile transmission of CW's bank statements evidencing that CW indeed had control of such funds.

10.    Shortly thereafter, the FBI arranged to create bank statements for CW from Bank One Bank in Columbus, Ohio which

5

appeared to verify that CW had control over millions of dollars.

11. Thereafter, at FM's request, CW caused an interstate facsimile transmission of these bank statements to be sent to FM in Florida, which immediately opened ongoing discussions between CW and FM, Morgenstern regarding CW's potential investment in their investment programs. FM told CW by phone on several occasions that the individuals in Europe were very excited about the potential investment opportunities with CW.

12. On September 14, 2000, FM stated to CW during an interstate telephone conversation that FM had made arrangements for CW to personally meet Morgenstern and others involved in the new investment program, and that the meeting would take place in London, England on September 25 and 26, 2000. FM advised CW that all expenses of CW would be paid for by him and Morgenstern. Further, FM advised CW that FM would also be traveling to London to participate in the meeting and that CW would meet all the individuals who he had hoped to meet in London when the meeting was originally scheduled to meet in July 2000.

13. Thereafter, FM, H and Silvestri advised CW that the unrecovered Chemical Trust funds were maintained in bank accounts in Switzerland.

14. In September 2000, Morgenstern had further telephone conversations with CW, in which Morgenstern stated that it would be necessary for CW to travel from London, England to Zurich, Switzerland for the purpose of meeting an associate, Gabriel MacEnroe, who resided in St. Gallen, Switzerland.

6

15.   During September 2000, CW was instructed via interstate telephone calls and interstate facsimile transmissions by Morgenstern to provide various documentation regarding CW's potential investment of millions of dollars with MacEnroe through Morgenstern.  CW provided Morgenstern by facsimile transmission with a copy of his Bank One bank statement reflecting a balance of in excess of $60 million.

16.   CW was thereafter advised telephonically by Silvestri that MacEnroe was a Central Intelligence Agency (CIA) trustee and that he (Silvestri) worked for the National Security Agency (NSA) at one time.

17.   CW was subsequently advised by Silvestri that MacEnroe was "one of the five" traders in the world who handled these specialized types of investments.

18.   CW was thereafter told by Morgenstern via interstate facsimile transmission on September 28, 2000 and October 20, 2000 that when CW made contact with MacEnroe, that he not mention any other matters to MacEnroe until CW and Morgenstern had the opportunity to meet in person and to discuss strategies.

19.   On October 5, 2000, CW received a facsimile transmission from MacEnroe in Switzerland advising CW "please also be advised we do not allow, nor are we permitted to use outside parties to negotiate or advise clients on what we do. Thus, the introductory party is going to see you to purely facilitate communications between us and establish a better understanding.  He knows this, but I do have to mention this to

7

you.  He is not involved with us except as an introductory party.
I am not in any way diminishing his role.  He will be rewarded
for his work.  I trust this is acceptable to you."

20.  On October 6, 2000, Morgenstern met with CW in
Columbus, Ohio and was introduced to the UCSA, who represented to
Morgenstern that he assisted CW in his business.

21.  CW was told by Morgenstern that MacEnroe worked with
the Treasury, and discussed with CW a series of questions which
had been set out in a one-page document concerning the investment
of funds.  Upon completing that questionnaire, the document was
sent via facsimile transmission to MacEnroe in Switzerland per
Morgenstern's request.

22.  Subsequent to the October 6, 2000 meeting between
Morgenstern and CW, the UCSA spoke with Morgenstern by phone to
set up a meeting with MacEnroe and Morgenstern on October 16,
2000 in Columbus, Ohio.

23. When UCSA expressed concerns about the safety of CW's
investment with MacEnroe and others, Morgenstern became irritated
and advised the UCSA that it was a "privilege" for CW to have an
opportunity to invest his funds through Morgenstern with
MacEnroe, and that CW "had no rights."

24.  On October 16, 2000, a meeting was held with CW, UCSA,
Morgenstern and MacEnroe in Columbus, Ohio for the purpose of
discussing further details regarding CW's investment with
Morgenstern and MacEnroe and regarding possible scenarios to
return Chemical Trust funds to the Receiver.  At that meeting,

8

MacEnroe told CW and the UCSA that MacEnroe's projects never placed any funds at risk and promised a guaranteed return of 400 percent on the funds invested during the first year. MacEnroe stated that his commissions are paid by the U.S. Treasury Department and the Federal Reserve. Further, MacEnroe stated that he would be traveling to Washington, DC on October 17, 2000 to obtain approval from the NSA for CW's investment project. MacEnroe stated that the NSA project involved 52 satellites. MacEnroe stated that the NSA would audit the investment project once a month for the first three months, and then certify the project to CW. CW and UCSA were further advised by MacEnroe that the funds placed with him would not take long to reach the amount of $100 million and stated the funds would initially earn five percent interest per week and then quickly move to the 22 percent interest per week range. MacEnroe stated that the $60 million placed with him by CW would be part of a block of funds totaling $500 million. CW was told by MacEnroe that CW could meet one of the "approving officials" in a Swiss bank following the financial transactions.

25. Several days prior to October 29, 2000, MacEnroe spoke with CW by phone and arranged a meeting with CW and UCSA in Myrtle Beach, South Carolina for the purpose of further discussing CW's investment in one of MacEnroe's projects. He stated to CW that he would bring with him documents that would evidence the location of the  Chemical Trust funds, as well as outline the details of his proposed investment project for CW and

9

other examples of past investment projects with which MacEnroe
arranged.

26.  On or about October 26 or 27, 2000, MacEnroe faxed his
travel itinerary from Switzerland to UCSA in the United States,
and on or about October 28, 2000 flew from Switzerland to Newark,
New Jersey.  After an overnight stay in Newark, MacEnroe traveled
by airline from Newark, New Jersey to the Myrtle Beach
International Airport in Myrtle Beach, South Carolina on October
29, 2000.

27.  On October, 29, 2000, during a meeting with UCSA in
Myrtle Beach, South Carolina, MacEnroe stated that the investment
opportunity he proposed for CW could realize 5-6 % return per
week and 450% per year, and that after a period of several weeks
after the initial investment, CW's return would dramatically
increase.  CW proposed that CW fly to Zurich and meet with
MacEnroe and Swiss bank officials for the purpose of opening a
bank account there to accomplish the transfer of investment funds
to that account.  He further stated that he had brought with him
documents associated with Morgenstern's control of the Chemical
Trust funds, and documents outlining details of his investment
proposal and examples of past investment projects with which he
was involved.

28.  On October 30, 2000, MacEnroe met with CW and UCSA at
the same location in Myrtle Beach, South Carolina, for the
purpose of further discussing details of CW's potential
investment and of Chemical Trust funds.  During the meeting,

10

MacEnroe again discussed his investment proposal, and stated
that he could provide a 5-7 % rate of return weekly on CW's
investment, which rate would rapidly increase and that he would
expect the CW to earn over $20 million in a six to eight week
period.  MacEnroe further represented that the person actually
handling the proposed investment contracted with the Federal
Reserve, that MacEnroe was associated with the NSA and that he
had previously handled placement of investments for the CIA.  He
also stated that he was a financial advisor to the Vatican.
MacEnroe further stated that there would be a "world tax
exemption" for all profits generated from the proposed
investment.

29.  Upon conclusion of the October 30, 2000 meeting,
MacEnroe was placed under arrest by FBI agents.

Based upon the above facts and circumstances set forth
above, there is probable cause to believe that Gabriel MacEnroe,
David Morgenstern and Joseph Silvestri engaged in a conspiracy to
commit fraud by wire in violation of 18 U.S.C. Section 371 and 18
U.S.C. Section 1343.

Paul A. Jacobs
Special Agent
Federal Bureau of Investigation
Greenville, South Carolina

Subscribed and sworn to before me this ___ day of October,
2000.

U.S. Magistrate

11

# AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
P.O. N-4123, Nassau, New Providence, Bahamas
Tel. 242.325.5777 Fax 242.326.5776

26 August 1999

By fax only:   +949.831.6971                                      **16 pages.**

Mr. Arnold J. Adler
59 Montera Drive
Aliso Viejo, CA 92656

Re:    <u>AFCM Managed Fund Information Statement</u>

Dear Mr. Adler,

On the request and recommendation of Charles Rosenblum & Virginia Battelle, I have compiled this package for you to complete to participate in our managed fund.  They have requested that this package be faxed to for your convenience.  We will, however, need the originals you complete be express mailed to AFCM at the address above.

Attached please find an AFCM Information Statement.  Please take a moment to review it.  These documents will provide a fundamental understanding of AFCM's Managed Fund and the purpose of our Homevest effort.

An AIBC Account Application is also attached for your convenience.  AIBC is a full service bank and your account is always in your full control. We also must point out that we are unrelated to the bank except that we are asset managers for certain of their accounts.

Please sign the "Commitment of Interest" letter, <u>complete all</u> the relevant information in the Patron Evaluation Summary, complete the AIBC account application and fax them back to me at the London fax number given below.  Originals of the bank application and our Managed Fund Agreement will have to be executed in the near future.

The package will be processed quickly and you should expect our Managed Fund Agreement within twenty-four hours of receipt of the completed package.

Please feel free to call me with any questions you may have.

Thank you for your support of AFCM & Homevest.  I look forward to a mutually beneficial relationship.

Sincerely,


Ralph King
Fiduciary Director
Telephone: +44.171.661.9465
Facsmile:   +44.171.661.9887

cc:    Mr. Gary W. Christie, AIBC  (Letter Only)
       Mr. Charles Rosenblum   (Letter Only)
       Mr. Virginia Battelle   (Letter Only)

Exh. 16

# AMERICAS FIDELITY *CAPITAL MANAGEMENT, LTD.*

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
P.O. Box 7135, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8772

Pack.1

DATED MATERIAL: 30 AUGUST 1999
NUMBERED AND ENCODED :   AJA.30.09.99.AFCM-MD

# INFORMATION STATEMENT
## PRIVATE AND CONFIDENTIAL

*We have a specific mission:*

*"To fortify the well being of humanity by eliminating the financially driven causes for the break up of families. We believe that the preservation of the traditional family unit will significantly abate drug abuse, violent crime, abortion, suicide, euthanasia, and the disturbing position that the aged are a burden to society."*

| | |
|---|---|
| AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD. | Private Investment Strategies |
| HOMEVEST WORLD SERVICES | Mortgage Driven Economics |
| THE BETHESDA ACCORD | Private Enterprise Assistance |

---

## NOTIFICATION

This is not an offer to buy or a solicitation to sell securities of any kind. It is a response to your request for information. The receipt of this document is the result of your unsolicited request to receive it.

This is a summary of sophisticated information which by its' very nature is inherently incomplete, as compared to the actual documents as may be summarized or referred to hereunder. No literature or advertising in whatsoever form can be employed regarding matters as discussed herein.

This information statement has been prepared in original color form. It is only for the benefit of the person to which it has been addressed. No permission has been granted, either expressed or implied, for its distribution by photocopy or by facsimile. No person has been authorized to give any information or to make any representation other than what is contained or provided for herein. If given or made, such other information or representations must not be relied upon as having been authorized by Americas Fidelity Capital Management, Ltd., and should be rejected in its entirety.

---

## DATED MATERIAL: 30 AUGUST 1999

The material herein is date sensitive. The delivery of this letter does not imply that changes have not occurred in matters discussed herein since the date above.

# AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO B-7103, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8778

**PROCEDURES LETTER**
PRIVATE AND CONFIDENTIAL

30 August 1999

Arnold J. Adler
~~59 Montera Drive~~   59 MONTARA DR.
Aliso Viejo, CA 92656  USA

Dear Mr. Adler:

Thank you for your interest in special purpose secured private placement investments sponsored by Americas Fidelity Capital Management, Ltd. This is neither an offer to buy nor is it a solicitation to sell securities of any kind. Please study the subject matter contained herein  Note that the "Patron's Evaluation Summary" and "Commitment of Interest" must be completed and returned to us. This data will permit our Compliance Department to open a file for you and release additional Forms for your perusal, which will become part of your Managed Fund contract. These Forms will be personalized with your information. We do not provide "draft" documents at any time. All communications are specific and confidential between our patrons (as legal entities) and ourselves.

Americas Fidelity Capital Management, Ltd. ("AFCM") manages assets for discreet patrons who endorse the advanced vision of HOMEVEST WORLD SERVICES among other causes. HOMEVEST supports the preservation of the traditional family unit (father, mother, children) by promoting a financial services system for nations that will fortify each family's well being through home ownership. In turn, we believe families having homes will provide a restored setting for moral absolutes, ethics, culture and neighborhood. We believe this will lead to greater social harmony worldwide as people to what they have with gratitude rather than to what others may have with envy.

In order to realize this vision, communities must be planned, as opposed to housing projects built, where accelerated construction of infrastructure, transportation, sanitation. hospitals. schools and telecommunications accompanies the created neighborhoods. It will be the planners and workers who build these communities who will be the ones able to buy their own homes. thereby increasing the standard of living in a free market system. In order to do this, there must be a shift in the economic focus of developing nations from imported consumer goods to "bricks and mortar" investments, using their local resources. By providing direct trade and housing finance. by supporting local private business enterprise. and by developing vital corrections in economic systems, AFCM is committed to enhancing the productivity of capital and the pride of labor.

Please return your Information Statement and Commitment of Interest in completed form as soon as practical, so that we may proceed towards your full involvement with this worthwhile endeavor  We are looking forward to serving your investment needs for the present and for the many years to come.

Sincerely,
AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.


Ralph H. King
Fiduciary Director

# AMERICAS FIDELITY *CAPITAL MANAGEMENT, LTD.*

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-8130, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8776

## SUMMARY OVERVIEW

AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD., ("AFCM") is a dedicated private society of high net worth individuals, foundations and corporations. We believe, as a collective, that the leading causes of crime, strife, conflict and disruption worldwide is the break up of the traditional family unit. AFCM is dedicated to pioneering change in order to stop the disintegration of the family. Our responsibility is to provide growth in capital and to pay fixed rates of income to our subscribers. AFCM is a Commonwealth of the Bahamas IBC in good standing which operates in compliance with applicable common law governing non-bank trusteeships. In Europe, we are known as Americas Fidelity Intermediação Financeira, S.A. (AFIF), a licensed and registered financial intermediary (fiduciary) provider operating in compliance with Madeira (offshore) and Portuguese (European Union) Central Bank regulations.

AFCM has developed a corrective technology (called "Homevest") which it believes can resolve the lifetime conflict between a person's need to save and requirement to spend. Designed first for dysfunctional economies, AFCM studies current fiscal circumstances by computer forecast delineation and then illustrates, through modeling, enhancements brought forth by the Homevest financial system. Our on-going strategy is to play a catalytic role in the financial services delivery industry and to fund private enterprise in specific nations.

Significant research confirms that affordable home ownership fortifies the preservation of the family unit and healthy family units strengthen both the social fabrics of a country and its emerging free enterprise system. The Homevest system's platform is housing starts which are funded through fixed-rate, value-added mortgage pools in which monthly payment contributions also simultaneously create retirement funds as each loan is repaid, for the benefit of the borrower. This plan de-pressurizes emerging growth governments from providing retirement schemes by placing the burden on private enterprise and on the individual workers themselves, thus bringing forth civic pride and individual responsibility for one's destiny.

Portions of the Yields from your secured investment will initially finance the development of energy efficient communities, consistent with native culture, climate and the topography in participating countries, not housing projects. Such funds will also train colloquial human resources to develop strategies for sanitation, telecommunications, roads, public transportation, and health care infrastructures, so that our initial project funding will have a conformable long lasting positive effect. While our invitation for you to participate is to help us to first create not-for-profit housing start ups, we also ask you to understand that low cost housing may begin with subsidy, but these assets are sustained by low cost lending pools for mortgages. This is why we have taken a long-term project approach to the undertakings as discussed herein.

To support the stability of private enterprise and its further growth in developing nations is our *prime directive.* The efficient use of resources, including human resources, is what accelerates and then sustains true economic stability. Building human resource infrastructure to undertake environmental, technical, financial, and economically viable projects, must precede, and then accompany, all materiel supply, sanitation, utility, communications and transportation, among many other requirements for developmental infrastructure. In the private sector, the costs of personnel training and labor force development is often sustained as part of the contract negotiation rather than being dependent upon socio-civic programs.

### (i) Infrastructure Projects

Developing economies need greater acceleration in infrastructure development in order to compete for capital investment from the rest of the globe. This fact calls for fresh ideas, innovation and solution diversity  AFCM manages its' not-for-profit funds in a manner where the majority of yields from such investments are pledged to support the advanced vision of Homevest  AFCM fully discloses in advance of accepting funds that providers of Capital, as well as all intermediaries, will be expected to further invest a substantial portion of their yields to support this worthwhile endeavor. Further, recipients of funding, in the countries where projects are under consideration, are assured, through the use of proprietary forecasting models, that Homevest builds stable economies based upon "home grown" resources consumed in local low cost housing. Homevest is "bricks and mortar" investment, which serves to fortify local currencies and all forms of collateral business development.

AFCM's hallmark plan for infrastructure project assistance is to: (i) Support, through direct equity investment and provisions for lending, the financial requirements of development; (ii) advise enterprises on the structuring of such projects to conform to long term master planning (this is to minimize long term costs, which includes energy efficiency and power conservation technologies); (iii) limit financial risks by providing custody disbursements of expenditures; and (iv) advise and assist governments with forecasting and analysis in order to create a future legal and regulatory framework for oversight of private enterprise.

In selecting infrastructure projects, AFCM pays particular attention to: (i) managing of investment yields and the committed uses of such proceeds; (ii) managing the process of selecting the developers and suppliers; (iii) the sensitivity of such developers and suppliers to environmental protection guidelines established for long term conservation; (iv) protection of the host country from paying uneconomic prices, or providing excessive returns to local developers, or unfair bargains forced by severe shortages of existing infrastructure services.

### (ii) Privatization Projects

Privatization is an important component of almost every economic policy in many emerging growth and developing nations  AFCM supports privatization in two (2) ways: *First*, technical assistance and advisory services. By making resources available to mobilize funds in order to help governments establish the legal framework for privatization, we create or strengthen privatization agencies, and develop the sophisticated accounting and valuations systems required; and *Second*, we arrange equity, bond issues, debt, and other types of sophisticated bank, institutional, and insurance financing, for long and short-term projects, in the form of loans, equity participation, and the implementation of securities issue underwriting.

### (iii) Assistance Projects

Homevest promotes the traditional family unit as the supreme reclamation tool to preserve ethics, culture and neighborhood. A nation of families in homes of their own will generate greater social harmony. More nations content makes peace possible, without displacement of peoples, war or calamity. By assisting real estate development projects in nations, by providing direct trade and housing finance, to the extent that these are accomplished, we plan to then provide local private business enterprise with the capacity to issue mortgages, medical and other insurance, plus certain financial services, to their nation's individual families. By supporting vital economic systems, including the generation of foreign exchange, earnings and savings, the creation of employment and improvements in the skills of both labor and management, Homevest will enhance the productivity of capital and the pride of labor. These are still the building blocks of necessity in order to bring forth a world at peace.

## COMMITMENT OF INTEREST

I accept the statements above and I understand the purpose of this undertaking. I acknowledge that AFCM did not solicit me in any manner whatsoever to participate in this endeavor. But rather, I have made an inquiry to AFCM as an act of free will. I ask that AFCM to consider what role I may play to bring forth positive global change.

I understand that by providing the information on the following page, under the heading "Member Evaluation," I assert my willingness to become an AFCM Patron. This is a matter of my own personal choice and it is a private and personal decision. You have my permission by my signature below to make inquiries regarding myself or as the case may be. my company(ies). Upon the completion of your due diligence, where certain documents are attached hereto for me to completely fill out, I understand that I may receive an invitation to participate, or I may receive a confidential communication from you indicating that my participation at this time is not appropriate. I understand that only if I accept your invitation, if any, to participate with AFCM, will I be asked to consider making a secured investment into this undertaking.

I also understand that this is neither an offer to buy nor a solicitation to sell securities of any kind. Investments, if any, shall always be strictly private placements between legal entities and shall never be available to the public. I hereby confirm, under penalty of perjury, that I have not been induced, enticed by payment, or promised by AFCM or any party that I have been guaranteed an advanced or privileged entry" into any investment undertaking, nor have I been quoted a guaranteed "higher than average rate of return," as an inducement or enticement to enter into any investment. Further, I have been fully informed that no investment contemplated by AFCM will be registered under any securities act, including the United States Securities Act of 1933, as amended, as such may apply to U.S. investors. Where applicable, AFCM relies on one or more exemptions from registration of its investment undertakings, in any number of jurisdictions.

Please note that, by completing this document, and then executing it under your signature, you are declaring yourself to be a high net worth individual and that you do not therefore need immediate liquidity in the investments contemplated. You are also warranting that you have relied on your own examination of the terms and opportunities as presented, and that you will continue to do so, including the merits and risks involved. No investment to be engaged in will be recommended by any securities commission or regulatory authority, and no such commission or authority will confirm the accuracy or determine the adequacy of any document. Any representation to the contrary is a criminal offense.

Accepted and acknowledged:

| First name(s): ~~Arnold~~ ARNOLD | Middle Initial I J. | Last Name Adler |
|---|---|---|

Name of Company

Title

Signature: *Arnold J. Adler*                     Date: *Sept 1, 1999*

## CONFIRMATION OF RECEIPT

The INFORMATION STATEMENT, as numbered and encoded above, and received by myself, is confidential in its entirety, and for my own sole purpose and use. I understand and I agree that it is not to be circulated in any form and it remains the property of AFCM as protected under US HR 7323 (theft of trade secrets, et al), who may require its return at any time.

Signature: *Arnold J. Adler*                     Date: *Sept. 1, 1999*

# AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
P. O-8190, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8777

## PATRON EVALUATION SUMMARY
### PRELIMINARY, PRIVATE AND CONFIDENTIAL

IT IS A REQUIREMENT in order for you to receive further information, FOR YOU TO COMPLETE THIS PRELIMINARY FORM which is in addition to executing the Americas Fidelity Capital Management, Ltd., Information Statement and Commitment of Interest. The following disclosure ensures proper compliance with the obligation to verify all contracting partners and the identification of the beneficial owner of funds, as established in the Article 2 through 5 of the Due Diligence Convention regarding the Federal Banking Commission Circular of December 1991, concerning the prevention of money laundering and Article 305 of the Swiss Criminal Code, among similar regulations in other jurisdictions. This information is protected under the secrecy laws of the Commonwealth of the Bahamas, to the extent that they are applicable. This notwithstanding, all parties are obligated to respect the professional secrecy, which shall remain in forces at all times, and take all appropriate precautions to protect the confidentiality of the information they hold in respect to their activities

| | | | |
|---|---|---|---|
| Surname | Adler | | |
| First Name/ Middle Initial | Arnold J. *ARNOLD J.* | | |
| Residence Address | *MONTARA* 59 Montara Drive, Aliso Viejo, CA 92656 | | |
| Postal Code | 92656 | Country: | USA |
| Telephone Number: | +949-831-0364 | Fax | +949.831.6971 |
| Personal Number | +949-831-0 | | |
| Email | ADUBLEA @ AOL.COM | | |
| Passport Number | 151155672 - American | | |
| Issuance Date (dd/mm/yy) | 21 March 94 | Expire Date: | 20 March 04 |
| Company Name | | | |
| Business Address | | | |
| Postal Code | | Country: | |
| Telephone Number | + | Fax: | + |
| Company Web Page | | | |
| Company Registered in | | | |

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

| | |
|---|---|
| Description of Business | |
| | |
| Personal Profile) | (please attach your curriculum vitae or equivalent) |
| Legal - Law Firm Name | |
| Attorney Name | |
| Address | |
| Telephone Number | Fax: |

# MEMBER EVALUATION SUMMARY
## Page 2

*Regarding Proof of Funds*

| | |
|---|---|
| Amount ($US) for allocation | ~~Ninety Thousand ($90,000 USD)~~ FIFTY THOUSAND ($50,000 USD) |
| Origin of funds (how earned?) | WAGES, SAVINGS, MUTUAL FUNDS, ETC. |
| Bank Name/Branch | World Savings Bank, FSB #833 |
| Address | 24310 Moulton Parkway |
| | Laguna Hills CA 92653 |
| Contact Officer | MARGIE CAMILLERI |
| Telephone Number | 949-768-1729    Fax +949-768-4909 |
| Account Name | Arnold J Adler |
| Account Number | 65-348304-0 |
| Euroclear Access, Cusip | MONTARA |
| Holder's Address | 56 Montara Drive |
| | Aliso Viejo, CA 92656    Country USA |
| Holder's Telephone No | +949-831-0364    Fax +949 831 6971 |

| Authorized Signatory(ies) | 1. Arnold J. Adler | Dual | Single X |
|---|---|---|---|
| | 2 | Dual | Single |

Your funds must be available at first call by you, freely transferable and free of all liens. If this is not true, explain why

**Other Bank Reference**

| | |
|---|---|
| Address | |
| Contact | |
| Telephone Number | Fax: |
| Account Name | |
| Address | |
| Account Number | |
| Telephone Number | Fax: |

Special Instruction, if any
Phone / Fax #'s at this time    Fax
Send hard copy for signature to
Organizer.[1]    Charles Rosenblum, Virginia Battelle

Signature[2]    Date

[1] This is your acknowledgement of who introduced you to AFCM, if such introduction was indirect.
[2] By the execution of this Patron Evaluation Form, the signatory agrees to supply all information without solicitation and as an act of their own free will, and that the above must be completed and returned to AFCM. Upon receipt AFCM will take all steps necessary to verify the accuracy of the information above, and may request additional documents at any time. These requirements will be communicated as required and sent for hard copy signature and return. When approved, a member number will be allocated with confirmation of the operational requirements

# Americas International Bank
## Corporation Ltd.

Euro Canadian Centre, Ground Floor Marlborough St. & Navy Lyon Road P.O. N-8190 Nassau, Bahamas
Tel (242) 326-3981 Fax: (242) 326-3980

## NEW ACCOUNT APPLICATION

### CLIENT INFORMATION FORM

**NAME ON THE ACCOUNT:** *ARNOLD    J.    ADLER*

**ADDRESS** *59 MONTARA DRIVE*     **TELEPHONE** *949-831-0364*

                                   **FACSIMILE** *949-831-6971*

**CITY/STATE** *ALISO VIEJO, CA.    92656*     **COUNTRY** *USA*

**SIGNATORY INFORMATION:**

| | | |
|---|---|---|
| *ADLER* | *ARNOLD* | *J* |
| Surname(s) | First name(s) | Middle Initial |

| | | | |
|---|---|---|---|
| *25/03/34* | *AMERICAN* | *DIVORCED* | *M* |
| Date of Birth (DD/MM/YY) | Nationality | Marital Status | Sex |

*59 MONTARA DRIVE*
Street Name & Number                    Suite Number

| | | | |
|---|---|---|---|
| *ALISO VIEJO* | *CA.* | *92656* | *USA* |
| City | State/Province | Postal/Zip Code | Country |

| | | | |
|---|---|---|---|
| *949-831-0364* | *949-831-6971* | | |
| Telephone Home | Facsimile Home | Telephone Business | Facsimile Business |

| | | | |
|---|---|---|---|
| *151155672* | *20/03/04* | *NATL. PASSPORT CNTR. USA* | |
| Passport No | Expiration Date | Bureau and Country Where Issued | |

| | | | |
|---|---|---|---|
| *566 40-1093* | *B0534929* | *25/03/03* | *DMV-CA, USA* |
| Social Security No | Drivers License No | Expiration Date | Place of Issuance |

| | |
|---|---|
| *RETIRED* | *INVESTMENTS* |
| Profession | Main Source of Income |

**PLEASE ANSWER THE FOLLOWING:**

Can we visit you in your home country?  YES *X*   NO ___

Can we call you at home?  YES *X*   NO ___

Can we call you at work?  YES ___   NO *X*

Can we telefax you?  YES *X*   NO ___

Do you prefer a private number?  YES ___   NO *X*

Please provide your private lines
*949-831-0364*
Telephone
*949-831-6971*
Facsimile

**ACCOUNTS DESIRED:**

___ CALL ACCOUNT
___ CURRENCY(IES)
___ SAFEKEEPING

___ CURRENT ACCOUNT
___ TERM DEPOSIT
___ PRECIOUS METALS

**SERVICES DESIRED:**

*X* IBC/TRUST FORMATION
*X* MANAGED FUND
___ MONEY MARKET

___ CREDIT CARD
*X* DEBIT CARD
___ MORTGAGE

**ASSETS TO BE DEPOSITED:**

*X* Currencies

___ Safekeeping Receipts of Assets Held Elsewhere

___ Securities, Precious Metals

___ Bank Notes, Letters of Credit

**INITIAL DEPOSIT** *(Express in United States Dollars)*     *$50,000 (USD*

THE AMOUNT OF ANTICIPATED FUNDS TO BE:

- Held for Your Banking/Consumer Services Needs   ___
- Managed By Our Trust Department   ___

**BANK REFERENCE:**

| | |
|---|---|
| *WORLD SAVINGS BANK, FSB* | *LAGUNA HILLS MOULTON PKY* |
| Name of Bank | Branch |

*24310 MOULTON PARKWAY*
Street Name & Number

| | | | |
|---|---|---|---|
| *LAGUNA HILLS* | *CA.* | *92653* | *USA* |
| City | State/Province | Postal/Zip Code | Country |

| | | | |
|---|---|---|---|
| *949-768-1729* | *949-768-4909* | *65-348304-0* | *10/01/98* |
| Telephone | Facsimile | Account Number | Date Opened |

| | | | |
|---|---|---|---|
| *MARYLIN CAMILLERI* | *BRANCH MANAGER* | | |
| Officer's Name | Title | Account Number | Date Opened |

**PLEASE ANSWER THE FOLLOWING**

Can we call your bank?  YES *X*   NO ___

Is Officer you gave whom we talk to?  YES *X*   NO ___

Can we verify account details?  YES *X*   NO ___

**CLIENT INFORMATION FORM** *(FOR INTERNAL USE ONLY)*

YOUR BACKGROUND: *Please provide a copy of your Curriculum Vitae*

Source of Assets deposited: WAGES, SAVINGS, SALES OF MUTUAL FUNDS, ETC.

Type of Transactions Anticipated: _____

Service Requirements: _____

Are you the beneficial owner of the Assets?   YES ☒   NO ☐   IF NO, THEN WHOM? _____

**CORRESPONDENCE:** *Is to be forwarded regularly to the following address:*

59 MONTARA DRIVE
Street Name & Number

ALISO VIEJO      CA.      92656      USA
City      State/Province      Postal/Zip Code      Country

| PLEASE ANSWER THE FOLLOWING |
| Shall we retain your Mail? |
| YES ___  NO ☒ |
| Shall we send it on to you? |
| YES ☒  NO ___ |

**OTHER SIGNATORIES:**

| Name | Passport No. | Birth dates (DD/MM/YY) | Signing jointly or Individually | County of Residence |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

We offer Trustee (Custodial) signatories or matters of convenience and privacy
Are you interested in hearing about this service at this time? Yes ___ No ___

**CONTACT IN CASE OF EMERGENCY:**

ADLER      MARK      L
Surname(s)      First name(s)      Middle initial

23601 VIA EL ROCIO
Street Name & Number

MISSION VIEJO      CA.      92691      USA
City      State/Province      Postal/Zip Code      Country

949-707-5075      949-707-1814
Telephone: Home      Facsimile: Home      Telephone: Business      Facsimile: Business

| PLEASE ANSWER THE FOLLOWING: |
| Will person be aware of this account? |
| YES ☒  NO ___ |
| Can we call them at work? |
| YES ___  NO ☒ |
| Can we telefax them? |
| YES ☒  NO ___ |

**NAME OF ATTORNEY OR EXECUTOR OF ESTATE:**

ADLER      MARK      L
Surname(s)      First name(s)      Middle initial

23601 VIA EL ROCIO
Street Name & Number

MISSION VIEJO      CA.      92691      USA
City      State/Province      Postal/Zip Code      Country

_____
Firm Name      Telephone: Business      Facsimile: Business

| PLEASE ANSWER THE FOLLOWING: |
| Will person be aware of this account? |
| YES ___  NO ___ |
| Can we call at work? |
| YES ___  NO ☒ |
| Can we telefax? |
| YES ☒  NO ___ |

**INTEREST IN OTHER PRODUCTS?**

___ PORTFOLIO MANAGEMENT
___ TRUST (FOR ESTATE PLANNING)
___ HOLDING COMPANY

___ CORPORATE MASTER CARD/VISA
___ LOAN (SECURED BY ASSETS DEPOSITED)
___ EMERGING MARKET INVESTMENTS

___ MUTUAL FUNDS
___ REAL ESTATE INVESTMENTS
___ LIFE INSURANCE

DATE _____

SIGNATURE OF APPLICANT: _____

TITLE (IF CORPORATE): _____

America International Bank
Corporation, Ltd.

# BANK ACCOUNT INFORMATION
*NOTE: This is the agreement for opening accounts.*

**To: BANK OFFICER**

**PLEASE OPEN:**

|  |  | **I DESIRE THE FOLLOWING SERVICES:** |
|---|---|---|
| ___ CALL ACCOUNT | ___ CURRENT ACCOUNT | X TRUST FORMATION |
| ___ CURRENCY (IES) | ___ TERM DEPOSIT | X MANAGED FUND |
| ___ SAFEKEEPING | ___ PRECIOUS METALS | ___ MONEY MARKET |

|  |
|---|
| ___ CREDIT CARD |
| X DEBIT CARD |
| ___ MORTGAGE |

In the name of: **ARNOLD J. ADLER**

I/We agree that all my/our dealings and transactions with AMERICAS INTERNATIONAL BANK CORPORATION, LTD. (the BANK) shall be subject to your standard General Policy & Conditions (the "Conditions"). I/We agree that you shall have the right at any time to amend the said Conditions. This agreement shall be governed by the laws of The Commonwealth of the Bahamas (the "Bahamas") and in the absence of any specific provision in your said Conditions, the standard banking customs and usage prevailing in the said Commonwealth of the Bahamas shall apply. I/We confirm that I am/we are non-resident of the Bahamas for Exchange control purposes. In regards to my correspondence statements and other communication pertaining to the account(s) are:

X **TO BE MAILED REGULARLY TO THE FOLLOWING ADDRESS**

Name of Recipient if not the Account Holder (the "Depositor")

| To the attention of | First name(s) | Middle Initial    Last Name |
|---|---|---|

| Street Name & Number |  | Suite Number |
|---|---|---|

| City | State/Province | Postal/Zip Code    Country |
|---|---|---|

___ **TO BE RETAINED BY THE BANK ON BEHALF OF THE DEPOSITOR, UNTIL NOTIFIED, AND UPON SPECIAL REQUEST:**
MAILED QUARTERLY ☐  HALF-YEARLY ☐  OR YEARLY ☐ TO:

Name of Recipient if not Depositor

| To the attention of | First name(s) | Middle Initial    Last Name |
|---|---|---|

| Street Name & Number |  | Suite Number |
|---|---|---|

| City | State/Province | Postal/Zip Code    Country |
|---|---|---|

Correspondence shall be deemed to have been duly transmitted when mailed or retained by the Bank in accordance with the above instructions. The Depositor assumes full liability for any consequences and possible damages that might occur due to the mailing or retaining of the correspondence in the prescribed manner. The Bank is under no obligation whatsoever to take any action with regard to the administration of the Depositor's holdings unless specific instructions are given by the Depositor to this effect. Correspondence not collected by the Depositor will be destroyed by the Bank three (3) years after its date of issue. An appropriate fee will be charged annually for retaining correspondence.

**AUTHORIZATION.** You are authorized to act in accordance with the following instructions and to honour cheques, notes, bills, electronic transfer instruments or other instruments if signed by one ☐ both ☐ all of us ☐ (initial below):

Special Instructions / Investment Instructions

_____

_____

_____

_____

| INITIAL | INITIAL | INITIAL |
|---|---|---|

Americas International Bank
Corporation, Ltd.

Date: 8/30/99 Time: 4:46:02 PM
Page 12 of 15
Case 8:01-cv-01085-GLT-AN   Document 47   Filed 09/16/02   Page 147 of 200   Page ID #:290
Page 3 of 8 pages

**ADDITIONAL DOCUMENTS REQUIRED:**

For the purposes of approving this application, please find (without exception) the attached documentation for each of the above signatories. Please note that these letters need not to be addressed directly to the Bank:

- One (1) letter of reference signed by Bank Account Officer (from banks where you currently have accounts)
- One (1) letter of reference (from attorney or accounting firm) to include discussion of your occupation, source of income, and reputation **OR** reference from **another** of your Bank Account Officer, Securities Broker or other Financial Services Representative
- Two (2) ENLARGED (140%) Color Laser Copies of passport (showing picture, number, expiry date, date of birth and address) where ON THE COPIES you have SIGNED your name in BLUE INK, next to your current Bank Officer's signature, bearing the bank's name, the Officer's title and his (her) short statement about you as an account holder

NOTE: WE ACKNOWLEDGE THAT FAILURE TO SUBMIT ALL OF THE ABOVE DOCUMENTS NULLIFIES THIS APPLICATION.

SIGNATORIES. The following persons are authorized to sign on these accounts, for our behalf:
*Note: In the case of corporations this is in accordance with the attached separate Company resolution*

| FULL NAME | POSITION | SPECIMEN SIGNATURE | INDIVIDUALLY, JOINTLY COLLECTIVELY |
|-----------|----------|--------------------|-------------------------------------|
| | | 1) | |
| | | 2) | |
| | | 3) | |

I/We acknowledge the above requirements and I/We stated that the signatures are herewith authenticated and confirmed in the signing powers as indicated. Signed and sealed,

Name as shown on the Account(s):

Date _____

(Signature) _____

Print Name _____

Title _____

Seal

_____

AMERICAS INTERNATIONAL BANK CORPORATION, LTD

Date _____

Countersigned BY PROOF OFFICER for and on behalf of the BANK in acceptance of the items contained herein.

Place _____

**Americas International Bank**
*Corporation, Ltd.*

**BANK ACCOUNT INFORMATION**

## COMPANY MANDATE & SIGNATURE CARD

! the Secretary of _____ a Company incorporated under the laws of _____ HEREBY
CERTIFY that on the ___ day of _____ 1998. the following Resolution was passed by the Board of Directors of the said
Company in accordance with its Articles of Association or By-Laws.

RESOLVED that a commercial and an asset custodial account be opened with AMERICAS INTERNATIONAL BANK
CORPORATION, LTD (the "BANK") numbered (to be designated) (hereinafter called "the said account") subject to the General
Conditions of the said Bank That the Bank be authorized and requested to accept

☐ Any one of the following acting individually ☐ Any two of the following acting jointly ☐ All of the following acting collectively

1 _____      2. _____

3 _____      4. _____

## PLEDGE

I/We the account holder(s) in consideration of AMERICAS INTERNATIONAL BANK, CORPORATION, LTD. (hereinafter called "the
Bank") granting me overdraft or credit facilities or agreeing to advance monies to me HEREBY PLEDGE to the Bank all securities
bonds. debentures stock shares bills, notes, monies cash-balances, chooses in action, receivables and other personal property
at any time lodged or to be lodged by me or on my behalf with any branch of the Bank and any renewals and substitutions therefor
(all of which is hereinafter called "the said property")

TO SECURE repayment of all monies now owing or hereafter to become owing by me to the bank on any account or in respect of
any type of transaction including charges, fees, costs, expenses, interest, and monies due from me as surety or guarantor
(hereinafter called my said indebtedness ) and further I agree-

(a) That this pledge shall be a continuing security
(b) That on default in payment of any of my said indebtedness or if the value of the said property or any part thereof shall in the
opinion of the Bank be in jeopardy or liable to depreciation the bank may forthwith without any notice demand, advertisement or
other formality (all of which are hereby waived) sell the said property or any part thereof by public or private sale for such price as
the bank may in its absolute discretion determine. The proceeds may be held as collateral security for the said indebtedness and
applied in satisfaction or reduction thereof when the Bank thinks fit.
(c) The Bank shall not be responsible for any loss occasioned by any sale or by the retention of the said property or any part
thereof or the neglect or refusal to enforce or sell all or any part thereof, nor shall the Bank by virtue of this pledge be obliged to
collect or see to the payment of interest or dividends in respect thereof
(d) That I will forthwith deliver to the Bank all interest. dividends, bonus issues, rights, offers, options and other monies or property
arising out of the said property that may be received by me to be held by the Bank subject to the terms of this pledge. The Bank
shall have the right but shall not be obliged to exercise any option or right which the holder of the said property or any part thereof
may at any time have and any monies expended by the Bank in respect thereof or in respect of any calls or other similar payments
shall be added to the said indebtedness and form part thereof
(e) I hereby irrevocably constitute and appoint the Bank my attorney to execute, complete, sign and deliver all or any transfers or
assignments of the said property or any part thereof or any other document with reference thereto, whether in exercise or its powers
or to protect the rights hereunder
(f) I agree at my own expense to execute all such transfers, assignments or other documents, and to do all acts reasonably
required by the Bank for the purposes of perfecting or realizing the security conferred by this Pledge
(g) The said indebtedness shall be deemed to include all costs and expenses (including legal costs) incurred by the Bank in
connection with the recovery of the said indebtedness and the sale of the said property or any part thereof
(h) With the consent of the Bank I may withdraw any securities or property forming part of the said property but any securities or
property deposited with the Bank in substitution therefore shall automatically become subject to the terms of this pledge
(i) Where my interest in any of the said property is contingent or partial only the Banks' rights hereunder shall attach to such
contingent or partial interest and all my rights and powers in respect thereof shall be assigned to the Bank Where part of the said
property shall consist of an unaccepted bill all claims present or future, against the drawer, drawee or other parties thereto to the
extent of the amount of such bill are hereby assigned to the Bank with full power to sue for and compound or compromise the
same, and any monies received by me in respect of such bill or bills shall be received as the agent of the Bank and shall be
forthwith paid over to it
(j) The Bank may grant extensions indulgences and renewals, take and give up securities, accept compositions, grant releases
receipts and discharges and otherwise deal with the said property and all parties thereof as the Bank may see fit without my
consent or specific instructions and without affecting my liability for the said indebtedness or its rights as pledged hereunder
(k) Insofar as applicable the General Conditions of the Bank currently in force shall apply to this Agreement which shall be
interpreted, construed and take effect in accordance with the laws of The Commonwealth of the Bahamas.

**Americas International Bank**
*Corporation, Ltd.*

## BANK ACCOUNT INFORMATION
### DEED OF PLEDGE

COMPANY NAME _____

INCORPORATED IN: _____ ON (DATE) _____ IN (REGISTRY): _____

REGISTERED OFFICE: _____

ADDRESS _____

STATUS FOR EXCHANGE CONTROL PURPOSE _____ FILED ON: (DATE) _____ COPY ON FILE?   YES   NO

**DECLARATION:** By providing my/our signature(s) hereafter Receipt and Acceptance of the following papers are herewith acknowledged.

### GENERAL CONDITIONS, DEED OF PLEDGE.

The contents thereof especially the clause on Applicable Law and Legal domicile have been approved by the Depositor(s) as the signatory(ies) and authorized agent(s) of the company to operate the said account namely for and on behalf of the Company.

(a) To make, draw, sign, accept, endorse, negotiate, lodge, discount, deposit or transfer all or any cheques, promissory notes, drafts, acceptance, bills of exchange, orders for the payment of money, contracts for letters of credit and forward exchange and other commercial papers whether or not an overdraft is thereby created on the said account but without prejudice to the Bank's right to refuse to allow an overdraft or increase of overdraft or increase of overdraft on the said account; provided that any one of the said signatories may endorse for deposit to the said account any cheques, drafts, bills, promissory notes or other negotiable instruments.

(b) To give all instructions with regard to the delivery or disposal of any securities, documents or property held by the Bank on behalf of the Company and generally with regard to the operation of the said account (including stop-payment instructions).

(c) To give receipts on behalf of the company.

(d) To apply for letters and other forms of Credit.

(e) To borrow money, with or without security.

(f) To pledge, mortgage, charge or hypothecate any property of the Company.

(g) To purchase, exchange, sell or otherwise deal in or with any stock, shares, bonds or other securities and to give instructions in connection therewith.

(h) To execute any agreement, instrument, assignment, indemnity, obligation, endorsement or other document required by the Bank in connection with the operation of the said account or any of the above mentioned transactions.

3. This authority shall remain in full force and may be relied upon by the Bank until the receipt by it of a certified copy of the resolution of the directors of the Company revoking or modifying the same.

The said signatory(ies) shall sign as follows.

_____
will sign as
(The position, if any, held by each signatory, e.g. Director, Secretary, etc., should be stated after each name)

_____
will sign as
(The position, if any, held by each signatory, e.g. Director, Secretary, etc., should be stated after each name)

_____
will sign as
(The position, if any, held by each signatory, e.g. Director, Secretary, etc., should be stated after each name)

IN WITNESS WHEREOF have hereunto subscribed by name and affixed the seal of the Company.

_____
Corporate Secretary (Seal)



Americas International Bank
Corporation, Ltd

## BANK ACCOUNT INFORMATION

Account No. _____

_____ (the Account )

### DECLARATION ON OPENING AN ACCOUNT

The undersigned hereby declares. (mark with a cross where applicable)

☐  as holder of the Account.

(the "Company"). as represented by _____

☐  that the he/she is the beneficial owner of the assets to be deposited with the bank, and

☐  that the beneficial owner of the assets to be deposited with the bank is the sole property of the Company

☐  As representative of the Account Holder:

that the following person(s) is/are the beneficial owner(s) of the assets to be deposited with the bank:

**FULL NAME**

_____

**ADDRESS/COUNTRY/NATIONALITY**

_____

_____

The Undersigned takes due note that:

1   The preservation of secrecy for banking establishments on business within the Commonwealth of the Bahamas provided for under The Banks and Trust Companies Regulations and Statute Law of the Country in which the Bank is domiciled. or any amendments thereto is not absolute. The Bank its Officers and Directors, employees and mandate holders are obliged to furnish certain information when lawfully required to do so by any Court of competent jurisdiction within the Bank's domiciled country or under the provisions of any law of Bank's domiciled country. Further they may only provide information relating to the identity assets. liabilities. transactions and accounts of a customer with the express or implied consent of the customer concerned

2   The establishment of accounts and securities deposits maintained under numbers or passwords is a purely internal measure by the Bank affecting in no way its obligations via-a-vis authorities to give evidence or information.

Full name, or firm, if applicable _____

Exact address _____

Place and date _____

Name _____      Name: _____

Title: _____      Title: _____

**Americas International Bank
Corporation, Ltd.**

**BANK ACCOUNT INFORMATION**

Ferm TTF

## AGREEMENT

THIS AGREEMENT governs the use of Facsimile (Telefax) (hereinafter "Fax") equipment when transmitting payment orders, investment guidelines and other instructions

The Undersigned, _____ as authorized signatory for _____
(the "Account Holder" or "Customer")

Agrees to entrust AMERICAS INTERNATIONAL BANK CORPORATION. LTD., ("The Bank") with payment orders and other instructions communicated by means of Fax (hereinafter "the Orders").

1   The Bank hereby agrees to execute the Orders on condition that:

    (a) they are encoded in accordance with the Banks instructions (the transmission code required for encoding will be communicated to the Customer by separate letter after he has signed this Agreement), and
    (b) the Orders include the time and date of transmission; and
    (c) each Order bears a signature showing no marked discrepancy from the specimen signature from the signature held by the Bank in accordance with the agreed signature regulations contained in the Bank's General conditions

2   It is hereby agreed that the Bank will have discharged its duties if the procedures under paragraph 2 hereof have been performed and it has acted with reasonable care. The Customer hereby acknowledges that the use of Fax equipment carries considerable risks such as inter alia falsifications misuse of signatures faulty identification or faulty mutilated incomplete lost or duplicate transmissions AND indemnifies the Bank against all or any actions proceedings claims demands costs and expenses whatsoever in respect of actions taken by the Bank upon instructions contained in the Orders

3   It is hereby agreed that except as herein the Bank's General Conditions shall apply to the customer

4   This Agreement is governed by the laws of the Commonwealth of the Bahamas.

5   This Agreement is valid for all accounts for which the Customer is a signatory or beneficial owner or agent

6   Not withstanding the foregoing the Customer hereby agrees that the Bank may take legal action in the Courts of the Customer's domicile or before any other Court of competent jurisdiction to enforce any claim or right to which the Bank may be entitled

IN WITNESS WHEREOF the Customer, as the Account Holder, has hereunto set his/her hand and seal the day and year first herein before written.

_____

Signed, Sealed and Delivered by          Name  _____
the said in the presence of -            Title: _____

_____         _____

Secretary of the Customer as
The Account Holder

IN WITNESS WHEREOF the Bank has caused its Common Seal
to be hereunto affixed.

The Common Seal was hereunto
affixed in the presence of:-

_____

Proof Officer



**Americas International Bank**
*Corporation, Ltd.*

# AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

**Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-8190, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8776**

11 September 1999

By fax only +949.831.6971                                        16 pages.

Mr Arnold J. Adler
59 Montera Drive
Aliso Viejo, CA 92656

Re:      AJA.30.08.99.AFCM-MD, AFCM Managed Fund Agreement.

Dear Mr Adler,

Attached please find an executed original of the AFCM –w- Arnold J. Adler Managed Fund
Agreement and the Qualifying Documents thereto. Please execute the agreement and fax it
back to me in London. Your signed copy should be retained in your files.

Please review the documents and execute them as follows:

1.  Initial every page of the 15 pages of the Agreement and Qualifying Documents.

2.  Page 7 of 15 – The execution page of the Managed Fund Agreement, please sign,
    state the place (city, state) where you signed and the date.

3.  Page 10 of 15 – Letter of Intent. Please have the signature witnessed by a notary.

4.  Page 12 of 15 – Letter of Non-solicitation Please have the signature witnessed by a
    notary

5.  Page 14 of 15 · Appendix B. Please have the signature witnessed by a notary.

6.  Page 15 of 15 – Appendix C Please have the signature witnessed by a notary.

7.  Your new AIBC account number is included on pages 10 & 15. Please be sure to
    express mail your original signed AIBC account application, with all the attending
    documents thereto, directly back to the bank to the attention of Mr. Gary Christie,
    Managing Director.

Please feel free to call me with any questions you may have.

Thank you for your support of AFCM & Homevest.

Sincerely,

Ralph King, Fiduciary Director
Tel. +44 171.499.1184 Fax: +44.171.491 1439

Exh.17



# AMERICAS FIDELITY *CAPITAL MANAGEMENT, LTD.*

**Euro Canadian Centre, Third Floor, Marlborough St. & Navy Lyon Road
PO N-7106, Nassau, New Providence, Bahamas
Tel. 242.326.6777 Fax. 242.326.6776**

### ASSET MANAGEMENT AGREEMENT
### Agreement Code: AJA.30.08.99.AFCM-MD

THIS AGREEMENT, ("Agreement") is made and entered into on this the 11 day of September 1999 by and between ARNOLD J. ADLER, 59 MONTARA DRIVE, ALISO VIEJO, CA 92656 (hereinafter "Grantor") and AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD (hereinafter Administrator""), with offices at Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road, Nassau, New Providence, Bahamas, whose authorized representative and signatory is Mr. Ralph H. King, Fiduciary Director.

### PREAMBLE

WHEREAS, Grantor is owner of good, clear, clean, freely transferable and unencumbered funds, in the total initial amount as indicated in Form 1 - Proof of Funds, attached hereto and made a part hereof, (herein the "Capital"), whereby Grantor desires to make the Capital immediately and exclusively available, to Administrator, for the purposes as set forth herein, and

WHEREAS, Administrator will directly enter the Capital into a Managed Fund, (herein the "Fund"), as controlled by Administrator, without any delay, where Grantor has indicated its desire for Administrator to do so, as indicated by its execution of Form 2 - Letter of Intent attached hereto, and

WHEREAS, Grantor, as an act of free will, and without being solicited in any manner whatsoever, as indicated in Form 3 - Letter of Non-Solicitation, wishes Administrator to act in Grantor's place and stead, in order to utilize the Capital as collateral reserves only in the Fund, in order to accommodate certain special purpose secured investments (where Forms 1, 2 and 3 are collectively contained in Appendix A attached hereto, and

WHEREAS, Grantor desires Administrator to permit Grantor to enter the Capital into the Fund, based upon Administrator's representations and warranties as contained in Appendix B and C attached hereto, and to administrate it for the benefit of Grantor, for the entire term of this Agreement and any renewals thereof.

NOW, THEREFORE, with respect to the mutual representations made herein, and for other good valuable consideration, and in order to make this a legal and binding Agreement, upon its execution, both Grantor and Administrator agree as follows:

### I. THE FUND

Administrator and Grantor agree that:

1.1 They, as the parties to this Agreement, hereby mutually accept the entry of the Capital into the Fund. Mr. Ralph H. King, as Asset Manager of the Fund, hereby agrees to act fully for and on behalf of the Fund, under international laws and regulations governing Asset Managers (as financial intermediaries) and their respective fiduciary responsibilities. The Asset Manager hereby agrees to comply with said laws and regulations and to be fully accountable for their (his) actions.

Grantor _____ *a a*
Initial

Page 1 of 1 Pages

Administrator _____

1.2. They, as the parties to this Agreement, hereby agree that this is a private placement between two legal entities and the Fund is not available to the public Furthermore, both parties attest and confirm that neither party has induced or solicited the other to enter into this Agreement and thereby establish the Fund.

1.3. They, as the parties to this Agreement, hereby agree that the underlying investment contemplated by this Agreement will not be registered under any securities act: including the Securities Act of 1933, as such may apply to U.S investors  Where applicable, the Administrator will rely on one or more exemptions from registration   Accordingly, Grantor represents that they are clients under management with high net worth and no need for liquidity in regard to these funds, as the Asset Management of said funds requires a minimum of one (1) year commitment of the Capital to the Fund. Further, in making a decision to place funds with the Manager, Grantor must rely on their own examination of the terms and opportunities of this Agreement, and the representations made by the Manager, including the merits and risks involved. Any securities commission or regulatory authority has, not recommended this Agreement, or the underlying investment. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offense.

1.4. They, as the parties to this Agreement, hereby agree that this Agreement is not an offering of securities. It is an Agreement issued in exchange for funds placed with Administrator by Grantor, recognizing that said funds will never be at risk of depletion or seizure, and for the expressed purposes outlined herein. No registration has been sought under any securities act or acts; including the Securities Act of 1933 as such applies to U S investors. In any event, should an interpretation be sought referencing compliance to any such acts or Act, the Administrator would rely on one or more exceptions from registration in addition to Grantor's representations as to no need for liquidity in regard to these funds and Grantor's assumption of the associated risks outlined in this Agreement, which will not extend to the principal sum placed by Grantor, into the "Fund," as such term is defined herein.

1.5. They, as the Parties to this Agreement, hereby agree that the Asset Manager shall take all appropriate measures consistent with the purposes of the Fund. More specifically, but without limiting the generality of the foregoing, the Asset Manager shall.

1.6. Operate the Fund, for the benefit of Grantor, on the date (hereinafter "Operative Date") that the Capital is received, into the Custody Account, in preparation for Grantor's investment activities in the Fund.

    1.6.1. Manage, control and supervise all aspects of the Fund, faithfully and professionally discharging each, any, and all of its duties, in accordance with the aims of the Fund, including any and all of its related activities;

    1.6.2 Prepare and submit reports, which accurately reflect the operating results of the Fund's activities to the parties when appropriate, including monthly-reconciled management accounts will be submitted on all funds under management.

    1.6.3 Enter into, sign and execute any and all documents with third parties for and on behalf of the Fund and/or the parties hereto;

Grantor _____  Page 2 of 2 Pages      Administrator _____

1.6.4    Act as sole representative and authorized contact with third parties in all matters pertaining to the Fund, as far as the management of the Yields is concerned.

1.6.5    Retain the services of any person, company, partnership or entity, deemed necessary in order to attain the purposes of the Fund, having satisfied himself as to the character and performance of any such person so retained

1.6.6.    Open any and all currency or securities accounts with financial institutions as may be further required, and otherwise deposit, manage, withdraw and deal with the cash flow generated as yields, from the activities of the Fund;

1.6.7.    Authorize and pay for any and all of the Fund's costs and expenses;

1.6.8.    Authorize and disburse any and all Yields for Administrator and Grantor into certain accounts established for each of them, the coordinates for which are set forth in Appendix C attached hereto and made a part hereof, or as may be submitted from time to time by Grantor.

1.6.9.    Further manage said yields for the separate accounts of Administrator and Grantor in a manner that gain additional fixed income and growth in Capital throughout the term of the Fund and extensions thereof.

1.6.10   Liquidate the Fund and render a full account thereof to the parties, upon the completion and attainment of the purposes of the FUND or at the request of the Grantor or upon the agreement of both parties hereto

## II. FUND PROCEDURES

Administrator and Grantor agree that the following events shall be referred to as the "Procedures" for the operation of the Fund

2.1    Contribution Procedures   Each of the parties hereto shall contribute certain resources to attain the purposes of the Fund in accordance with the following procedures, for more certainty:

2.1.1.    Grantor shall provide good, legally obtained and cleared funds, and the freely transferable use or reservation thereof, as may be agreed or required for the Fund, in Form 1 – Proof of Funds, attached hereto, and

2.1.2.    Administrator, as well as serving as the Asset Manager of the Fund, must provide, and thereafter manage various investment opportunities for the benefit of the Fund, in order to fulfill its business purposes. It is understood that the Asset Manager must demonstrate that the Yields, within reasonable parameters, are attainable.

2.2    Transaction Procedure   Notwithstanding anything herein, and for the purposes of clarity, the parties hereto agree that the Asset Manager shall be authorized to act and shall act, if and when applicable, according to the following rules and procedure.

2.2.1    The Custody Account, or other accounts as applicable, in which the Capital shall be held, and all Yields or other monies contributed to the Fund by Grantor, shall be held by the Fund, and controlled by the Asset Manager. Said account shall at all times be non-depletionary in value and shall contain at all times "freely transferable cash for near-cash securities of equal or greater realizable value, convertible to cash on immediate call," within the said Custody Account under the instructions of the Asset Manager.

Grantor _____      Page 3 of 3 Pages      Administrator _____
        Initial                                          Initial

2.2.2   The Investments  No investment term shall be less than 30 banking days nor more than 360 banking days unless renewed or extended. The Asset Manager shall invest primarily for objectives of Growth and Income. The Asset Manager shall not invest in commodities, options, gold, silver or any other "high risk" investment that is not consistent with the objectives of the Fund. The terms of any investment shall be set forth in Appendix B attached hereto. Any deviations in the type of investments, a change of objectives, or modifications to Appendix B shall be accepted and confirmed in writing by Grantor to the Asset Manager, and be accepted in writing by both Parties.

### III. FUND YIELDS

3.1   Administrator's and Grantor's share in the respective Yields from the investment of the Capital, after the payment of any costs and expenses of operating the Fund, shall be disbursed in accordance with the schedule as specified in Appendix B and to the respective coordinates of Administrator and Grantor as indicated in Appendix C attached hereto and made a part hereof. Administrator hereby agrees to utilize its financial expertise to manage and to professionally invest the Yields in order to realize additional growth over time and income payable on a regular basis. Grantor's Yields shall be invested in the following manner:

3.1.1   Growth Account. With the exception of those funds designated as monthly income, as deducted and disbursed from the Yields under the terms of Paragraph 3.1.2 below, Administrator shall pay to Grantor's designated account(s), at agreed to intervals between Administrator and Grantor, but in its entirety one (1) year from the date that the Capital is first utilized in the Investments, an amount at least equal to a minimum gain as set forth in Appendix B.

3.1.2   Income Account. Unless designated to the contrary by Grantor, the "Income," payable at the end of each thirty (30) day period to each of Grantor's designated accounts, as earned on the Fund, shall be paid as earned in each thirty (30) day period  This notwithstanding, Grantor reserves the right to transfer any of these Funds designated as Income not drawn upon, into its Growth account, or to accrue and earn greater returns in the Income Account.

3.1.3   Administrator shall provide monthly statements to Grantor showing it's balances on each account in the Fund. Grantor shall at all times have the right to audit its Fund (and any other such accounts established for Grantor by Manager), to have full disclosure of all Yields generated and, if necessary, to discharge the Administrator from its position as Grantor's Asset Manager upon thirty (30) days notice if Grantor is not satisfied with the Administrator's investment results to the extent that said discharge does not violate any of the provisions of this Agreement.

3.1.3   Administrator will be obligated, if such discharge occurs, to transfer all cash and/or securities in the Fund in accordance with Grantor's instructions beginning seven (7) international banking days after end of the 30 day notice period, such that all funds and/or securities shall be fully transferred by the end of an additional 30 day period.

Grantor   _a\a_     Page 4 of 4 Pages         Administrator   _____
          Initial                                             Initial

## IV. DISSOLUTION, LIQUIDATION AND TERMINATION OF THE FUND

4.1   Upon termination of the Fund, for any cause or reason, the Administrator shall act as the liquidator of the Fund if this is agreeable to the Grantor or to agree to the appointment of a mutually acceptable liquidator, and without limiting the generality of the foregoing, the Administrator shall:

      4.1.1. Release the Capital to Grantor, and then continue to act as Administrator until such time as all Yields, or other assets and property, if any, due and owing to Grantor that remain in the Custody of Administrator are released to Grantor;

      4.1.3. To pay any debts of Grantor, from the Grantor's Yields, resulting from any and all margins or borrowings that may have been made by Grantor against Grantor's Yields, and then;

      4 1 4  Distribute any exceeding amounts to Grantor, in accordance with Appendix "B" attached hereto;

      4 1 3  Render final accounts pertaining to the Fund to Administrator and Grantor.

4.2  Termination  This Agreement, and consequently the Fund, shall terminate in accordance with the following terms and as confirmed in writing to Grantor by Administrator

      4 2 1  Upon written agreement of the parties hereto, or upon the termination or consummation of the investments described in Appendix B hereto.

      4.2.2. Within Thirty-two (32) days (or such other longer period as warranted by any authorized outstanding investment of the Fund) of a written request made to the Administrator and Grantor by the investment obligations of the Fund.

## V. GENERAL PROVISIONS.

5.1  <u>Term:</u> The initial term of the Agreement shall be for one (1) year and one (1) month from the date first written above and may be extended for an additional term by mutual agreement between the parties hereto.

5.2  <u>Taxes:</u> The Parties make any representations regarding tax consequences, if any, of the transaction contemplated and or undertaken herein. Each party, individually and separately, accepts the liability for any taxes, impost, levies, duties or charges that may be found applicable in the performance of their respective obligations herein.

5.3  <u>Applicable Law and Arbitration</u>  This Agreement shall be construed under and in accordance with the laws of the Commonwealth of the Bahamas Any unresolved dispute arising from or in connection with this Agreement shall be settled by arbitration, subject to the rules of the International Arbitration Association, with all hearings to be conducted within the Commonwealth of the Bahamas. Damages can be claimed in application of this Agreement.

5 4  <u>Agreement Not Exclusive:</u> The Parties hereto agree that this Agreement is not exclusive and pertains only to the business of the Administrator for the purposes described herein. Nothing contained herein shall prevent either party from pursuing its own business activities

5.5 Persons Bound: This Agreement shall remain in full force and effect until completion of the term and shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns.

5.6 Full Authority: The Parties hereto are acting with full legal authority and responsibility and by approval and direction of their respective Board of Directors, if a corporation or business organization and or with full legal authority and responsibility if an individual

5.7 Assignment: This Agreement may not be assigned and is only transferable by reason of demise, bequest or decree.

5.8 Counterparts: This Agreement may be executed in any number of counterparts at different times and locations and shall have the same force and effect as if the parties hereto had signed the same Agreement in the same place. All counterparts shall be construed together and shall constitute one Agreement.

5.9 Validity of Original Documents Transmitted by Facsimile: It is agreed that the original executed copies of this Agreement transmitted via facsimile one to the other shall have the same force and effect as if it were the original and shall be deemed legal and binding The parties hereto acknowledge that certain validation features may be included in such transmissions: revealed each to the other, at the time of such transmissions.

5.10 Wording: Wherever the context shall so requires, all words herein in any gender shall be deemed to include the masculine, feminine, neuter gender, all singular words shall include the plural and all plural words shall include the singular.

5.11 Paragraph Captions and Headings: Where applicable, these are intended for ease of reading only and not necessarily to define the content of the text to follow.

5.12 Enforceable Provisions. Should any provision of this Agreement be or become invalid by virtue of applicable law or fail enforceability, the remainder of this Agreement shall remain in full force and effect and the validity of unenforceable provision shall be replaced by provision to be mutually agreed upon between the parties hereto within the spirit and intent of this Agreement.

5.13 Notices: All notices required or permitted to be given hereunder by either party to the other: shall be effected in writing and shall be delivered by Certified Mail, return receipt requested, or overnight courier service, to the address of the respective party as provided herein or at such other addresses as may have been specified by written notice delivered by a party whose address has changed. Notices shall be deemed delivered not later than the third (3rd) business day following posting.

5.14 Exclusive Communication: Grantor agrees any oral or written communication regarding this transaction, Agreement and the subject matter herein shall be exclusively directed to Administrator. Further, there shall be no direct or indirect, oral or written, communication with any bank or bank officer pertaining to this Agreement, transaction or the subject matter hereof.

5.15 Surviving Terms and Conditions: The terms and conditions of this Agreement shall apply to any and all amendments, modifications, extensions and reinvestments.

Grantor   _a_a_   Page 6 of 6 Pages   Administrator   _____
         Initial                                      Initial

5.16 Full Understanding: Grantor acknowledges and affirms that they fully understand their rights and obligations with respect to this Agreement and that they have had adequate time and opportunity to examine the transaction contemplated herein including consulting with legal counsel of their choice to enter into this transaction prior to the execution of this Agreement, and having been fully informed and/or having relied upon such review and advice, executed this Agreement freely and without reservation.

5.17 Entire Understanding: This Agreement contains the entire understanding between the parties and supersedes any and all prior oral and or written understandings or agreements between the parties respecting the subject matter hereof.

IN WITNESS WHEREOF the parties hereto have signed at the place and date affixed below, and Administrator and Grantor severally confirm that they have obtained at least one signed copy of this Agreement, immediately after its execution by both of them.

"GRANTOR"
Arnold J. Adler

Mr. Arnold J. Adler
An Individual
Place: Aliso Viejo, Calif., USA
Date: 9-31-99

"ADMINISTRATOR"
AMERICAS FIDELITY CAPITAL
MANAGEMENT, LTD

Mr. Ralph H. King
Fiduciary Director
Place: London
Date: 13 Sep 99

Grantor _a/a_ Initial          Page 7 of 7 Pages          Administrator _____ Initial

APPENDIX A - Agreement Code: AJA.30.08.99.AFCM-MD

# AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-7109, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8776

# QUALIFYING DOCUMENTS
## PRIVATE AND CONFIDENTIAL

### NOTIFICATION

GRANTOR WILL BE REQUIRED TO SIGN, OR IF APPROPRIATE, PROCURE THE EXECUTION OF, ADDITIONAL DOCUMENTS THAN THESE PRESENTED, IN ORDER TO GIVE FULL AND PROPER EFFECT TO THE CONTENT OF THE PRIVATE MANAGED FUND CONTRACT. GRANTOR'S FAILURE TO COMPLY WITH THE REQUEST FOR ADDITIONAL DOCUMENTS MAY FORCE ADMINISTRATOR TO RENDER ITS CONTRACT WITH GRANTOR NULL AND VOID. GRANTOR, BY EXECUTING THE DOCUMENTS HEREWITH, ACCEPTS IN ITS ENTIRETY THIS PROVISION, AS AN ACT OF NECESSITY BY ADMINISTRATOR.

FORM 1　　-　　PROOF OF FUNDS
FORM 2　　-　　LETTER OF INTENT
FORM 3　　-　　LETTER OF NON-SOLICITATION

Grantor　　_____　　Page 8 of 8 Pages　　Administrator　　_____
　　　　　Initial　　　　　　　　　　　　　　　　　　Initial

Case 8:01-cv-01085-GLT-AN Document 47 Filed 09/16/02 Page 160 of 200 Page ID #:306

GRANTOR'S BANK LETTERHEAD

## PROOF OF FUNDS

**Form 1**

**Note:** Grantor should attach hereto the transfer instruction that the Capital has been transferred from World Savings Bank, FSB #833 to the following coordinates:

| | |
|---|---|
| BANK NAME: | BARCLAYS BANK PLC |
| ADDRESS: | NEW YORK BRANCH |
| | 75 WALL STREET |
| ABA# | 026 002 574  **SWIFT CODE: BARCUS33** |
| FOR ACCOUNT | BARCLAYS BANK PLC BAY STREET BRANCH NASSAU, BAHAMAS |
| SWIFT CODE: | BARCBSNS |
| Beneficiary Bank | AMERICAS INTERNATIONAL BANK CORPORATION, LIMITED |
| ADDRESS: | MARLBOROUGH ST. AND NAVY LYON ROAD GROUND FLOOR |
| | NASSAU, BAHAMAS PO N-8190 |
| ACCOUNT NO. | 1026180 |
| CREDIT TO: | **ARNOLD J. ADLER** |
| ACCOUNT NO. | 106342 |
| CREDIT TO: | AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD |
| ACCOUNT NO. | 672266197 |
| REFERENCE: | UNS-27.03.99-AFCM: Contribution to AFCM MANAGED FUND |

Grantor _____ Initial

Page 9 of 9 Pages

Administrator _____ Initial

# Arnold J. Adler

59 MONTARA DRIVE, ALISO VIEJO, CA 92656
TEL 949.831.0364  FAX 949.831.6971

## <u>LETTER OF INTENT</u>

**FORM Z**

**11 September 1999**

TO: PROGRAM ADMINISTRATOR

RE: PRIVATE PLACEMENT – MANAGED FUND PROGRAM
    (Investor's Reference Code: AJA.30.08.99.AFCM-MD)

Dear Administrator:

ARNOLD J ADLER, 59 MONTARA DRIVE, ALISO VIEJO, CA 92656, as authorized signatory, where an enlarged color copy of my passport photo page is enclosed herewith, with full authority vested, with full legal responsibility, and under penalty of perjury, in order to participate in a private managed fund to be established and managed for my benefit, and the subsequent participation in special purpose secured investments thereby.

I hereby commit the collective amounts of at least ~~Ninety~~ 50,000 Thousand United States Dollars (US$~~90,000~~ 50,000 USD) respectively, to the AFCM Managed Fund  The funds, which shall be transferred, are unencumbered, free of third party liens and available for transfer.

In addition to portions of the Yields being applied to HOMESVEST WORLD SERVICES and THE BETHESDA ACCORD, one-third (1/3) of earnings from any investment activities of the managed fund, are to be used for humanitarian, philanthropic charitable causes

AFFIRMED BY
  "GRANTOR"

| Notarization Seal or Witness of Signature |
| --- |
|  |

ARNOLD J. ADLER, An Individual
  Place:            Date:

Grantor _____        Page 10 of 10 Pages        Administrator _____
        Initial                                               Initial

# Arnold J. Adler

59 MONTARA DRIVE, ALISO VIEJO, CA 92656
TEL. 949.831.0364  FAX 949.831.6971

## LETTER OF NON-SOLICITATION

**FORM 3**

11 SEPTEMBER 1999

TO: PROGRAM ADMINISTRATOR

RE: PRIVATE PLACEMENT – MANAGED FUND PROGRAM
(Investor's Reference Code: AJA.30.08.99.AFCM-MD)

Dear Administrator:

ARNOLD J. ADLER, 59 MONTARA DRIVE, ALISO VIEJO, CA 92656, as authorized signatory by this instrument hereby requests from Americas Fidelity Capital Management, Ltd., (herein "Administrator") highly specific confidential information regarding the formulation of a segregated, closed end Managed Fund, and a currently available private placement, secured investment program, in order to serve our interests and purposes and not for further distribution, except to parties directly involved with the transaction.

I hereby agree to keep all information strictly confidential and I will not disclose it to any other party that is not involved in this transaction

I hereby declare that I am fully aware that the information received or to be received from you is in direct response to our request and is not considered or intended to be a solicitation of any kind, and are intended solely for my general knowledge only.

I hereby affirm under penalty of perjury that I have requested specific information from you and your organization of my own choice and free will.

I understand that the contemplated transaction(s) are strictly one of private placement and are in no way relying upon existing regulations relating to the United States Securities Act of 1933, as amended, (the "Act") or other related regulations, and does not involve the sale of securities of any kind.

I further declare that I am not licensed securities broker or government employee and understand that neither are you or your organization

I mutually agree that this private placement transaction is exempt from the US Securities Act of 1933, as amended, and is not intended for the general public. All materials are for my private use only.

I understand and agree that the US HR 3723 and International Chamber of Commerce ("ICC") Non-disclosure and Non-circumvention rules apply to this Agreement generally and this Letter of Non-Solicitation specifically, regarding the transaction(s) contemplated, and I hereby agree to the current applicable standards of the ICC apply in all aspects.

Grantor _____ Initial        Page 11 of 11 Pages        Administrator _____ Initial

LETTER OF NON-SOLICITATION

Form 3- Page 2

I hereby confirm that neither this Administrator, nor anyone on his or her behalf has solicited me in any way, and that no documentation that we have received or will receive, shall be deemed to be a solicitation. Additionally, I confirm that there has not been any offer to buy or to sell securities and that this is not intended to be an offer to buy or sell securities of any kind.

It is agreed that a telefax of this letter, or any other associated documents thereto, to this transaction, are as valid as is the original.

All statements herein are made under penalty of perjury.

AFFIRMED BY.
  "GRANTOR"

Notarization Seal of Witness of Signature

ARNOLD J. ADLER, An Individual
  Place: _____ Date. _____

**APPENDIX B - Agreement Code: AJA.30.08.99.AFCM-MD**
**Page 1 Of 2 Pages**

THIS APPENDIX B, ("Agreement") is made and entered into on the date as indicated below the signatories, by and between ARNOLD J ADLER, 59 MONTARA DRIVE, ALISO VIEJO, CA 92656(hereinafter "Grantor) and AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD. (hereinafter "Administrator"), with offices at Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road, Nassau, New Providence, Bahamas, whose authorized representative and signatory is Mr. Ralph H. King, Fiduciary Director.

## INVESTMENT:

| | |
|---|---|
| Unit Amount | A "Unit" Investment shall be a minimum of ~~Ninety~~ *Fifty* Thousand United States Dollars $~~90,000~~ *$ 50,000* USD (the "Capital") and any greater increments thereof. |
| Yield | Yield" is defined for this Agreement's purposes, as "those sums, as received by Administrator, from investment activities contemplated herein, net of deductions for customary bank fees and charges, where all such charges cannot exceed ten (10 %) percent of Gross Returns." |
| Distribution | The Yields shall be distributed over a period of One (1) year, based upon Fund activities during each calendar month. Yields for each month shall be payable within ten (10) banking days following the end of each calendar month, in the following order: |

| Bank Fee | One (1) percent of Capital invested (from first Yield only). |
|---|---|
| Grantor | Fifty (50%) percent of Yield, distributed as "Income" and "Growth," in these percentages: <br>• Income: Twenty-five (25%) percent, distributed each month to Grantor's designated account:. [1] <br>• Growth: Seventy-five (75%) percent, reinvested in order to compound, distributed at the end of Agreement's term |
| Intermediaries [2] | Calculated as Ten (10%) percent of Grantor's Gross Yield, but without deduction to Grantor's Yields. |
| Manager | Forty (40%) percent of Gross Yield. |

[1] Please note all AFCM Accounts are settled on the basis of a calendar month end, with distributions made on the 12th day of the following month, or the next immediate business day thereafter. Please expect your funds to be credited to your Income account at AIBC on or about 20th of the month, as it takes approximately one calendar week for bank transfer for funds to be cleared into your AIBC Account.

[2] Please note that all Intermediaries are settled from AFCM Accounts in the same fashion as Grantor's Income accounts, without consideration for growth. All Intermediaries, whether for Administrator or Grantor, are limited to share within this calculated tier. Administrator and Grantor must identify all intermediaries prior to the execution of this Agreement, and execute Payee Introductions to the Asset Manager to assure proper compensation of Intermediaries. After the execution of this Agreement, the Asset Manager is not obligated to acknowledge any intermediary not so designated in advance of execution by Asset Manager and Grantor.

Changes in Distribution:

If you choose to alter the income of any account, whether Income, or Growth equations as noted above, AFCM must be informed of such changes in writing prior to the close of each month in order make such changes effective for the following month.

| Grantor | Page 13 of 13 Pages | Administrator |
|---|---|---|
| *aja* (Initial) | | *(signature)* (Initial) |

## Appendix B - Page 2 of 2 Pages

**Performance**      Due the current investment conditions, the performance of the investment shall be measured by the attainment of higher than average yields, which shall be provided to Grantor in the form of a written projection, immediately following the date of the first settlement of Yields.

**Investment Term**      Minimum : Thirty (30) banking days;
              Maximum: Three Hundred Ninety (390) days, from commencement the Fund's investment activities, In which the Capital has been placed.

**Investment's Key
Characteristics:**      Capital is invested in a manner where, as a result, yields may be either higher or lower than other forms of investment. For example, this approach, while normally less volatile than equities, generally has a higher price volatility than fixed interest investments.

**Termination:**      Grantor may terminate this Agreement under the following circumstances:

1. Where no yield on investment is demonstrated within forty (40) days from the initial date of commencement of the investment.

2. Where no payment of yields in the agreed proportions is made in accordance with the "Distribution" terms above, from the initial date of commencement of the investment.

**Expenses**      All reasonable expenses, (including but not limited to banking, legal, travel and commissions), and Bank Fee of one (1%) percent will be deducted from the Yield of the Fund prior to division and distribution.

IN WITNESS WHEREOF the "Parties" to this Appendix B have signed at the place and date affixed below, for and on behalf of their respective entity, having the full corporate and legal authority to so do, and they severally confirm that they have obtained at least one signed copy of this Agreement, immediately after its execution by all of them.

**THE "PARTIES"**

"GRANTOR"
ARNOLD J. ADLER

_Arnold J Adler_ (signature)

Mr. Arnold J Adler
An Individual
Place: _Aliso Viejo, Ca. USA_
Date: _9-21-98_

"ADMINISTRATOR"
AMERICAS FIDELITY CAPITAL
MANAGEMENT, LTD

(signature)

Mr. Ralph H. King
Fiduciary Director
Place: _ON STON_
Date: _13 580 98_

(signature)

Grantor _____
     Initial                    Page 14 of 14 Pages                    Administrator _____
                                                         Initial

APPENDIX C - Agreement Code: AJA.30.08.99.AFCM-MD
Page 1 Of 1 Page

## BANK COORDINATES FOR WIRE TRANSFER OF THE CAPITAL AND FOR THE SETTLEMENT OF YIELDS

THIS APPENDIX C ("Agreement") is made and entered into on this the 11th day of September, 1999, by and between **ARNOLD J. ADLER, 59 MONTARA DRIVE, ALISO VIEJO, CA 92656** (hereinafter "Grantor") whose authorized representative and signatory is and AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD. (herein "Administrator"), with offices at Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road, Nassau, New Providence, Bahamas, whose authorized representative and signatory is Mr. Ralph H. King, Fiduciary Director.

Administrator agrees to wire transfer the Monthly Income Yields to:

| BANK NAME: | BARCLAYS BANK PLC | |
|---|---|---|
| ADDRESS. | NEW YORK BRANCH | |
| | 75 WALL STREET | |
| ABA# | 026 002 574 | SWIFT CODE: BARCUS33 |
| FOR ACCOUNT: | BARCLAYS BANK PLC BAY STREET BRANCH NASSAU, BAHAMAS | |
| SWIFT CODE: | BARCBSNS | |
| Beneficiary Bank: | Americas International Bank Corporation, Limited | |
| ADDRESS | MARLBOROUGH ST. AND NAVY LYON ROAD GROUND FLOOR | |
| | NASSAU, BAHAMAS PO N-8190 | |
| ACCOUNT NO. | 1026180 | |
| CREDIT TO: | **ARNOLD J. ADLER** | |
| ACCOUNT NO | 106342 | |

Grantor hereby agrees to have its monthly Growth funds re-invested for further growth to:

| FOR ACCOUNT. | BARCLAYS BANK PLC BAY STREET BRANCH NASSAU, BAHAMAS |
|---|---|
| Beneficiary Bank: | Americas International Bank Corporation, Limited |
| CREDIT TO: | AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD. |
| REFERENCE | UNS-27.03.99-AFCM Contribution to AFCM MANAGED FUND |

IN WITNESS WHEREOF the "Parties" to this Appendix C have signed at the place and date affixed below, for and on behalf of their respective entity, having the full corporate and legal authority to so do, and they severally confirm that they have obtained at least one signed copy of this Agreement, immediately after its execution by all of them.

"GRANTOR"
Arnold J. Adler

Mr. Arnold J. Adler
An Individual
Place: Aliso Viejo, Co. USA
Date: 9-31-99

"ADMINISTRATOR"
AMERICAS FIDELITY CAPITAL
MANAGEMENT, LTD

Mr. Ralph H. King
Fiduciary Director
Place: LONDON
Date: 13 Sept 99

Grantor _____
Initial

Page 15 of 15 Pages

Administrator _____
Initial

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-7109, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8776

### ORGANIZER AGREEMENT

THIS AGREEMENT ("Agreement") dated the 9th day of May, 1999, by and between, Rosenblum Partners, LLC, which in addition to being a corporation during organized and in good standing in the country of the United States, with offices situate at 245 Fischer Avenue, Costa Mesa, CA 92626, it also serves to acknowledge a team of individuals, institutions, and/or corporate entities, whose authorized representative and signatory is Mr. Charles L. Rosenblum, USA Passport No. 034587837, (all of which are collectively referred to hereinafter as "Organizer") and AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD. including any of its direct or indirect sub-companies or affiliates, or any other such entity or entities as may perform services for the benefit of Administrator, whether these entities are in the form of partnerships, alliances, corporations or individuals (such that for the purposes of this Agreement these shall collectively be referred to as "Administrator"), whose offices are situate at Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road, Nassau, New Providence, Bahamas, whose authorized representative and signatory is Mr. Ralph King, Fiduciary Director, (where Organizer and Administrator are herein referred to as the "Parties").

1. **Appointment.** Having the full legal and corporate authority to so do, Administrator hereby appoints Organizer to act in the best interest of Administrator, both for himself and for others, so that Organizer shall contribute to the facilitation of Administrator's duties, relevant to any of Administrator's commerce or investment activities.

2. **Acceptance.** Organizer hereby accepts the said appointment as Organizer, and agrees to facilitate third party (herein "Clients") entry into Administrator's Managed Funds, or any other such commerce or investment structure of Administrator, on an exclusive basis.

3. **Fees.** In accordance with any Agreement executed by Administrator with such third party, who have been or will be introduced to Administrator by Organizer, and where these said Clients enter into Administrator's Managed Funds, as the result of Organizer's services provided or to be provided to Administrator, Administrator will pay Organizer the following:

   a) **Client Relations Fee:** Calculated as a maximum of five (5%) percent of the total sum of Clients' Yields, payable as earned, in accordance with the terms of Yields settlement as expressed in Administrator's Managed Fund Agreement, for their full operating term, and for any extensions thereon. The Client Relations Fee shall be paid on any client agreements generated as the result of Organizer's efforts and at the same intervals as the Client is paid in any such Agreement.

   b) **Facilitation Advance:** For services rendered, Organizer may request an advance against the Client Relations Fee due under an executed transaction, whereby such advance is payable seven (7) banking days following commencement of Administrator's investment activities on behalf of each said Client, except if any of said Clients' funds are redeemed by rescission prior to the commencement of any investment. The advance will be recouped in equal parts from the first/ next four Client Relations Fee payments due Organizer.

1

*Exh. 18*

**All Intermediaries Covered.** It is hereby understood and agreed to that Organizer's portion of the Clients' Yields is the full compensation to Organizer and any other facilitators and intermediaries associated with Organizer. "Clients' Yield" is defined as "those sums, as received by Client, earned in Administrator's investment activities, net of deductions for Projects (1/3 of Gross Yields), and Administrator's Yields (1/3 of Gross Yields). Gross Yields is defined as "Total Return on Capital, payable as earned, less customary costs and expenses, including bank changes, where all such charges cannot exceed ten (10 %) percent of Total Return."

4. **Best Efforts.** Organizer shall use its best efforts to provide adequate and full disclosure to Administrator in good faith concerning each Client, but Organizer is not a fiduciary or guarantor of Administrator's investment activities or of anyone's performance thereunder, and shall not be liable therefor. This Agreement is one for sharing profits from investment yields, only if a particular investment succeeds, and no compensation shall be payable to anyone unless an investment activity is consummated and Yields are paid. The investment contract and other documents are separate from this Agreement, subject to Clients' sole, exclusive satisfaction and discretion, and are not necessarily within the control of Organizer.

5. **Parties Not Merged.** Organizer is not a agent or employee of Administrator, and no party has any authority to represent the other for any other purpose, and no party shall be bound to any agreement or action without that party's written consent.

6. **Non-Circumvention and Confidentiality.** Both Administrator and Organizer hereby agree to respect the names and confidences revealed by the other and will not try to circumvent or contact the other's referrals, banks or other contacts without consent. In the case of willful or deliberate circumvention or breach of confidentiality, the offending party shall pay to the innocent party an amount equal to the full original agreed compensation that would have been paid in each such case, whether or not a transaction is consummated.

7. **Effective Date; Termination.** This Agreement is effective upon execution by each Party and shall govern all transactions between them not otherwise specified. Any later termination shall not affect the obligations of non-circumvention and non-disclosure set forth in Paragraph 7, above.

8. **Governing Law; Arbitration.** This Agreement shall be governed by, construed and enforced in accordance with the laws of England and Wales, U.K., to whose jurisdiction the parties irrevocably submit, with service of process by certified mail. In the event of a dispute, the parties shall submit it for binding arbitration in England, under the arbitration rules of the International Chamber of Commerce. Judgment by the arbitrator shall be final, and may be entered and enforced in any court of competent jurisdiction.

IN WITNESS WHEREOF the "Parties" have signed at the place and date affixed below, for and on behalf of their respective entity, having the full corporate and legal authority to so do, and they severally confirm that they have obtained at least one signed copy of this Agreement, immediately after its execution by all of them.

**THE "PARTIES"**

"ORGANIZER"

---

Mr. Charles L. Rosenblum
USA Passport No. 034587837
Place: _____
Date: _____

"ADMINISTRATOR"
AMERICAS FIDELITY CAPITAL
MANAGEMENT, LTD

---

Mr. Ralph King
Fiduciary Director
Place: _____
Date: _____

# AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-8190, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8776

BY FACSIMILE AND POSTAL SERVICE.

**DATED MATERIAL: 24 NOVEMBER 1999**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:  Asset Management Agreement No. AJA.30.08.99.AFCM-MD- 11 September
1999

Mr. Arnold J. Adler
59 Montera Drive
Aliso Viejo, CA 92656

Dear Mr. Adler,

AFCM will transfer $875 into your Current Account #106342 at Americas International Bank
Corporation, Ltd., ("AIBC"), Nassau, Bahamas, reflecting the income portion of your allocation
for October investment activities.

Please be aware that any further inquiry regarding the disposition or further transfer of these
funds should be directed to Mr. Gary W. Christie, Managing Director of AIBC, at 242.326.3981,
or fax 242.326.3980.

Regarding your growth account with AFCM, namely #672266430-AF, the additional sum of
$2,625 has been credited to that account for further investment. Accordingly, please examine
the attached statement, which indicates the transfer of income to your AIBC Current Account
from the Managed Fund Account, and what ammounts are now available for our onward
investment that remain in AFCM custody.

If there are any questions, please do not hesitate to call.

Sincerely,
AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

Ralph King
Fiduciary Director

Exh.19

# AMERICAS FIDELITY *CAPITAL MANAGEMENT, LTD.*

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-8190, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8776

## ACCOUNT POSITION STATEMENT

| Adler, Arnorld | Account No. 106342-MF699 |
|---|---|

**DATED MATERIAL: 24 NOVEMBER 1999**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:   Asset Management Agreement No. AJA.30.08.99.AFCM-MD- Dated: 11 September 1999

| | September | | October | | November | |
|---|---|---|---|---|---|---|
| Beginning Balance | $0 | | $50,000 | | $52,625 | |
| Monthly Yield Allocated | 7.20% | $0.00 | 7.00% | $3,500.00 | 0.00% | $0.00 |
| | INCOME | GROWTH | INCOME | GROWTH | INCOME | GROWTH |
| **Monthly Income** | $0 | | $875 | | $0 | |
| **Accum. Income** | $0 | | $875 | | $875 | |
| **Monthly Growth** | | $0 | | $2,625 | | $0 |
| **Accum. HOMEVEST** | | -0- | | -0- | | -0- |
| **Accum. Net Growth** | | $0 | | $2,625 | | $2,625 |
| **Initial Capital** | | $0 | | $50,000 | | $50,000 |
| **AFCM Balance** | | $0 | | $52,625 | | $52,625 |

**CONFIDENTIAL DISCUSSION OF POSITION STATEMENT**
It is our policy at the beginning of a contract to report all accounts net. The amount of funds contributed to HOMEVEST is nil at this time, as your investment is just beginning. The HOMEVEST contribution is a requirement for you participation in the Managed Fund and will be disclosed to you in your monthly statements. This figure will show the results of your participation as your contract proceeds. After four (4) months of reinvesment of Growth, that sum will resolve to your HOMEVEST account. While it still continues to earn yields, it is no longer kept in the same capital account. Accordingly, your position statement for November will show "Accum HOMEVEST" for the first time.

Note: Your Accumulated Income, through October, is $875, or 1.75% return on Initial Capital over the three-month period of your involvement. You may want to discuss with AIBC, on a fee basis, what the tax consequences are for United States citizens, as many parties are not fully informed as to the nature of taxation and the reporting of earnings therefrom regarding off-shore investments. Your Acummulated Growth for the period is $2,625, or 5.25% return on Initial Capital, where these funds are available for onward investments in the Managed Fund. Your current AFCM balance is $52,625, which will continue to grow over time, and as noted above, the Growth account after September will be divested from the Capital Account and placed into the HOMEVEST investment account for your benefit to continue to earn.

Please note: All AFCM Managed Fund accounts are settled on the basis of a calendar month end, with distributions made no later than the 12th day of the following month, or the next immediate business day thereafter. Income funds are usually fully credited into your AIBC account by the 20th of the month or the next business day thereafter. Please be aware that any changes in the proportions of your monthly income versus Growth Account splits should be received by us in writing prior to the close of the month and shall become effective within sixty (60) days thereafter.

We are greatly priviledged to serve you,

AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

David A. Morgenstern

# AMERICAS FIDELITY *CAPITAL MANAGEMENT, LTD.*

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-8190, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8776

BY FACSIMILE AND POSTAL SERVICE.

**DATED MATERIAL: 12 DECEMBER 1999**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:   Asset Management Agreement No. AJA.30.08.99.AFCM-MD- 11 September 1999

Mr. Arnold J. Adler
59 Montera Drive
Aliso Viejo, CA 92656

Dear Mr. Adler,

AFCM will transfer $1,398 into your Current Account #106342 at Americas International Bank Corporation, Ltd., ("AIBC"), Nassau, Bahamas, reflecting $1,048 as the income portion of your allocation for November investment activities, and an additional $350 reflecting an adjustment of 2.5% in income in October.

Please be aware that any further inquiry regarding the disposition or further transfer of these funds should be directed to Mr. Gary W. Christie, Managing Director of AIBC, at 242.326.3981, or fax 242.326.3980.

Regarding your growth account with AFCM, namely #672266430-AF, the additional sum of $1,125 for October, bringing the total to $3,750, and $3,144 for November have been credited to that account for further investment. Accordingly, please examine the attached statement, which indicates the transfer of income to your AIBC Current Account from the Managed Fund Account, and what ammounts are now available for our onward investment that remain in AFCM custody.

If there are any questions, please do not hesitate to call.

Sincerely,
AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

Ralph King
Fiduciary Director

*Exh. 20*

# AMERICAS FIDELITY *CAPITAL MANAGEMENT, LTD.*

Euro Canadian Centre, Third Floor, Marlborough St. and Navy Lyon Road
PO N-8190, Nassau, New Providence, Bahamas
Tel. 242.326.8777 Fax. 242.326.8776

## ACCOUNT POSITION STATEMENT

| Adler, Arnorld | Account No. 106342-MF699 |
|---|---|

**DATED MATERIAL: 12 DECEMBER 1999**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE: Asset Management Agreement No. AJA.30.08.99.AFCM-MD- Dated: 11 September 1999

| | September | | October | | November | |
|---|---|---|---|---|---|---|
| Beginning Balance | $0 | | $50,000 | | $53,750 | |
| Monthly Yield Allocated | 7.20% | $0 | 10.00% | $5,000 | 7.80% | $4,193 |
| | INCOME | GROWTH | INCOME | GROWTH | INCOME | GROWTH |
| **Monthly Income** | $0 | | $1,250 | | $1,048 | |
| **Accum. Income** | $0 | | $1,250 | | $2,298 | |
| **Monthly Growth** | | $0 | | $3,750 | | $3,144 |
| **Accum. HOMEVEST** | | -0- | | -0- | | -0- |
| **Accum. Net Growth** | | $0 | | $3,750 | | $6,894 |
| **Initial Capital** | | $0 | | $50,000 | | $50,000 |
| **AFCM Balance** | | $0 | | $53,750 | | $56,894 |

**CONFIDENTIAL DISCUSSION OF POSITION STATEMENT**
It is our policy at the beginning of a contract to report all accounts net. The amount of funds contributed to HOMEVEST is nil at this time, as your investment is just beginning. The HOMEVEST contribution is a requirement for you participation in the Managed Fund and will be disclosed to you in your monthly statements. This figure will show the results of your participation as your contract proceeds. After four (4) months of reinvesment of Growth, that sum will resolve to your HOMEVEST account. While it still continues to earn yields, it is no longer kept in the same capital account. Accordingly, your position statement for February, 2000 will show "Accum HOMEVEST" for the first time.

Note: Your Accumulated Income, through November, is $2,298, or 4.6% return on Initial Capital over the three-month period of your involvement. You may want to discuss with AIBC, on a fee basis, what the tax consequences are for United States citizens, as many parties are not fully informed as to the nature of taxation and the reporting of earnings therefrom regarding off-shore investments. Your Acummulated Growth for the period is $3,144, or 13.79% return on Initial Capital, where these funds are available for onward investments in the Managed Fund. Your current AFCM balance is $56,894, which will continue to grow over time, and as noted above, the Growth account after February, 2000 will be divested from the Capital Account and placed into the HOMEVEST investment account for your benefit to continue to earn.

Please note: All AFCM Managed Fund accounts are settled on the basis of a calendar month end, with distributions made no later than the 12th day of the following month, or the next immediate business day thereafter. Income funds are usually fully credited into your AIBC account by the 20th of the month or the next business day thereafter. Please be aware that any changes in the proportions of your monthly income versus Growth Account splits should be received by us in writing prior to the close of the month and shall become effective within sixty (60) days thereafter.

We are greatly priviledged to serve you,

AMERICAS FIDELITY CAPITAL MANAGEMENT, LTD.

David A. Morgenstern

Dear Patron,

Please note that your monthly statement for January 2000 is printed on Standard Atlantic, Inc. (STAT) letterhead and not AFCM.

In our ongoing effort to provide complete disclosure to our clients, all your future statements will come from STAT.  STAT is the company that actually performs the growth activity on the funds. STAT is owned and operated by the same people that owned and operated AFCM.

Nothing has changed concerning your principal and/or growth account.  The managed fund accounts are simply now being shown in the name of the company actually creating the return.

Hopefully, this change will provide increased clarity on your participation in our managed fund.

Please do not hesitate to call me with any questions you may have.

Sincerely,

Ralph King

Exh. 21

# STANDARD ATLANTIC Inc.

| | |
|---|---|
| **BAHAMAS OFFICES** | **LONDON OFFICES** |
| Euro Canadian Centre Marlborough St. / Navy Lyon Rd. | Private Client Enquiries Only |
| PO-7109 Nassau, New Providence, Bahamas | Tel. +44.171.262.1997 |
| Tel. +242.326.8477 Fax. +242.326.8479 | Fax. +44.171.224.9877 |

BY FACSIMILE AND POSTAL SERVICE.

**DATED MATERIAL: 15 February 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:    Asset Management Agreement No. AJA.30.08.99.STAT-MD- 11 September 1999

Mr. Arnold J. Adler
59 Montera Drive
Aliso Viejo, CA 92656

*108200*

Dear Mr. Adler,

STAT will transfer $797 into your Current Account #106342 at Americas International Bank Corporation, Ltd., ("AIBC"), Nassau, Bahamas, reflecting the income portion of your allocation for January investment activities.

Please be aware that any further inquiry regarding the disposition or further transfer of these funds should be directed to Mr. Gary W. Christie, Managing Director of AIBC, at 242.326.3981, or fax 242.326.3980.

Regarding your growth account with STAT, namely #672266430-AF, the additional sum of $2,390 has been credited to that account for further investment. Accordingly, please examine the attached statement, which indicates the transfer of income to your AIBC Current Account from the Managed Fund Account, and what ammounts are now available for our onward investment that remain in STAT custody.

If there are any questions, please do not hesitate to call.

Sincerely,
STANDARD ATLANTIC, INC.

Ralph King
Fiduciary Director

# STANDARD ATLANTIC Inc.

| BAHAMAS OFFICES | LONDON OFFICES |
|---|---|
| Euro Canadian Centre Marlborough St. / Navy Lyon Rd. | Private Client Enquiries Only |
| PO-7109 Nassau, New Providence, Bahamas | Tel. +44.171.262.1997 |
| Tel. +242.326.8477 Fax. +242.326.8479 | Fax. +44.171.224.9877 |

## ACCOUNT POSITION STATEMENT

Adler, Arnorld                                        Account No. 106342-MF699.X

**DATED MATERIAL: 15 February 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:    Asset Management Agreement No. AJA.30.08.99.STAT-MD- Dated: 11 September 1999

| | October | | November | | January | |
|---|---|---|---|---|---|---|
| Beginning Balance | $50,000 | | $53,750 | | $56,894 | |
| Monthly Yield Allocated | 10.00% | $5,000 | 7.80% | $4,193 | 5.60% | $3,186 |
| | INCOME | GROWTH | INCOME | GROWTH | INCOME | GROWTH |
| Monthly Income | $1,250 | | $1,048 | | $797 | |
| Accum. Income | $1,250 | | $2,298 | | $3,095 | |
| Monthly Growth | | $3,750 | | $3,144 | | $2,390 |
| Accum. HOMEVEST | | -0- | | -0- | | -0- |
| Accum. Net Growth | | $3,750 | | $6,894 | | $9,284 |
| Initial Capital | | $50,000 | | $50,000 | | $50,000 |
| STAT Balance | | $53,750 | | $56,894 | | $59,284 |

### CONFIDENTIAL DISCUSSION OF POSITION STATEMENT

It is our policy at the beginning of a contract to report all accounts net. The amount of funds contributed to HOMEVEST is nil at this time, as your investment is just beginning. The HOMEVEST contribution is a requirement for you participation in the Managed Fund and will be disclosed to you in your monthly statements. This figure will show the results of your participation as your contract proceeds. After four (4) months of reinvestment of Growth, that sum will resolve to your HOMEVEST account. While it still continues to earn yields, it is no longer kept in the same capital account. Accordingly, your position statement for February, 2000 will show "Accum HOMEVEST" for the first time.

Note: Your Accumulated Income, through January 2000, is $3,095, or 6.19% return on Initial Capital over the three-month period of your involvement. You may want to discuss with AIBC, on a fee basis, what the tax consequences are for United States citizens, as many parties are not fully informed as to the nature of taxation and the reporting of earnings therefrom regarding off-shore investments. Your Acummulated Growth for the period is $9,284, or 18.57% return on Initial Capital, where these funds are available for onward investments in the Managed Fund. Your current STAT balance is $59,284, which will continue to grow over time, and as noted above, the Growth account after February, 2000 will be divested from the Capital Account and placed into the HOMEVEST investment account for your benefit to continue to earn.

Please note: All STAT Managed Fund accounts are settled on the basis of a calendar month end, with distributions made no later than the 12th day of the following month, or the next immediate business day thereafter. Income funds are usually fully credited into your AIBC account by the 20th of the month or the next business day thereafter. Please be aware that any changes in the proportions of your monthly income versus Growth Account splits should be received by us in writing prior to the close of the month and shall become effective within sixty (60) days thereafter.

We are greatly priviledged to serve you.

# STANDARD ATLANTIC Inc.

| BAHAMAS OFFICES | LONDON OFFICES |
|---|---|
| Euro-Canadian Centre Marlborough St. & Navy Lyon Rd. | Private Client Enquiries Only |
| PO-7109 Nassau, New Providence, Bahamas | Tel. +44.171.262.1997 |
| Tel. +242.326.8477 Fax. +242.326.8776 | Fax. +44.171.224.8776 |

12 March 2000

If you would like to receive your monthly statements by fax as well as through the mail, please complete the following request, sign it and fax it back to me at 242.326.8776. Please print the information clearly.

Thank you.

---

Date: _03 - 21 - 00_

To:     Standard Atlantic, Inc.

Fr:     _ARNOLD J. ADLER_  (your account name)

Re:     Request for fax delivery of Monthly Statements.

Please send a fax copy of my Monthly Statement in addition to the normal mail delivery of the original.

My fax number for receipt of confidential information is: _949-831-6971_

Thank you,

_Arnold J. Adler_  (signature)

Exh. 22

# STANDARD ATLANTIC ₁ᴄ·

BAHAMAS OFFICES
Euro Canadian Centre Marlborough St. / Navy Lyon Rd.
PO-7109 Nassau, New Providence, Bahamas
Tel. 242.326.8477 Fax. +242.326.8479

**LONDON OFFICES**
Private Client Enquiries Only
Tel. +44.171.262.1997
Fax. +44.171.224.9877

BY FACSIMILE AND POSTAL SERVICE.

**DATED MATERIAL: 12 March 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:    Asset Management Agreement No. AJA.30.08.99.STAT-MD- 11 September 1999

Mr. Arnold J. Adier
59 Montera Drive
Aliso Viejo, CA 92656

Dear Mr. Adier,

STAT will transfer $1,186 into your Current Account #106342 at Americas International Bank Corporation, Ltd., ("AIBC"), Nassau, Bahamas, reflecting the income portion of your allocation for February investment activities.

Please be aware that any further inquiry regarding the disposition or further transfer of these funds should be directed to Mr. Gary W. Christie, Managing Director of AIBC, at 242.326.3981, or fax 242.326.3980.

Regarding your growth account with STAT, namely #672266430-AF, the additional sum of $3,557 has been credited to that account for further investment. Accordingly, please examine the attached statement, which indicates the transfer of income to your AIBC Current Account from the Managed Fund Account, and what ammounts are now available for our onward investment that remain in STAT custody.

If there are any questions, please do not hesitate to call.

Sincerely,
STANDARD ATLANTIC, INC.

Ralph King
Fiduciary Director

# STANDARD ATLANTIC Inc.

| BAHAMAS OFFICES | LONDON OFFICES |
|---|---|
| Euro Canadian Centre Marlborough St. / Navy Lyon Rd. | Private Client Enquiries Only |
| PO-7109 Nassau, New Providence, Bahamas | Tel. +44.171.262.1997 |
| Tel: +242.326.8477 Fax. +242.326.8479 | Fax. +44.171.234.9877 |

## ACCOUNT POSITION STATEMENT

**Adler, Arnorld**      **Account No. 106342-MF699.**

**DATED MATERIAL: 12 March 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE: Asset Management Agreement No. AJA.30.08.99.STAT-MD- Dated: 11 September 1999

| | November | | January | | February | |
|---|---|---|---|---|---|---|
| Beginning Balance | $53,750 | | $56,894 | | $59,284 | |
| Monthly Yield Allocated | 7.80% | $4,193 | 5.60% | $3,186 | 8.00% | $4,743 |
| | INCOME | GROWTH | INCOME | GROWTH | INCOME | GROWTH |
| Monthly Income | $1,048 | | $797 | | $1,186 | |
| Accum. Income | $2,298 | | $3,095 | | $4,280 | |
| Monthly Growth | | $3,144 | | $2,390 | | $3,557 |
| Accum. HOMEVEST | | -0- | | -0- | | -0- |
| Accum. Net Growth | | $6,894 | | $9,284 | | $12,841 |
| Initial Capital | | $50,000 | | $50,000 | | $50,000 |
| STAT Balance | | $56,894 | | $59,284 | | $62,841 |

**CONFIDENTIAL DISCUSSION OF POSITION STATEMENT**
It is our policy at the beginning of a contract, to report all accounts net. The amount of funds contributed to HOMEVEST is nil at this time, as your investment is just beginning. The HOMEVEST contribution is a requirement for you participation in the Managed Fund and will be disclosed to you in your monthly statements. This figure will show the results of your participation as your contract proceeds. After four (4) months of reinvestment of Growth, that sum will resolve to your HOMEVEST account. While it still continues to earn yields, it is no longer kept in the same capital account. Accordingly, your position statement for February, 2000 will show "Accum HOMEVEST" for the first time.

Note: Your Accumulated Income, through February 2000, is $4,280, or 8.56% return on Initial Capital over the three-month period of your involvement. You may want to discuss with AIBC, on a fee basis, what the tax consequences are for United States citizens, as many parties are not fully informed as to the nature of taxation and the reporting of earnings therefrom regarding off-shore investments. Your Acummulated Growth for the period is $12,841, or 25.68% return on Initial Capital, where these funds are available for onward investments in the Managed Fund. Your current STAT balance is $62,841, which will continue to grow over time, and as noted above, the Growth account after February, 2000 will be divested from the Capital Account and placed into the HOMEVEST investment account for your benefit to continue to earn.

Please note: All STAT Managed Fund accounts are settled on the basis of a calendar month end, with distributions made no later than the 12th day of the following month, or the next immediate business day thereafter. Income funds are usually fully credited into your AIBC account by the 20th of the month or the next business day thereafter. Please be aware that any changes in the proportions of your monthly income versus Growth Account splits should be received by us in writing prior to the close of the month and shall become effective within sixty (60) days thereafter.

We are greatly priviledged to serve you.



# STANDARD ATLANTIC, INC.

| BAHAMAS OFFICES | LONDON OFFICES |
|---|---|
| Euro Canadian Centre Marlborough St. / Navy Lyon Rd. | Private Client Enquiries Only |
| PO-7109 Nassau, New Providence, Bahamas | Tel. +44.171.262.1997 |
| Tel. (242.326.8477 Fax. (242.326.8479 | Fax. +44.171.224.9877 |

BY FACSIMILE AND POSTAL SERVICE.

**DATED MATERIAL: 12 April 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:    Asset Management Agreement No. AJA.30.08.99.STAT-MD
Dated:        11 September 1999

Mr. Arnold J. Adler
59 Montera Drive
Aliso Viejo, CA 92656

Dear Mr. Adler,

STAT will transfer $1,170 into your Current Account #106342 at Americas International Bank Corporation, Ltd., ("AIBC"), Nassau, Bahamas, reflecting the income portion of your allocation for March investment activities.

Please be aware that any further inquiry regarding the disposition or further transfer of these funds should be directed to your account manager.

Regarding your growth account with STAT, namely #672266430-AF, the additional sum of $3,511 has been credited to that account for further investment. Accordingly, please examine the attached statement, which indicates the transfer of income to your AIBC Current Account from the Managed Fund Account, and what ammounts are now available for our onward investment that remain in STAT custody.

If there are any questions, please do not hesitate to call.

Sincerely,
STANDARD ATLANTIC, INC.

Ralph King
Fiduciary Director

Exh. 23

# STANDARD ATLANTIC Inc.

| BAHAMAS OFFICES | LONDON OFFICES |
|---|---|
| Euro Canadian Centre Marlborough St. / Navy Lyon Rd. | Private Client Enquiries Only |
| PO-7109 Nassau, New Providence, Bahamas | Tel. +44.171.262.1997 |
| Tel. +242.326.8477 Fax. +242.326.8479 | Fax. +44.171.224.9877 |

## ACCOUNT POSITION STATEMENT

**Adler, Arnorld**  **Account No. 106342-MF699.**

**DATED MATERIAL: 12 April 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:    Asset Management Agreement No. AJA.30.08.99.STAT-MD- Dated: 11 September 1999

| | January | | February | | March | |
|---|---|---|---|---|---|---|
| Beginning Balance | $56,894 | | $59,284 | | $62,841 | |
| Monthly Yield Allocated | 5.60% | $3,186 | 8.00% | $4,743 | 7.45% | $4,682 |
| | INCOME | GROWTH | INCOME | GROWTH | INCOME | GROWTH |
| Monthly Income | $797 | | $1,186 | | $1,170 | |
| Accum. Income | $3,095 | | $4,280 | | $5,451 | |
| Monthly Growth | | $2,390 | | $3,557 | | $3,511 |
| Accum. HOMEVEST | | -0- | | -0- | | -0- |
| Accum. Net Growth | | $9,284 | | $12,841 | | $16,352 |
| Initial Capital | | $50,000 | | $50,000 | | $50,000 |
| STAT Balance | | $59,284 | | $62,841 | | $66,352 |

**CONFIDENTIAL DISCUSSION OF POSITION STATEMENT**
It is our policy at the beginning of a contract to report all accounts net. The amount of funds contributed to HOMEVEST is nil at this time, as your investment is just beginning. The HOMEVEST contribution is a requirement for you participation in the Managed Fund and will be disclosed to you in your monthly statements. This figure will show the results of your participation as your contract proceeds. After four (4) months of reinvestment of Growth, that sum will resolve to your HOMEVEST account. While it still continues to earn yields, it is no longer kept in the same capital account. Accordingly, your position statement for March, 2000 will show "Accum HOMEVEST" for the first time.

Note: Your Accumulated Income, through March 2000, is $5,451, or 10.9% return on Initial Capital over the three-month period of your involvement. You may want to discuss with AIBC, on a fee basis, what the tax consequences are for United States citizens, as many parties are not fully informed as to the nature of taxation and the reporting of earnings therefrom regarding off-shore investments. Your Acummulated Growth for the period is $16,352, or 32.7% return on Initial Capital, where these funds are available for onward investments in the Managed Fund. Your current STAT balance is $66,352, which will continue to grow over time, and as noted above, the Growth account after March, 2000 will be divested from the Capital Account and placed into the HOMEVEST investment account for your benefit to continue to earn.

Please note: All STAT Managed Fund accounts are settled on the basis of a calendar month end, with distributions made no later than the 12th day of the following month, or the next immediate business day thereafter. Income funds are usually fully credited into your AIBC account by the 20th of the month or the next business day thereafter. Please be aware that any changes in the proportions of your monthly income versus Growth Account splits should be received by us in writing prior to the close of the month and shall become effective within sixty (60) days thereafter.

We are greatly priviledged to serve you.

# STANDARD ATLANTIC

| | |
|---|---|
| **BAHAMAS OFFICES**<br>Euro-Canadian Centre Marlborough St. & Navy Lyon Rd.<br>PO-7109 Nassau, New Providence, Bahamas<br>Tel. +242.322.7554 Fax. +242.322.7544 | **LONDON OFFICES**<br>Private Client Enquiries Only<br>Tel. +44.171.262.1997<br>Fax. +44.171.224.9877 |

12 May 2000

Memo To:      All Standard Atlantic Accountholders

Memo Re:      New Business Policy

In our ongoing effort to maintain compliance with all the rules, codes and statutes currently in place or pending in the Bahamas, and/or any other territories that might effective our company or our participants, STAT's officers and legal counsel have recently completed a major review of our business practice and policy. Resultant to this exhaustive review STAT has adopted certain new policy for its operation as follows;

Effective July 1, 2000, Standard Atlantic, Inc. (STAT) will evaluate new prospective business relationships, and / or continue its existing business relationships, only with Bahamian International Business Companies (IBC) of good standing. For such business relationship to be established, or continued, the company must meet the following criteria:

1. Company must hold a bank account in good standing in a bank domiciled in the Bahamas.
2. Company Director may not be a citizen of the United States or the United Kingdom.
3. Company must be prepared to an initial commitment of US $250,000 toward the creation of project funding. Further, Company must be prepared to increase their commitment to US $1,000,000 within six months.
4. Company must provide evidence of funds in their account, corporate documents, corporate resolution empowering Director/ Signatory, copy of the Director/ Signatory' passport and completed Information Statement (provided by STAT).

All current agreements with entities not meeting this criteria as of July 1, 2000 with be deemed terminated by mutual consent and the assets contained in the account shall be returned as per the agreement.

Any questions concerning this new policy or the status of your account should be directed to your Organizer.

Exh. 24

# STANDARD ATLANTIC Inc.

BAHAMAS OFFICES
Euro Canadian Centre Marlborough St. / Navy Lyon Rd.
PO-7109 Nassau, New Providence, Bahamas
Tel. +242.326.8477 Fax. +242.326.8479

By Federal Express.

## DATED MATERIAL: 12 MAY 2000
## PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED

RE:    Asset Management Agreement No. AJA.30.08.99.STAT-MD
Dated:        11 September 1999

Mr. Arnold J. Adler
59 Montera Drive
Aliso Viejo, CA 92656

Dear Mr. Adler,.

STAT will transfer $1,095 into your Current Account #106342 at Americas International Bank Corporation, Ltd., ("AIBC"), Nassau, Bahamas, reflecting the income portion of your allocation for April investment activities.

Please be aware that any further inquiry regarding the disposition or further transfer of these funds should be directed to your account manager.

Regarding your growth account with STAT, namely #672266430-AF, the additional sum of $3,284 has been credited to that account for further investment. Accordingly, please examine the attached statement, which indicates the transfer of income to your AIBC Current Account from the Managed Fund Account, and what ammounts are now available for our onward investment that remain in STAT custody.

If there are any questions, please do not hesitate to call.

Sincerely,
STANDARD ATLANTIC, INC.

Ralph King
Fiduciary Director

# STANDARD ATLANTIC Inc.

**BAHAMAS OFFICES**
Euro Canadian Centre Marlborough St. / Navy Lyon Rd.
PO-7109 Nassau, New Providence, Bahamas
Tel. +242.326.8477 Fax. +242.326.8479

<u>LONDON OFFICES</u>
Private Client Enquiries Only
Tel. +44.171.262.1997
Fax. +44.171.224.9877

## ACCOUNT POSITION STATEMENT

**Adler, Arnorld**           **Account No. 106342-MF699**

**DATED MATERIAL: 12 MAY 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:Asset Management Agreement No.AJA.30.08.99.STAT-MD Dated: 11 September 1999

| | February | | March | | April | |
|---|---|---|---|---|---|---|
| **Beginning Balance** | $59,284 | | $62,841 | | $66,352 | |
| **Monthly Yield Allocated** | 8.00% | $4,743 | 7.45% | $4,682 | 6.60% | $4,379 |
| | INCOME | GROWTH | INCOME | GROWTH | INCOME | GROWTH |
| **Monthly Income** | $1,186 | | $1,170 | | $1,095 | |
| **Accum. Income** | $4,280 | | $5,451 | | $6,546 | |
| **Monthly Growth** | | $3,557 | | $3,511 | | $3,284 |
| **Accum. HOMEVEST** | | -0- | | -0- | | -0- |
| **Accum. Net Growth** | | $12,841 | | $16,352 | | $19,637 |
| **Initial Capital** | | $50,000 | | $50,000 | | $50,000 |
| **STAT Balance** | | $62,841 | | $66,352 | | $69,637 |

**CONFIDENTIAL DISCUSSION OF POSITION STATEMENT**
It is our policy at the beginning of a contract to report all accounts net. The amount of funds contributed to HOMEVEST is nil at this time, as your investment is just beginning. The HOMEVEST contribution is a requirement for you participation in the Managed Fund and will be disclosed to you in your monthly statements. This figure will show the results of your participation as your contract proceeds. After four (4) months of reinvesment of Growth, that sum will resolve to your HOMEVEST account. While it still continues to earn yields, it is no longer kept in the same capital account. Accordingly, your position statement for March, 2000 will show "Accum HOMEVEST" for the first time.

Note: Your Accumulated Income, through April 2000, is $6,546, or 13.09% return on Initial Capital over the three-month period of your involvement. You may want to discuss with AIBC, on a fee basis, what the tax consequences are for United States citizens, as many parties are not fully informed as to the nature of taxation and the reporting of earnings therefrom regarding off-shore investments. Your Acummulated Growth for the period is $19,637, or 39.27% return on Initial Capital, where these funds are available for onward investments in the Managed Fund. Your current STAT balance is $69,637, which will continue to grow over time, and as noted above, the Growth account after March, 2000 will be divested from the Capital Account and placed into the HOMEVEST investment account for your benefit to continue to earn.

Please note: All STAT Managed Fund accounts are settled on the basis of a calendar month end, with distributions made no later than the 12th day of the following month, or the next immediate business day thereafter. Income funds are usually fully credited into your AIBC account by the 20th of the month or the next business day thereafter. Please be aware that any changes in the proportions of your monthly income versus Growth Account splits should be received by us in writing prior to the close of the month and shall become effective within sixty (60) days thereafter.

We are greatly priviledged to serve you.



# STANDARD ATLANTIC Inc.

| BAHAMAS OFFICES | LONDON OFFICES |
|---|---|
| Euro Canadian Centre Marlborough St. / Navy Lyon Rd. | Private Client Enquiries Only |
| PO-7109 Nassau, New Providence, Bahamas | Tel. +44.171.262.1997 |
| Tel. +242.322.7554 Fax. +242.322.7544 | Fax. +44.171.224.9877 |

By Federal Express.

**DATED MATERIAL: 12 JUNE 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:    Asset Management Agreement No. AJA.30.08.99.STAT-MD
Dated:       11 September 1999

Mr. Arnold J. Adler
59 Montera Drive
Aliso Viejo, CA 92656

Dear Mr. Adler,

STAT will transfer $1,088 into your Current Account #106342 at Americas International Bank Corporation, Ltd., ("AIBC"), Nassau, Bahamas, reflecting the income portion of your allocation for May investment activities.

Please be aware that any further inquiry regarding the disposition or further transfer of these funds should be directed to your account manager.

Regarding your growth account with STAT, namely #672266430-AF, the additional sum of $3,264 has been credited to that account for further investment. Accordingly, please examine the attached statement, which indicates the transfer of income to your AIBC Current Account from the Managed Fund Account, and what ammounts are now available for our onward investment that remain in STAT custody.

If there are any questions, please do not hesitate to call.

Sincerely,
STANDARD ATLANTIC, INC.

Ralph King
Fiduciary Director

Exh-25

# STANDARD ATLANTIC Inc.

**BAHAMAS OFFICES**
Euro Canadian Centre Marlborough St. / Navy Lyon Rd.
PO-7109 Nassau, New Providence, Bahamas
Tel. +242.322-7554 Fax. +242.322-7544

**LONDON OFFICES**
Private Client Enquiries Only
Tel. +44.171.262.1997
Fax. +44.171.224.9877

## ACCOUNT POSITION STATEMENT

**Adler, Arnorld**                    **Account No. 106342-MF699.**

**DATED MATERIAL: 12 JUNE 2000**
**PRIVATE AND CONFIDENTIAL – NOT TO BE DISCLOSED**

RE:Asset Management Agreement No.AJA.30.08.99.STAT-MD Dated: 11 September 1999

| | March | | April | | May | |
|---|---|---|---|---|---|---|
| Beginning Balance | $62,841 | | $66,352 | | $69,637 | |
| Monthly Yield Allocated | 7.45% | $4,682 | 6.60% | $4,379 | 6.25% | $4,352 |
| | INCOME | GROWTH | INCOME | GROWTH | INCOME | GROWTH |
| Monthly Income | $1,170 | | $1,095 | | $1,088 | |
| Accum. Income | $5,451 | | $6,546 | | $7,634 | |
| Monthly Growth | | $3,511 | | $3,284 | | $3,264 |
| Accum. HOMEVEST | | -0- | | -0- | | -0- |
| Accum. Net Growth | | $16,352 | | $19,637 | | $22,901 |
| Initial Capital | | $50,000 | | $50,000 | | $50,000 |
| STAT Balance | | $66,352 | | $69,637 | | $72,901 |

**CONFIDENTIAL DISCUSSION OF POSITION STATEMENT**
It is our policy at the beginning of a contract to report all accounts net. The amount of funds contributed to HOMEVEST is nil at this time, as your investment is just beginning. The HOMEVEST contribution is a requirement for you participation in the Managed Fund and will be disclosed to you in your monthly statements. This figure will show the results of your participation as your contract proceeds. After four (4) months of reinvestment of Growth, that sum will resolve to your HOMEVEST account. While it still continues to earn yields, it is no longer kept in the same capital account. Accordingly, your position statement for March, 2000 will show "Accum HOMEVEST" for the first time.

Note: Your Accumulated Income, through May 2000, is $7,634, or 15.27% return on Initial Capital over the three-month period of your involvement. You may want to discuss with AIBC, on a fee basis, what the tax consequences are for United States citizens, as many parties are not fully informed as to the nature of taxation and the reporting of earnings therefrom regarding off-shore investments. Your Acummulated Growth for the period is $22,901, or 45.80% return on Initial Capital, where these funds are available for onward investments in the Managed Fund. Your current STAT balance is $72,901, which will continue to grow over time, and as noted above, the Growth account after March, 2000 will be divested from the Capital Account and placed into the HOMEVEST investment account for your benefit to continue to earn.

Please note: All STAT Managed Fund accounts are settled on the basis of a calendar month end, with distributions made no later than the 12th day of the following month, or the next immediate business day thereafter. Income funds are usually fully credited into your AIBC account by the 20th of the month or the next business day thereafter. Please be aware that any changes in the proportions of your monthly income versus Growth Account splits should be received by us in writing prior to the close of the month and shall become effective within sixty (60) days thereafter.

We are greatly priviledged to serve you.



# U.S. TREASURY
# BUY / SELL
# PROGRAM

EXh. 26



# ONE MILLION U.S. TREASURY BUY/SELL PROGRAM BY INVITATION ONLY

*(Revised 1/5/2001)*

Criteria:         Owner of 1M-99M in cash funds must be in good standing with the U.S. Department of the Treasury, the U.S. Department of Justice and the U.S. Department of State.

Representations:
No funds will ever leave the owner's bank account. This is a "reserved funds" program. There is <u>zero risk</u> to the owner of funds as no funds ever leave the owner's custody or control for any reason. There are <u>never</u> any advance fees required or requested of the owner.

Application:     A <u>Client Information Form</u> must be completely and legibly filled out by the owner of funds and returned to the Qualifications and Screening Unit Officer via fax or via e-mail. The Client Information Form must contain a detailed history or origin of the funds (such as from what business or investments or inheritance it had been earned), and a detailed statement of purpose (for what specific purpose the funds will be used for, whether personal (savings or

1

investment), developmental (creation of jobs or expansion of business or new business venture), or charitable (humanitarian) purposes. Specific plans and intentions are required, not merely generic categories. If USA accounts, an ABA Routing Number is mandatory. If non-USA accounts, a S.W.I.F.T. code is mandatory. Forms without one or the other will not be accepted. <u>A valid e-mail address is mandatory to receive documents</u> from the Qualifications and Screening Unit Officer.

Passport:  Of owner of funds 8" x 10" photo page and 8" x 10" signature page is required, in color.

Proof of Funds:

Bank: <u>Two</u> Bank Officer's <u>original</u> signatures on an <u>original</u> bank letter with bank letterhead which is five (5) calendar days old or less, including printed name and telephone number and fax number of the bank for verification by the Federal government; <u>and</u> the most recent copy of the computer-generated bank statement issued to the client, showing the dollar amount on deposit in the bank, which is thirty (30) days old or less, for verification by the federal government.

Brokerage Firm: <u>Original</u> signatures of Two Vice Presidents on an <u>original</u> brokerage firm letter containing brokerage firm letterhead which is five (5) calendar days old or less, including printed name and telephone number and fax number of the brokerage firm for verification by the Federal government; <u>and</u> the most recent copy of the computer-generated brokerage firm statement issued to the client showing the dollar amount on deposit in the brokerage firm, which is thirty (30) days old or less for verification by the Federal government.

*Please note that <u>cash on deposit</u> from a brokerage firm must be <u>cash</u>, and not a money market cash fund, since a money market cash fund is <u>not</u> cash, but rather a negotiable instrument, and therefore not acceptable.*

2

Text:     Whether from either a bank or a brokerage firm, the Proof of Funds must contain the following information:

1. Name of the owner of funds whether an individual owner or a corporation with only one authorized signatory. Partnership accounts where there are two names listed on the proof of funds are <u>not allowed, as there can be only one responsible party</u>.

2. Proof of Funds must have the account number of the owner of funds on the bank letter.

3. Proof of Funds must contain the wording "cash on deposit in your account" as part of the text.

4. Proof of Funds must be cash only, whether in savings or checking, and <u>not</u> a negotiable instrument such as a fund or U.S. Treasury instrument (which would have to be sold or liquidated to be converted to cash).

5. Proof of Funds must be on an original bank letterhead only, not a computer-generated tear sheet.

6. Two bank officers must be precisely that – officers of the bank, and not simply tellers or cashiers or customer service assistants who are not legally designated as <u>bank officers</u>.

Acceptable:   Accounts preferred and/or requested in Bank of America USA, or alternatively in registered banking/brokerage institutions in good standing within the United States, Canada, United Kingdom, France, Germany, Austria, Switzerland, Luxembourg, Ireland, Spain or the Netherlands. All other branches of banks within other nations may be approved by special exception upon application.

3

History:    A three-year written History Statement of Exclusive Ownership of cash funds is required to be written by the owner of said cash funds on a one-page document on his or her own letterhead, as well as a Statement of Purpose indicating what the proceeds will be legally used for. We repeat: The Client Information Form must contain a detailed history or origin of the funds (such as from what business or investments or inheritance it had been earned), and a detailed statement of purpose (for what specific purpose the funds will be used for, whether personal (savings or investment), developmental (creation of jobs or expansion of business or new business venture), or charitable (humanitarian) purposes. Specific plans and intentions are required, not merely generic categories.

Projects:   Project Funding is provided by forty IRS 501(c)(3) approved projects, including End World Hunger, The Heritage Foundation, World Relief Fund, and 37 others dedicated to numerous humanitarian programs ranging from catastrophic victims of natural disasters to AIDS research worldwide. The master commitment holder is one of these forty humanitarian foundations which acts as a disbursing agent or an umbrella foundation for all forty non-profit charitable organizations under its Master Commitment Declaration (MCD), all of which are registered as IRS 501(c)(3) corporations. The owner of funds need not have his own humanitarian project. There is a 50%/50% joint venture with the master commitment holder humanitarian foundation for the benefit of all forty non-profit charitable organizations on an equal basis.

Approval:   A maximum of twenty-four hours is required in order to approve the authorized signatory upon physical (not faxed) receipt of a copy of his color passport, and his original proof of funds statement signed by two bank officers or brokerage firm officers in original form, again received in physical (not

4

faxed) form and delivered by Federal Express or DHL or UPS courier.

Corporate:      Board Corporate Resolution information required on the Client Information Form, along with the color passport of the authorized signatory, who must be a director of the company as well as an authorized signatory on the account.

Documentation:

Once approved, the owner of funds will be furnished seven (7) preliminary documents for his signature:

---

1. Letter of Intent;
2. Memorandum of Understanding Agreement;
3. Affidavit of Exclusive Ownership of Funds;
4. Joint Venture with Humanitarian Foundation;
5. History of Funds and Statement of Purpose;
6. Corporate Resolution Documents, *only if the submission is being made by a corporate entity;*
7. Authorization to Verify Funds.

---

Accounts:       The master commitment holder humanitarian foundation will distribute all weekly disbursements to the owner of funds in their account or to their specific pre-approved receiving account of choice, or to a new account for the owner of funds in Bank of America at the option of the humanitarian foundation, within eight (8) banking days after the receipt of the preliminary signed documents referenced above, if the principal amount is in excess of Ten Million United States Dollars; or within twenty (20) banking days after the receipt of the preliminary signed documents referenced above if the principal amount is less than Ten Million United States Dollars.

Contract:       Master Contract will be an internal document between the humanitarian foundation and the U.S. Department of the

Treasury, with the owner of funds internally listed as the Joint Venture Partner of the humanitarian foundation.

Transacting:    First transaction will occur pursuant to the schedule listed above under "Accounts." *Note: this is not "trading." In a trade, only one side of the contract (either the entry or the exit) is held by the trader or commitment holder. In that situation, the trader has to find the opposite position.* This is a "buy-sell" contract facility where both the entry and the exit contract is simultaneously electronically contracted, with <u>zero risk</u> to the Federal government, to the Bank of America, to the trader, to the humanitarian foundation, and to the owner of funds.

Rate:    <u>Owner of funds will be paid 25% per week for forty (40) weeks</u> to be divided 60% - 40% of weekly 25% rate of return. 60% of 25% weekly rate of return paid to investors and 40% of 25% weekly rate of return paid to introducing agents.

Term:    All transactions are paid into the receiving account daily, with settlement once per week to the owner of funds, for forty (40) weeks.



# CLIENT INFORMATION FORM

*(Revised 1/5/2001)*

In accordance with Articles 2 through 5 of the Due Diligence Convention and the Federal Banking Commission Circular of December 1998 concerning the prevention of money laundering and Article 305 of the Swiss Criminal Code, the following information may be supplied to banks and/or other financial institutions for purposes of verification of identity and activities of the Client described below, and the nature and origin of the funds which are to be utilized. The foregoing is subject to agreement by all parties to whom this information is provided that they are obligated to respect the privacy rights of the Client and all individuals described herein, as well as the generally accepted professional standards relating to the maintenance of confidential information, and to take all appropriate precautions to protect the confidentiality of the information contained herein. This legal obligation shall remain in full force indefinitely without restriction.

Name of Signatory: _____

Company of Signatory: _____

Title of Signatory: _____

Name of Chairman: _____

Name of President: _____

Name of Director: _____

Address of Company: _____

Company City, State, Zip: _____

Company Telephone Number: _____

Company Fax Number: _____

Company e-mail Address: _____

Registered Office: _____

Company Registration Number: _____

Home Address of Signatory: _____

Home City, State, Zip, Country: _____

Home Telephone Number: _____

Home Fax Number: _____

E -Mail Address: _____

Nationality of Signatory: _____

Passport Number: _____

Issue Date: _____

Expiration Date: _____

Social Security Number: _____

Date of Birth: _____

Place of Birth: _____

Funds Available: _____

Name of Bank: _____

Bank Account Number: _____

Address of Bank: _____

Bank City, State, Zip: _____

Bank Telephone Number: _____

Bank Fax Number: _____

Bank S.W.I.F.T. Code: _____

Bank A.B.A. Routing No.: _____

Bank Officer 1 Name: _____

Bank Officer 1 Title: _____

Bank Officer 2 Name: _____

Bank Officer 2 Title: _____

Origin of Funds: _____
_____
_____

Three Year History of
Where Funds Were Situated: _____
_____
_____

Purpose of Funds: _____
_____
_____